**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LARRY KLAYMAN

               Plaintiff,

v.

JULIA PORTER, HAMILTON FOX III, and
LAWRENCE BLOOM

               Defendants.

**CASE NO: 20-cv-3109**

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR INJUNCTION
AGAINST VEXATIOUS LITIGATION BY PLAINTIFF, REQUEST FOR
EVIDENTIARY HEARING OR TRIAL, AND CROSS MOTION FOR SANCTIONS
UNDER 28 U.S.C. § 1927 AND THE COURT'S INHERENT AUTHORITY**

Date: May 10, 2021

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: (561)-558-5336
Email: leklayman@gmail.com

Plaintiff Pro Se

1

## TABLE OF CONTENTS

INTROUCTION AND STATEMENT OF RELEVANT FACTS .................................................1

THE LAW.........................................................................................................................16

The Court Should Sanction Defendants Pursuant to 28 U.S.C. § 1927 and/or its Inherent
Authority .....................................................................................................................22

An Evidentiary Hearing,Trial or at a Minimum Discovery is Needed As a Matter of Due
Process ........................................................................................................................24

CONCLUSION .................................................................................................................27

# TABLE OF AUTHORITIES

## *CASES*

*Alyeska Pipeline Service Co. v. Wildnerness Society*, 421 U.S. 240, (1975...................................23

*Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216 (D.C. Cir. 1991) .......................................................23

*Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*,
434 U.S. 412 (1978)......................................................................................................................21

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) .........................................................................25

*De Long v. Hennessey*, 912 F.2d 1144 (9th Cir. 1990).................................................................21

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir.) .....................................................................25

*Duru v. Mitchell*, 289 F. Supp. 3d 112, 117 (D.D.C. 2018) ...............................................16, 17, 20

*Hall v. Cole*, 412 U.S. 1 (1973) ...................................................................................................23

*In re Oliver*, 682 F.2d 443, 445 (3d Cir. 1982)..............................................................................17

*In re Powell*, 851 F.2d 427 (D.C. Cir. 1985) ....................................................................17, 20, 21

*Manzanita Band of the Kumeyaay Nation v. Wolf*, 2020 U.S. Dist. LEXIS 192507....................25

*Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012)..................................................21

*Moy v. United States*, 906 F.2d 467 (9th Cir. 1990) ......................................................................21

*NOW v. Operation Rescue*, 747 F. Supp. 772 (D.D.C.).................................................................25

*Page Communications Engineers, Inc. v. Froehlke*, 475 F.2d 994 (D.C. Cir.) ............................25

*Pavilonis v. King*, 626 F.2d 1075(1st Cir. 1980) ..........................................................................17

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002)........................23

*Roger v. Johnson-Norman*, 514 F. Supp. 2d 50 (D.D.C. 2007)...................................18, 19, 20, 21

*Ruderer v. United States*, 462 F.2d 897(8th Cir. 1972) .................................................................21

*Shepherd v. American Broad. Cos.*, 62 F.23d 1469  (D.C. Cir. 1995) .........................................22

*Speleos v. McCarthy*, 201 B.R. 325 (D.D.C. 1996)  ...............................................................19, 20

*Truax v. Corrigan*, 257 U.S. 312  (1921)......................................................................................27

*United States v. Wallace*, 964 F.2d 1214  (D.C. Cir. 1992)..........................................................22

*Urban v. United Nations*, 768 F.2d 1497 (D.C. Cir. 1985) ..........................................................17


## *STATUTES*

28 U.S.C. § 1927..........................................................................................................................22

## MEMORANDUM OF ALW

Plaintiff Larry Klayman ("Mr. Klayman") hereby responds to Defendants Lawrence Bloom, Hamilton Fox, and Julia Porter's ("ODC Defendants") Motion for Injunction Against Vexatious Litigation by Plaintiff, ECF No. 21. Matthew Kaiser has sought to intervene join in the ODC Defendants' motion as well, which is pending before this Court. Should the Court allow Mr. Kaiser's intervention joinder, Mr. Klayman adopts the arguments contained herein as to Mr. Kaiser, and respectfully requests leave to supplement with regard to Mr. Kaiser specifically and the Defendants generally concerning any such joinder through intervention.

## I.      INTRODUCTION AND STATEMENT OF RELEVANT FACTS

> The history of the present King of Great Britain is a history of repeated Injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over these States. To prove this, let Facts be submitted to a candid world

> Declaration of Independence, July 4, 1776

While the District of Columbia Bar Disciplinary Counsel ("ODC") is not the King of Great Britain, as a self-styled king which believes it is sovereign over members of the bar, it acts as if it is absolutely under all circumstances immune from the legal consequences of its myriad of seemingly never ending, contrived and tyrannical efforts to unethically remove from the practice of law conservative and Republican Party lawyers who it's leftist leadership despise if not loathe. Plaintiff, the founder of both Judicial Watch, Inc. and later Freedom Watch, Inc., a former federal prosecutor in the Antitrust Division of the U.S. Department of Justice on the trial team that succeeded in breaking up the AT&T telecommunications monopoly, and a former Republican candidate for the U.S. Senate in Florida, and private practitioner, is just one of ODC's many proliferating partisan targets ever since the former Bar Disciplinary Counsel Wallace "Gene" Schipp, an honest and ethical man, retired.  *See* Exhibit 8; *Klayman Bio*.

During the Trump years in particular, ethics complaints were filed, accepted and initiated against Trump White House Counsellor Kellyanne Conway[1] over remarks she made on cable news, against former Trump Attorney General William Barr[2] (the complaint was outrageously and incredibly filed by all prior presidents of the bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[3] and Josh Hawley[4] over their role in advocating for President Trump in the last election, and of course former U.S. Attorney Rudy Giuliani[5] over his representation of President Trump, to name just a few. To the contrary, when a complaint was filed against fellow leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well.[6]

---

[1] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[2] https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

[3] https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[4] https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[5] https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[6] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

This comes as no surprise, since all of officials of the DC Bar's Disciplinary Apparatus, including Chairman Matthew Kaiser of the overseeing Board of Professional Responsibility, support and have donated heavily to Democrats and while Plaintiff Klayman is non-partisan in his public interest advocacy – having even sued President George W. Bush and Vice President Dick Cheney at Judicial Watch, and later Freedom Watch, he notably has also filed high profile complaints against many of the persons who these bar officials support and have handsomely donated to, namely former President Bill and First Lady Hillary Clinton, former President Barack Obama and the current President Joe Biden. See <u>Exhibit 1</u> - *Federal Election Commission records of the "new" Bar Disciplinary Counsel Defendant Hamilton Fox and Chairman of the Board of Professional Responsibility Mathew Kaiser*, the latter of whom also has penned articles for the ultra-leftist legal publication "Above the Law," extolling the virtues and "honesty" of Hillary Clinton and trashing Donald Trump.[7] It is no coincidence that references to Mr. Klayman's alleged "fixation" toward and with the Clintons appear in various hearing committee and Board recommendations advocating suspensions for Plaintiff.

This leftist and Democrat control of the DC Bar's Disciplinary Apparatus even actually resulted in an avowed and proud communist, Michael Tigar, being somehow placed on a Hearing Committee, along with another very partisan leftist lawyer, the chair of the Hearing Committee, Anthony Fitch, which issued a recommendation to suspend Plaintiff Klayman for 33 months with a prohibitive career ending reinstatement recommendation. This matter is currently before the Court of Appeals for the District of Columbia after Chairman Kaiser effectively rubber stamped the recommendation with little to no review of the record before him, again with irrelevant and

---

[7] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

inappropriate references to Mr. Klayman's public advocacy to hold Hillary Clinton to the rule of law. *See* <u>Exhibit 2</u> – *Documentation showing Tigar's communist ideology and activism*.

The DC Bar's Disciplinary Apparatus, falsely hiding behind claims of "absolute immunity' – immunity which was accorded to them not legally through legislation by the District of Columbia City Council, but which they conveniently, brazenly and illegally created out of whole cloth ultra-vires - acts as if they are unaccountable for any of their vindictive if not tyrannical actions, much like the King of Great Britain. But the law is clear, that when any government official or employee, contractor or agent acts outside of the scope of his or her authority, abuses process, or violates constitutional rights, they lose any such claim, however ultra vires, to immunity, much more "absolute immunity." Indeed, even President Biden, during a quasi-state of the union speech to Congress, recently declared that even the amendments to our Constitution are not absolute in application. To wax philosophical and spiritual, nothing on this earth is absolute except the word of the Father and his Son.

Contrary to Defendants attempts to smear Plaintiff Klayman with a few decades old irrelevant other cases in its Defendant's Motion for An Injunction Against Vexatious Litigation by Plaintiff (hereinafter "Defendants' PI Motion") – and Plaintiff has been engaged in the legal practice in good standing for nearly forty five (45) years in his home state of Florida and until only recently in the District of Columbia—the only two cases now before this honorable Court revolve around just the latest abuses and "injuries and usurpations," as Jefferson put it, by the DC Bar's Disciplinary Apparatus and it's ODC. Here, without authority to tortiously interfere with Plaintiff's court admissions and thus on-going cases with clients in other jurisdictions, ODC sent ex-parte letters to these other courts and jurisdictions seeking to have reciprocal discipline imposed on Mr. Klayman, when they lacked the jurisdiction and thus authority to do so under the

District of Columbia Rules of Professional Conduct, but only as a vindictive act to injure and severely damage Mr. Klayman and his clients. Defendants counsel, Mark MacDougall of the mega- Democrat law firm of Akin, Gump, Strass, Hauer and Feld, who has shown hostility and disrespect not just to Mr. Klayman, but also his associate, admitted as much Defendants' PI Motion when at page he strangely writes "….Mr. Klayman's contention that the D.C. Rules of Professional Conduct to not expressly authorize notification of his suspension to other courts is inapposite." ECF No. 21 at 19. The key word is "inapposite" in the context Defendants' tortious interference with Mr. Klayman's representation of his clients in other jurisdictions which do not concern them. Its use is simply meaningless and only an incoherent dodge to try to legitimize a bogus and failed argument that has no legal basis.

And indeed, Mr. Klayman only learned of the Defendants secret and undisclosed ex-parte communications when he was provided notice of them by a judge in the U.S. District Court for the Northern District of Texas, where he has been a member in good standing for many years. Importantly, as the relevant DC disciplinary matter is now twelve (12) years old, the statute of limitations in Texas bars disciplinary proceeding older than four years. *Gamez v. State Bar of Tex.*, 765 S.W.2d 827, 833 (Tex. App.—San Antonio 1988, writ denied) ("All matters involved in the Azteca grievance arose in 1984 and 1985. The October 15, 1985 notice to Gamez had attached to it a copy of the grievance. It is clear that the alleged misconduct did not occur more than four years before the allegation was brought to the attention of *grievance committee counsel*. It is that *counsel* who must have knowledge of the complaint within four years after the occurrence—not the attorney who is the subject of the grievance.") Id. So, to put it most succinctly and in every day parlance, ODC had no authority to secretly stick its partisan vindictive nose, albeit and egregiously without authority to do so, into another jurisdiction's

business with the purpose of harming and damaging Mr. Klayman and his clients.

When Plaintiff learned of this unauthorized attempt to tortiously interfere in Mr. Klayman's legal representation of clients before the Northern District of Texas, as well as the Western District of Texas, he asked Defendants to disclose the correspondence that had been secretly sent ex-parte to this court, which incredibly and arrogantly they refused to do. Included in the several requests was later also a plea for Chairman Mathew Kaiser to order Defendants to disclose, and he, the titular head of the DC Bar's Disciplinary Apparatus, also refused, compounding ODC's misconduct. Further, without belaboring all of the misconduct and unethical actions of ODC, Mr. Klayman also asked Chairman Kaiser to undertake an internal review, so the Board could police its underlings at ODC. This was refused as well. To put it most simply, Plaintiff Klayman thus had no choice but to initiate suit, since he had exhausted all other attempted remedies within the DC Bar's Disciplinary Apparatus, and was instead given the back of its arrogant and unaccountable hand.

Importantly, the previous website of the District of Columbia Bar promised equal treatment to both complainants and those members of the bar who are subjected to, in this case, unfounded and largely time-barred complaints. It read:

> In this capacity, the Office of Disciplinary Counsel has and claims and admits to have a dual function: to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints.

Unequal treatment and this same unethical misconduct by the Defendants was repeated with the other related case before this honorable Court, this time involving the U.S. District Court for the Northern District of California. The same scenario unfolded and ODC and the DC Bar Disciplinary Apparatus again defiantly refused again to even reveal their ex-parte secret correspondence with that California federal court, much less take any remedial action, internally

or otherwise.

Attached as <u>Exhibit 3</u> is documentation showing how Plaintiff Klayman attempted to resolve these matters amicably with ODC and Chairman Kaiser, but was arrogantly rebuffed, which result is also discussed in Plaintiff Klayman's Opposition to Defendants' Motion to Dismiss, which is being filed concurrently with this pleading.

As far as the reasons that Plaintiff Klayman had to bring other complaints in court against ODC, he refers this honorable Court to the docket and record in these cases, and a review will sustain the good faith grounds upon which Mr. Klayman has been forced to defend himself from those who claim to be able to act as they please, not just against him but other targets such as Ms. Conway, Mr. Barr, Senators Cruz and Hawley and Mr. Giuliani. But again, this has no relevance to the cases before this honorable Court. Nevertheless the foregoing is a brief summary of these cases and the reasons why Plaintiff Klayman was forced into defending himself:

1. *In Re Larry Klayman*, 18-BG-100 (D.C. App.) - A thirteen (13) year old case, originally filed by non-lawyer Tom Fitton of Judicial Watch in retaliation over matters after I left Judicial Watch to run for the U.S. Senate in Florida, that renowned professional ethics and constitutional law professor and scholar Ronald Rotunda, found to have no merit. Importantly, the genesis of this bar disciplinary proceeding was an order by the Honorable Royce C. Lamberth disqualifying Mr. Klayman primarily from representation in a case involving an abandoned client of Judicial Watch. But Judge Lamberth testified at the Hearing Committee that he did not view the disqualification as a reason to refer the matter to Bar Disciplinary Counsel, and that the matter should have ended there. Plaintiff Klayman's contends with backup proof that the case was pursued for political extra-judicial reasons.  *See* <u>Exhibit 6</u>; *Ethics Opinion of Professor Rotunda*, who rendered it

pro bono finding no ethics violation.

2. *In Re Klayman*, 20-BG-583 (DC. App.) – Despite The Florida Bar and Pennsylvania Bars having dismissed identical complaints nine (9) years ago, filed by an Iranian female client of Mr. Klayman, this bar disciplinary proceeding was resurrected under the direction of Defendants Fox and Porter after it had been for six (6) years abandoned by the complainant, and continues on twelve (12) years later. This is the case where communist Michael Tigar was inserted to sit on the Hearing Committee, along with the nearly equally leftist chair Anthony Fitch. *See* Exhibit 6; *Ethics Opinion of Professor Ronald Rotunda, rendered pro bono finding no ethics violation*.

3. *In Re Klayman*, 18-BD-070 (Board on Prof. Resp.) – This second ethics complaint was not coincidentally also gratuitously filed by Tom Fitton of Judicial Watch, who has always felt competitive with Mr. Klayman since he is not a lawyer,  in a case that neither he nor Judicial Watch had any involvement or interest, and concerns allegations by federal judge Gloria Navarro in the now famous criminal prosecution of Cliven Bundy and his sons, Nevada ranchers, who peacefully stood down the Obama Bureau of Land Management, who attempted to seize his cattle to pay alleged grazing fees. Navarro found that Mr. Klayman had not accurately characterized the state of the bar disciplinary proceeding discussed in 1.) above, on my application pro hac vice to enter as trial counsel for Cliven Bundy. However, the Honorable Ronald Gould of the U.S. Court of Appeals for the Ninth Circuit, an honest liberal jurist,  found that I disclosed all that I was required to disclose. In this case, the Hearing Committee could not find clear and convincing evidence after the hearing concluded, but ODC is challenging this and continuing to pursue me nevertheless. Incredibly, ODC though Defendant Porter, who prosecuted this

bogus case, argued at the hearing that I be disbarred over this, incredibly and vindictively stating that Mr. Klayman "should not continue to have the privilege of being a lawyer." *See* Exhibit 7; *Hearing transcript excerpt*.

4.  Finally, there are two frivolous complaints sitting before ODC which it refuses to dismiss that have zero merit, and they are obviously holding them in abeyance in case they do not get their desired result of disbarment in the other initiated and pending matters. They concern a recognized con man and fraudster Dennis Montgomery and a convicted felon Pete Santilli, the latter of which Plaintiff Klayman never even legally represented. Both were paid by convicted felon Roger Stone to file these nuisance complaints, after Mr. Klayman sued Stone over defamation of his client Dr. Jerome Corsi and himself.  The obvious reason for failing to dismiss these matters, as well as pursing the other stale and/or unwarranted cases, is an admitted longstanding agenda under Defendants Fox and Porter   to remove Plaintiff Klayman from the practice of law. At the requested evidentiary hearing, Mr. Klayman will present evidence of this agenda through legal one party consent recorded audio admissions of former Deputy Bar Disciplinary Counsel Elizabeth Herman and now retired Assistant Bar Disciplinary Counsel H. Clay Smith, III, notwithstanding Defendant Porter's offensive and revealing non-sensical but wholly vindictive argument before  the Hearing Committee in  paragraph 3, above.

Notwithstanding the inordinate and unconscionable  delay and substantive lack of merit in these proceedings, all designed to end  Plaintiff Klayman's distinguished career as a conservative public interest advocate and private practitioner to hold the leftist establishment to the rule of law (as Mr. Klayman has also done with Republicans and others), and has sued former and current presidents of both parties, is the sheer cost in terms of time, legal fees and expenses, not to

mention emotional distress to him and his family,  that they have caused him in defense of his interests and livelihood. In Mr. Klayman's reasoned opinion, these unjustified actions, most of which would be time-barred in other jurisdictions,   are cleverly calculated to severely financially harm if not bankrupt Plaintiff, even if and when ODC does not get it desired result.

Consistent with ODC's and the DC Bar's Disciplinary Apparatus's unethical and dishonest misconduct to try to remove Mr. Klayman from the practice of law, Defendants' PI Motion is also rife with false and misleading statements and frankly absurd pathetic and bizarre claims that Mr. Klayman has inflicted pain and emotional distress on the Defendants, when in fact their literal jihad to try to remove him from the practice of law worked just the opposite condition on Plaintiff, his colleagues and his family. To the contrary, ODC's unjustified pursuit against Mr. Klayman has cost him hundreds of thousands of dollars in lost time, and when he could afford it legal fees to outside attorneys and expenses, and retarded his pubic interest and private practice advocacy.  It also  amounts to chutzpah of the highest order for Defendants counsel to disingenuously cry about having to allegedly represent their clients pro bono, when it is Mr. Klayman who has been relegated, with one associate, to defend himself against ODC's onslaught to remove him from the practice of law. And, that this is the mission of ODC under its "new leadership" following the ethical and honest leadership of its prior Bar Disciplinary Counsel Wallace "Gene" Schipp, will be proven at a requested and necessary evidentiary hearing or trial on Defendants' PI Motion, given the attempt by Defendants to effectively extinguish Mr. Klayman's right under the Sixth Amendment to the Constitution to due process and his concomitant right to protect his law practice and he, his colleagues,  and his family's well- being generally by regrettably having to file suit *pro se*.

Of particular significance with regard to the unethical and patently false statements

contained in Defendants' PI Motion are the sworn affidavits of ODC's Senior Staff Attorney Lawrence Bloom and Deputy Bar Disciplinary Counsel Julia Porter, Defendant Fox's highly partisan "right hand supervisor." Ms. Porter, not coincidentally, should be under an internal review for her false statements and unethical conduct concerning another conservative lawyer, J.P. Szymkowicz-, the only Republican official in DC government. *See* Exhibit 5-2. This internal review was ordered by the prior Chairman of the Board Robert Bernius, but under the new Board Chairman Mathew Kaiser, it has been deep sixed despite inquiries and polite requests by J.P. Szymkowicz that Kaiser get the proverbial "show on the road." This matter has now sat with Kaiser for several years, with no action taken, consistent with other unethical misconduct by bar officials and ODC when it comes to conservative and Republican lawyer members of the bar. Put succinctly, the DC Bar Disciplinary Apparatus, led by Chairman Kaiser and Bar Disciplinary Counsel Defendant Fox, refuse to police themselves, with no claimed recourse to bar members other than to file suit.

In the affidavit of Defendant Bloom attached to Defendants' PI Motion for instance, obviously prepared in conjunction with his counsel Mark McDougall and his associate, he falsely swears:

Paragraph 6 "Mr. Klayman has ignored my attorneys numerous written requests to serve any legal process on his firm by electronic mail. Despite the risks associated with COVID-19, Mr. Klayman continues to send process servers to my home. Typically I am in bed by 8:00 p.m. I live in a building with predominantly older individuals and young families who also do not want to be disturbed at night. Nevertheless, on at least three occasions, the process server came to my home between 8:15 and 9:15 p.m."

Paragraph 7 "The process server also refuses to legally enter my secure condominium

building. To gain access, guests much use a directory at the front door to call the unit that they are visiting, at which point the resident can unlock the front door. The process server, however, continues to circumvent the call box and break into my building, always in the evening, and beat on my door for the obvious purpose to make his presence known to all of my neighbors. When I requested that the process server stop entering my building without calling, he ignored the request and walked away."

The sworn affidavit of Defendant Julia Porter likewise swears and complains at Paragraph 6 about being served at home as well, and add for good measure that this "causes continued disruption to my household and embarrassment to me in the presence to me in the presence of my neighbors."

Not to be outdone by his underlings Bloom and Porter, Bar Disciplinary Counsel Hamilton P. Fox, III weighs in with his affidavit, also obviously prepared with his counsel Mark MacDougall and his associate. He declares under oath:

Paragraph 6. "… Mr. Klayman ignores my attorney's written requests instructing Mr. Klayman to effect service on my behalf via electronic mail. Instead, Mr. Klayman insists on sending a process server to my house who serves my wife.

Paragraph 7. It has been difficult and distressing watching my deputy, Julia Porter, deal with meritless lawsuits challenging her ethics and professionalism for the past two years. Mr. Klayman should not be permitted to continue to file frivolous lawsuits that disrupt my life and that of my colleagues."

While the real disruption of life and concomitant  emotional distress had been inflicted on Mr. Klayman, his colleagues and his family, financially and emotionally – as Mr. Klayman had been a member in continuous good standing of the bar for  over 40 years - Mr. Bloom, the person

who was directed to send the secret ex-parte letters to the federal courts in Texas and California and tortiously interfere, is simply not telling the truth and instead perjuring himself. Attached and set forth below is a sworn affidavit of Branden Snesko, an owner and manager of Same Day Process, a well -respected prominent process server in the district, that his process server did not force his way into the building, did wear a mask, and did not commit the other atrocities which Mr. Bloom disingenuously cries about. <u>Exhibit</u> 4. But in the words of Eva Peron, "don't cry for me Argentina!" Bloom's sworn claims that he lives in a condominium, where consent is needed to enter, is also false as he instead lives in an apartment, where no prior consent is needed under DC law as the tenants are not owners of the building. *Id.* The entirety of Mr. Snesko's affidavit reads;

1. I am one of the owners of Same Day Process along with my father, Tony Snesko, and I manage it's day to day operations.

2. I have reviewed the declarations of Lawrence Bloom, Julia Porter and Hamilton P. Fox, III and they are false in several respects.

3. First, my process server Kion Lathan and all of my process servers are instructed to and do wear masks when affecting service of process and they will testify that they did so in serving process on Mr. Bloom and Ms. Porter. He was in each instance instructed, as the audio recording on our telephone answering message states and confirms, to follow all social distancing norms and Covid-19 safety protocols and did so in serving process for Mr. Klayman.

4. Second, Mr. Lathan did not "force his way into or break into" Mr. Bloom's building, which contrary to Mr. Bloom's false representations is not a condominium but an apartment building, which under the law does not require authorization to enter to affect service of process. Moreover, federal law prohibits a person inhibiting, obstructing and preventing service of process at 18 U.S. Code 1501.

5. Third, my process server who served Mr. Fox had been met with and subjected to profanity by Mr. Fox's wife, including use of the "F" word. To the contrary, he had been courteous and respectful of her and Mr. Fox.

6. Fourth, having hired and supervised Mr. Lathan, I have never received a complaint that he was rude, disrespectful and violated any law.

7.      Fifth, before COVID-19, we had tried to affect service of process on Mr. Fox and Ms. Porter in the past for Mr. Klayman at the offices of the District of Columbia Bar Disciplinary Counsel at 515 Fifth Street, N.W., Building A, Suite 117, Washington, D.C. 20001, and my process servers have been prevented from making service there, which is the place of business of Mr. Fox and Ms. Porter.

8.      Finally, during COVID-19, as persons work from home, including Bar Disciplinary Counsel, one can only affect service of process at their residence. This has become both necessary and routine.

SWORN TO UNDER PENALTY OF PERJURY THIS 10th DAY OF MAY 2021.

*Brandon Snesko*

Exhibit 4

What none of the Defendants will discuss, is that they had previously evaded service of process, when process servers were turned away from serving Mr. Fox and Ms. Porter at the office of the ODC at 515 5th Street, N.W., Building A, Suite 117, Washington, D.C. 20001. Finally the reason that service was made by hand, rather than through acceptance by email, was that in the later event, Defendants would have had 60 days with a service waiver by email to file a responsive pleading to the complaints and time was of the essence to get the case moving before more unauthorized secret ex parte letters were sent to other courts, which in fact did occur in any event. All of which has distracted Mr. Klayman and caused him not just distress but compromised other client interests in their on-going litigation.

Moreover, logically Defendants could not have been served in their office after COVID-19 hit, as they were presumably working at home.

And finally, the Same Day process server was not disrespectful to any of those served. To the contrary, the wife of Defendant Fox cursed at the process server, by using the "F" word. *Id.*

Further, as pled in a related companion case which is not before this honorable Court,

Defendants acted in concert with the leftist publication "Politico" in defaming Mr. Klayman and publicizing to the legal community and current and prospective clients that Mr. Klayman would be removed from the practice of law. This has severely harmed Mr. Klayman. Attached as Exhibit 5 is the complaint in that regrettable but necessary action. And, not coincidentally this same vindictive tactic and outrage occurred with J.P. Szymkowicz, even after he and his father John Szymkowicz had prevailed in a frivolous and wrongly brought bar proceeding prosecuted by none other than Defendant Porter, which lasted thirteen (13) years and brought this father and son small law firm to the brink of bankruptcy. *See* Exhibit 5-2.

Thus, the Defendants phony cries of emotional distress, the result their own improper, unauthorized and unethical actions, are not only ridiculous, pathetic and contrived, but even if true – which they obviously are not -- were caused by their own misconduct and illegal actions.

When Defendants are put under oath at the requested upcoming evidentiary hearing, trial or discovery on their PI Motion, it will be even more apparent that they are simply not telling the truth and have no credibility. And why should they tell the truth about virtually anything. According to them and their "overlord and master" Chairman Kaiser, they have "absolute immunity" and can do as they please.

At this evidentiary hearing, trial or during discovery, Plaintiff Klayman, Same Day Process and other material witnesses look forward to testifying and being cross examined by defense counsel and if desired this honorable Court. Given the stakes involved, which would effectively nullify Mr. Klayman ability to bring legal redress pro se under the Sixth Amendment to protect the interests of himself, his colleagues, his family's well-being  and last but hardly least his clients, an evidentiary hearing or trial  is an absolute necessity as a matter of due process as well as well as the rules if not procedures of this honorable Court and the Federal Rules of

Civil Procedure, particularly under these extreme circumstances where Defendants shamelessly ask for Mr. Klayman's constitutional rights to be abridged, more as a tactic to smear and prejudice Plaintiff before this Court, rather than with having any valid factual or legal basis to do so. Importantly, Defendants' motion appears to ask for a permanent injunction rather than even a preliminary injunction, which would require discovery and then trial to adjudicate. However, since Defendants' motion is purposely vague, Plaintiff has argued convincingly for an evidentiary hearing, discovery and later a trial whether their prayer if for a preliminary and/or permanent injunction. And if what Defendants want is a preliminary injunction, they have not shown irreparable jury or for that matter any of the other factors required for such extraordinary relief.

## II.  THE LAW

The law is clear that to enjoin a *pro se* plaintiff's right to file suit to seek redress of his grievances, requires an extremely high threshold of proof that he or she is a vexatious litigant. Hypocritically and paradoxically, it is Defendants and their counsel who have ironically vexatiously litigated against Mr. Klayman, multiplying pleadings, disparaging him in pleadings and participating in the public defamation of Politico, a highly leftist publication. Exhibit 5. Their over 400-plus page behemoth of a PI Motion is a testament to their multiplying pleadings needlessly, as this honorable Court is competent to adjudicate their defenses without trying to grossly overreach to try cut off Plaintiff Klayman's constitutional rights and smear and prejudice him before this honorable Court in the process. In the words of William Shakespeare, Defendants and their counsel doth protest too much, the equivalent of the pot calling the kettle black.

Defendants are tasked with the very heavy if not insurmountable burden of showing that Plaintiff Klayman is a vexatious litigant, an "extreme remedy" in any event. *Duru v. Mitchell*,

289 F. Supp. 3d 112, 117 (D.D.C. 2018). A vexatious litigant injunction, such as the one Defendants attempt here, is an "extreme sanction and should be imposed in only the most egregious cases." *In re Powell*, 851 F.2d 427, 434 (D.C. Cir, 1988); *see also In re Oliver*, 682 F.2d 443, 445 (3d Cir. 1982) (an injunction "is an extreme remedy, and should be used only in exigent circumstances."). Such injunctions should "remain very much the exception to the general rule of free access to the courts . . ." *In re Powell*, 851 F.2d at 431; *see also Pavilonis v. King*, 626 F.2d 1075, 1079 (1st Cir. 1980) (same).

The D.C. Circuit has, accordingly, "established a few basic guidelines for [such] injunction[s]." *In re Powell*, 851 F.2d at 431. In particular, the Court must "look to both the number and content of the filings as indicia of frivolousness or harassment" and must "make substantive findings as to the frivolous or harassing nature of the litigant's actions." *Id*. In order for a Court to consider this type of injunction, the "orderly and expeditious administration of justice" must have been "so impeded as to require such an extreme sanction." *Id*. at 435 (citing *Urban v. United Nations*, 768 F.2d 1497, 1500 (D.C. Cir. 1985)).

*In re Powell*, 851 F.2d 427 (D.C. Cir, 1988), for example, two federal prisoners filed numerous civil actions in the district courts involving Freedom of Information Act ("FOIA") requests and other issues. *In re Powell*, 851 F.2d at 428-29. Within only two years, one prisoner filed sixteen actions in district court. *Id*. at 428, 433. Even though the D.C. Circuit found Powell's filings to "suggest a litigious propensity, about which [the Court was] duly concerned," because it found that Powell's sixteen filings were not "so clearly harassment of the district court as to warrant issuing an injunction[,]" it reversed the district court's order enjoining the prisoners from filing new civil actions. *Id*. at 433.

Similarly, in the recent case of *Duru v. Mitchell*, 289 F. Supp. 3d 112 (D.D.C. 2018), the plaintiff filed an action against nearly thirty defendants concerning a financial dispute that led to a separate action. *Id*. at 113. Six of the defendants filed motions to dismiss asserting various defenses and several other defendants moved that the court declare plaintiff a vexatious litigant. The court advised plaintiff that she needed to respond to defendants' motions and that she had an opportunity to be heard in opposition to defendants on the vexatious litigant issue. Plaintiff failed to respond to the motions to dismiss or the vexatious litigant motion and instead filed more than twenty motions for default judgment. *Id*. After the court denied the motions for default judgment, attaching a copy of Federal Rule of Civil Procedure 4 to its order, it gave plaintiff another opportunity to effect service on defendants, even though the deadline to serve had elapsed several months earlier. The court gave plaintiff a new deadline and mailed a copy of its order to her home. Two days later, the court received a notice of change of address and because she might not have received the court's order before, the court again extended the deadline and directed the Clerk to mail the order to plaintiff's new address. The plaintiff never responded at all. *Id*.

There, even though the plaintiff never opposed the defendants' motion to declare her a vexatious litigant, even though the court "concluded that [the plaintiff's] claims *in [that] action* [were] frivolous," and even though the defendants pointed out to the judge that a Texas court had already found the plaintiff to be a vexatious litigant, the court still declined to enjoin the plaintiff from filing further lawsuits because of that high threshold. *Id*. at 117 (emphasis in original).

Further, in *Roger v. Johnson-Norman*, 514 F. Supp. 2d 50 (D.D.C. 2007), the defendant sought an award of attorneys' fees and costs under the Fair Credit Reporting Act ("FCRA") as well as an order declaring the plaintiff a vexatious litigant. *Id*. at 51. For a period between 1998

and 2000, the parties had a romantic relationship and the district court had found that the instant case was "the latest chapter in a lengthy saga of alleged harassment and related litigation . . ." *Roger v. Johnson-Norman*, 466 F. Supp. 2d 162, 165 (D.D.C. 2006). While the court found that the plaintiff engaged in harassing conduct during the course of litigation, it still declined to enjoin him from filing future suits, cautioning that although it found the plaintiff's conduct harassing, "defendant has not demonstrated that plaintiff has engaged in the kind of pattern of harassment that warrants issuance of an injunction." *Roger*, 514 F. Supp. 2d at 53.

In *Speleos v. McCarthy*, 201 B.R. 325 (D.D.C. 1996), an appellant debtor challenged an order of the U.S. Bankruptcy Court for the District of Columbia that limited a trustee's obligations to provide her with certain information relating to her bankruptcy and required her to seek leave before filing suit (an order declaring her a vexatious litigant). *Id*. at 327. The bankruptcy court found that the plaintiff's complaint was "barred by collateral estoppel based on numerous orders giving [the trustee] authority to take the actions complained of" and was "frivolous and failed to meet the standards of Rule 9011." *Id*. The court further found that the case was "unnecessarily prolonged by the plaintiffs' frivolous objections to practically every step the trustee has taken," that "[the plaintiff] has a history of filing frivolous lawsuits and objections," and that the plaintiff's actions "imposed upon the strained resources of the court." *Id*. at 328. The court's opinion concluded that, in addition to a monetary sanction, "a sufficient pattern of repeated frivolous conduct has been laid to warrant a limited injunction to protect the estate and its representatives against the prospect of further litigation and in the exercise of its discretion. . . [the Court] will impose an injunction." *Id*.

There, the district court reversed the bankruptcy court, finding that although "[the plaintiff's] conduct in the bankruptcy case suggests a litigious propensity worthy of concern[,]"

that concern "does not support the issuance of an injunction." *Id.* at 331. The court found that the debtor's conduct, **while vexatious**, fell "**well below the level of abuse** found by other courts to have warranted limitations on the right of access to the courts." *Id.* (emphasis added).

The plaintiffs in *In re Powell*, *Duru*, *Rogers*, and *Speleos* come much closer to reaching the high threshold of being considered vexatious litigants than Plaintiff Klayman, even though he is no such thing. Still, the courts refused to declare them as such. Plaintiff Klayman, a *pro se* party, has been forced to exercise his constitutional right to seek redress against Defendants because of their continued pattern and practice of unethical misconduct and continuing illegalities. Plaintiff did not engage in improper tactics and had a reasonable factual basis for filing his claims.

Defendants reference an irrelevant order by the U.S. District Court for the Southern District of Florida which declared Plaintiff Klayman a vexatious litigant in an unrelated case concerning his former wife. Defendants fail to mention that the parties there were engaged in a decade-long custody battle where his wife kept his children away from him and made seriously false allegations against him, and bore "false witness." Divorce and custody battles can be ugly. It's even uglier when children are involved. A Southern District of Florida ruling shows nothing about this case or the Defendants' own bad behavior here. Indeed, Defendants' fixation if not obsession with Plaintiff Klayman and his family and the misfortunate events that occurred between him and his former wife is another example of their unbridled animus toward Mr. Klayman, as they have demonstrated with other conservative/Republican public figures and legal advocates, while looking the other way with regard to their leftist brethren such as David Kendall.   More importantly, however, here as elsewhere, the law is not on Defendants' side.

Here, Plaintiff Klayman never "so impeded [the system] as to require such an extreme sanction [as an injunction]," *In re Powell*, 851 F.2d at 435, and never "so clearly harass[ed] [] the district court as to warrant issuing an injunction." *Id*. at 433. Even the court in *Rogers* found that while the plaintiff engaged in "harassing conduct" during the course of the litigation, it declined to enjoin him from filing future suits. *Rogers*, 514 F. Supp. 2d at 53. Plaintiff Klayman has not engaged in harassing conduct, but simply sought to use legal recourse to defend himself, his colleagues and his family from run at the hand of Defendants.

Indeed, litigiousness alone does not support an issuance of an injunction. *In re Powell*, 851 F.2d at 434; *see also Moy v. United States*, 906 F.2d 467, 470 (9th Cir. 1990) (the plaintiff's claims must not only be numerous but also patently without merit); *Ruderer v. United States*, 462 F.2d 897, 899 (8th Cir. 1972). The focus must be on the number of suits that were frivolous or harassing in nature rather than on the number of suits that were simply adversely decided. *See De Long v. Hennessey*, 912 F.2d 1144, 1147-48 (9th Cir. 1990). Indeed, the mere fact that a plaintiff has had numerous suits dismissed against him is an insufficient ground upon which to make a finding of vexatiousness. *See Microsoft Corp. v. Motorola, Inc*., 696 F.3d 872, 886 (9th Cir. 2012). The U.S. Supreme Court cautioned against courts concluding that a case is meritless just because it was dismissed.

> **[I]t is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation**. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412 (1978)

(emphasis added).

This case is important as, yet again, Defendants have been caught lying, secreting correspondence to other courts where they have no, repeat no authority and jurisdiction to do so, and taking retaliatory actions when Mr. Klayman had no option but to pursue legal remedies for their unethical and illegal actions.

**A.     The Court Should Sanction Defendants Pursuant to 28 U.S.C. § 1927 and/or its Inherent Authority**

Because of Defendants' frivolous PI Motion, Plaintiff Klayman put Defendants' counsel on notice that he would seek sanctions (*see* Exhibit 9) pursuant to 28 U.S.C. § 1927:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. *See* Exhibit 9; *email correspondence with Defendants' counsel regarding cross-motion for sanctions*. Indeed, any attorney who "so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess of costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Id*. The purpose of 28 U.S.C. § 1927 is to allow the Court "to access attorney's fees against an attorney who frustrates the progress of judicial proceedings." *United States v. Wallace*, 964 F.2d 1214, 1218 (D.C. Cir. 1992).

Defendants and their counsel's bad faith and frivolous filing of this PI Motion is precisely the kind of vexatious misconduct 28 U.S.C. § 1927 seeks to protect against. Here, all the elements are met. Defendants and their counsel acted unreasonably and vexatiously when they

strategically filed their PI Motion which they knew or had reason to know is contrary to law. Undoubtedly, the PI Motion "multiplie[d] the proceedings[.]" 28 U.S.C. § 1927.

In addition to the powers deriving from 28 U.S.C. § 1927, it is well established in the D.C. Circuit that when "rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process," courts have an inherent power to impose sanctions for abusive litigation practices. *Shepherd v. American Broad. Cos*., 62 F.23d 1469, 1474 (D.C. Cir. 1995). Courts also have inherent authority to sanction litigation misconduct when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Service Co. v. Wildnerness Society*, 421 U.S. 240, 258-59 (1975).[8] Such power is government "by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc*., 501 U.S. 32, 42 (1991). The Court's inherent authority is most commonly invoked when there is no court order in place regarding the conduct at issue. *See, e.g., Residential Funding Corp. v. DeGeorge Fin. Corp*., 306 F.3d 99, 106-07 (2d Cir. 2002) ("[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs").

Bad faith "may be found, not only in the actions that led to the lawsuit, but in the conduct of the litigation." *Hall v. Cole*, 412 U.S. 1, 4 (1973); *see also Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 219-20 (D.C. Cir. 1991) (bad faith includes "the filing of a frivolous complaint or meritless motion, or discovery-related misconduct").

Here, when Defendants and their counsel multiplied the pleadings herein that were unnecessary and non-meritorious – and contrary to fact and  law – requiring Plaintiff Klayman,

---

[8] Importantly, Plaintiff Klayman has engaged in no alleged litigation misconduct in the two related cases before this Court.

acting *pro se*, to spend a considerable amount of time and financial resources preparing a response, Defendants and their counsel acted in bad faith for strategic reasons. Defendants' do not mind forcing Mr. Klayman to expend still more time and expense, in order to attempt to drive him and his legal practice, if not family, into virtual bankruptcy.

In short, Defendants filed their unconstitutional Motion PI as a tactic to only to run up unnecessary time, legal fees and costs. This also wastes the valuable resources of this honorable Court. This misconduct is sanctionable and Defendants and their counsel should respectfully have their Motion stricken and an order entered against them, sanctioning them by paying for Plaintiff Klayman's reasonable fees and costs in having to respond to such a frivolous motion.

Plaintiff Klayman consulted with counsel for Defendants and asked for consent to file this cross-motion for sanctions, but Mr. MacDougall would not agree. *See* Exhibit 9.

**B.     An Evidentiary Hearing or at a Minimum Discovery is Needed As a Matter of Due Process**

Plaintiff Klayman's claims that forced him to pursue his legal rights in court are bona fide and substantial. They should not serve as a frivolous basis to abridge his constitutional rights.

Rule 65 of the Federal Rules of Civil Procedure contemplates an evidentiary hearing when substantial constitutional rights are implicated, such by abridging Plaintiff's right to file suit pro se under the Sixth Amendment to the Constitution.  And, in granting such an evidentiary hearing, the Court may in fact accelerate the final adjudication of the case, saving valuable resources for itself and the parties. For instance, subpart (a) (2) to Rule 65 provides:

> Consolidating the Hearing with the Trial on the Merits. Before or after the beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial."

Subpart (c) to Rule 65, which would be applicable in the unlikely event this honorable Court overrides Plaintiff Klayman's constitutional rights, provides:

> SECURITY. The court may issues a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.  The United States, its officers, and its agencies are not required to give security.

As Defendants herein are not the "United States, its officers, and its agencies," they must give security for the projected costs and damages to Mr. Klayman in the unlikely event that a preliminary injunction restraining his sacrosanct constitutional rights is entered.

The right to a full hearing in even just a preliminary injunction action is well-established under the Federal Rules of Civil Procedure and binding common law. This is even further amplified when the movant seeks a permanent injunction, as is the case here. As a matter of course, no permanent injunction can issue without first a preliminary injunction, and/or a full trial.

The Court in *Manzanita Band of the Kumeyaay Nation v. Wolf*, 2020 U.S. Dist. LEXIS 192507 found:

> A court can grant a preliminary injunction "based on less formal procedures and on less extensive evidence than in a trial on the merits, but if there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required.

*See also Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) ("A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits, but if there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required. Particularly when a court must make credibility determinations to resolve key factual disputes in favor of the moving party, it is an abuse of discretion for the court to settle the question on the basis of documents alone, without

an evidentiary hearing."); *see also Page Communications Engineers, Inc. v. Froehlke*, 475 F.2d 994 (D.C. Cir.); *NOW v. Operation Rescue*, 747 F. Supp. 772 (D.D.C.); *DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir.).

There are numerous fact-intensive issues that must be resolved, and which can only be done so via an evidentiary hearing. First, there are numerous questions of fact that need to be resolved with regard to the numerous old cases that Defendants have brought to the Court's attention in their 400 plus page PI, which are not relevant to this instant matter in any event. If Defendants are relying on these old cases as part of their request for injunctive relief, Mr. Klayman must also be allowed an evidentiary hearing to fully flush out and make a factual record concerning these old cases. Second, numerous questions of fact pervade this instant action, as Defendants have sent out *ex parte* letters to numerous courts all around the country with no notice to Mr. Klayman in order to tortiously interfere with him. An evidentiary hearing or trial is needed to fully develop exactly why Mr. Klayman had no choice but to file these instant actions. Third, an evidentiary hearing or trial is necessary with regard to Defendants' falsified affidavits, which have been unmasked as false and perjurious by Mr. Snesko's affidavit. Exhibit 4. Fourth, as Defendants have invoked Mr. Klayman's constitutional due process rights by attempting to deprive him of the ability to defend himself from their gross misconduct, Mr. Klayman must be afforded an evidentiary hearing.

Further, an evidentiary hearing or trial is necessary, not just because constitutional rights are implicated in Defendants gambit to obtain an injunction, but because as shown herein, their credibility and truthfulness is implicated. Plaintiff, his colleagues, and his process servers are more than willing to testify under oath about the events which gave rise to this litigation, and Defendants, who claim to be public servants, but instead falsely and deceitfully vindictively act

as if they are above the law and "absolutely immune" from scrutiny for their actions, should also be put under oath on a witness stand, to also judge their demeanor and credibility at a minimum.

And, if this honorable Court does not grant an evidentiary hearing and immediate trial, then at least it should allow for discovery in the form of document requests and depositions.

For all of these compelling, where constitutional rights are implicated, Plaintiff deserves and requires due process of law. Defendants secret *ex parte* communications with other jurisdictions – where they have no authority to act -- vindictively designed to tortiously harm Mr. Klayman, his colleagues and his family and his clients before those courts, which they still refuse to disclose, underscore why full due process rights must be according and why there must be an evidentiary hearing or trial,  or at least discovery prior to this honorable Court's disposition of the PI Motion. Lastly, as it is unclear whether Defendants seek a permanent or preliminary injunction, to the extent that Defendants seek a permanent injunction, this matter must be decided at trial.

## III.  <u>CONCLUSION</u>

"The due process clause requires that every man shall have the protection of his day in court. *Truax v. Corrigan*, 257 U.S. 312, 332 (1921) (citing *Hurtado v. California*, 110 U.S. 516, 535 (1884)). Plaintiff Klayman, acting *pro se* and having addressed the issues raised by Defendants in this instant motion, has shown that Defendants' PI Motion is baseless, frivolous, filed in bad faith and for an improper purpose, with an intent to delay justice, harass, hold up to false light and defame again Plaintiff Klayman, underscoring why Plaintiff Klayman has regrettably been forced to bring suit. Plaintiff Klayman has acted in good faith, with a legitimate reason for filing cases against Defendants, and treated his duty to the courts with integrity.

Plaintiff Klayman respectfully requests that this Court deny Defendants' PI Motion and award sanctions in the form of attorneys' fees and costs to him.


Date: May 10, 2021                                    Respectfully submitted,

                                                       */s/ Larry Klayman*
                                                      Larry Klayman
                                                      7050 W. Palmetto Park Rd
                                                      Boca Raton, FL, 33433
                                                      Tel: (561)-558-5336
                                                      Email: leklayman@gmail.com

                                                      Plaintiff Pro Se

**<u>CERTIFICATE OF SERVICE</u>**

I, Larry Klayman, hereby certify that on this day, May 10, 2021 a copy of the foregoing was filed via this Court's e-filing system and served upon all parties and/or counsel of record through Notices of Electronic Filing.

*/s/ Larry Klayman_____*
Larry Klayman

1

# EXHIBIT 1

## Individual Contributions Arranged By Type, Giver, Then Recipient

### Contributions to All Other Political Committees Except Joint Fundraising Committees

| Contributor Name | City | State | ZIP Code | Employer | Occupation | Committee Name | Transaction Date | Amount | Image Number |
|---|---|---|---|---|---|---|---|---|---|
| FOX, HAMILTON | WASHINGTON | DC | 20002 | SUTHERLAND | LAWYER | OBAMA, BARACK / JOSEPH R. BIDEN **VIA** OBAMA FOR AMERICA | 09/10/2008 | 2300.00 | 11972515694 |
| FOX, HAMILTON | WASHINGTON | DC | 20004 | SOUTHERLAND ASBILL & BRENNEN | | WATT, MELVIN L **VIA** MEL WATT FOR CONGRESS COMMITTEE | 09/12/1998 | 1000.00 | 98033684253 |
| FOX, HAMILTON P. III | WASHINGTON | DC | 20002 | SUTHERLAND, ASBILL & BRENNAN | ATTORNEY | ACKERSON, NELS **VIA** NELS ACKERSON FOR CONGRESS | 08/05/2008 | 1000.00 | 28933533701 |
| FOX, HAMILTON P. MR. | WASHINGTON | DC | 20002 | SUTHERLAND ASBILL | ATTORNEY | MURPHY, KEVIN **VIA** KEVIN MURPHY FOR CONGRESS | 06/25/2003 | 1000.00 | 23991832436 |
| FOX, HAMILTON P. MR. | WASHINGTON | DC | 20002 | SUTHERLAND ASBILL/ATTORNEY | ATTORNEY | MURPHY, KEVIN **VIA** KEVIN MURPHY FOR CONGRESS | 09/08/2003 | 1000.00 | 23992122376 |
| | | | | | | **Total Contributions:** | | 6300.00 | |

TRY A: **NEW QUERY** RETURN TO: **FEC HOME PAGE**

Generated Thu May 10 18:33:30 2018

Federal Election Commission, 999 E Street, NW, Washington, DC 20463 (800) 424-9530 In Washington (202) 694-1100
For the hearing impaired, TTY (202) 219-3336 Send comments and suggestions about this site to: **webmaster@fec.gov.**

🇺🇸 **An official website of the United States government**
Here's how you know

Home › Campaign finance data › Browse data › Individual contributions

# Individual contributions

Viewing   **49**   filtered results for:   Reset filters

"Matthew Kaiser"    Maryland

| Contributor name | Recipient | State | Employer | Receipt date | Amount |
|---|---|---|---|---|---|
| KAISER, MATTHEW | BIDEN FOR PRESIDENT | MD | TMAC | 08/13/2020 | $100.00 |
| KAISER, MATTHEW | BIDEN FOR PRESIDENT | MD | KAISERDILLON PLLC | 08/05/2020 | $2,800.00 |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 07/27/2020 | $25.00 |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 07/11/2020 | $100.00 |
| KAISER, MATTHEW | BIDEN FOR PRESIDENT | MD | TMAC | 07/11/2020 | $100.00 |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 06/13/2020 | $100.00 |
| KAISER, MATTHEW | BIDEN FOR PRESIDENT | MD | TMAC | 06/13/2020 | $100.00 |

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 05/15/2020 | $100.00 | |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 04/20/2020 | $15.00 | |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 04/14/2020 | $50.00 | |
| KAISER, MATTHEW | GINA ORTIZ JONES FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 10/24/2018 | $500.00 | |
| KAISER, MATTHEW | HEIDI FOR SENATE | MD | KAISER LEGRAND & DILLON | 10/18/2018 | $500.00 | |
| KAISER, MATTHEW | MCCASKILL FOR MISSOURI | MD | KAISER LEGRAND & DILLON | 10/18/2018 | $500.00 | |
| KAISER, MATTHEW | GILLIBRAND FOR SENATE | MD | KAISER LEGRAND & DILLON | 10/18/2018 | $500.00 | |
| KAISER, MATTHEW | DNC SERVICES CORP./DEM. NAT'L COMMITTEE | MD | ZUCKERMAN SPAEDER LLP | 09/30/2018 | $500.00 | |
| KAISER, MATTHEW | BETO FOR TEXAS | MD | KAISER LEGRAND & DILLON | 09/28/2018 | $500.00 | |
| KAISER, MATTHEW | LIZ FOR INDIANA | MD | KAISER LEGRAND & DILLON | 09/25/2018 | $500.00 | |
| KAISER, MATTHEW | DEBBIE FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | SUSIE LEE FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | XOCHITL FOR NEW MEXICO | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| KAISER, MATTHEW | EASTMAN FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $1,000.00 | |
| KAISER, MATTHEW | EASTMAN FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | DR KIM SCHRIER FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | JESSE COLVIN FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | LAUREN UNDERWOOD FOR CONGRESS | MD | KAISERDILLON PLLC | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | LIZ FOR INDIANA | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | LIZ FOR INDIANA | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | ELIZABETH PANNILL FLETCHER FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | HALEY STEVENS FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | JESSICA MORSE FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | FRIENDS OF JAHANA HAYES | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | FRIENDS OF DANA BALTER | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | GINA ORTIZ JONES FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| KAISER, MATTHEW | LAUREN BAER FOR CONGRESS | MD | KAISERDILLON PLLC | 09/06/2018 | $500.00 | |
| KAISER, MATTHEW | CINDY AXNE FOR CONGRESS | MD | KAISERDILLON PLLC | 09/06/2018 | $500.00 | |
| KAISER, MATTHEW | CINDY AXNE FOR CONGRESS | MD | KAISERDILLON PLLC | 07/11/2018 | $500.00 | |
| KAISER, MATTHEW | LAUREN BAER FOR CONGRESS | MD | KAISERDILLON PLLC | 07/10/2018 | $500.00 | |
| KAISER, MATTHEW | ELIZABETH PANNILL FLETCHER FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 06/04/2018 | $500.00 | |
| KAISER, MATTHEW | FINKENAUER FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 06/04/2018 | $500.00 | |
| KAISER, MATTHEW | DEBBIE FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 06/04/2018 | $500.00 | |
| KAISER, MATTHEW | GINA ORTIZ JONES FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 06/04/2018 | $500.00 | |
| KAISER, MATTHEW | KEN HARBAUGH FOR CONGRESS | MD | KAISERDILLON | 05/29/2018 | $250.00 | |
| KAISER, MATTHEW | ACTBLUE | MD | KAISERDILLON PLLC | 11/15/2016 | $100.00 | |
| KAISER, MATTHEW | HILLARY FOR AMERICA | MD | KAISERDILLON PLLC | 08/01/2016 | $2,700.00 | |
| KAISER, MATTHEW | HILLARY VICTORY FUND | MD | KAISERDILLON PLLC | 08/01/2016 | $2,700.00 | |
| KAISER, MATTHEW | OBAMA FOR AMERICA | MD | ZUCKERMAN SPAEDER LLP | 10/16/2008 | $200.00 | |

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| KAISER, MATTHEW | OBAMA FOR AMERICA | MD | ZUCKERMAN SPAEDER LLP | 09/30/2008 | $30.00 | |
| KAISER, MATTHEW | OBAMA FOR AMERICA | MD | ZUCKERMAN SPAEDER LLP | 01/27/2008 | $500.00 | |
| KAISER, MATTHEW | OBAMA FOR AMERICA | MD | ZUCKERMAN SPAEDER LLP | 01/04/2008 | $50.00 | |

Results per page: 50

Showing 1 to 49 of 49 entries

# EXHIBIT 2

# 'Free speech' advocate works to silence Larry Klayman

**Exclusive: Jack Cashill exposes radical ideology of lawyer pushing punishment**

 **By [Jack Cashill](#)**

**Published January 1, 2020 at 5:38pm**

In July of 2019, a hearing committee of the District of Columbia Bar Board of Professional Responsibility made a recommendation that Judicial Watch founder Larry Klayman be suspended, a recommendation now under appeal, from the practice of law in the district for 33 months.

The three-person committee strangely and inexplicably included only two attorneys, both of whom are of the left, and one of whom, Michael Tigar, is proudly far left.

How far left? Consider the following review on the jacket of Tigar's most recent book: "'An incisive, unsparing, creative, brilliant critique of capitalist law and its dire human consequences.' – BERNARDINE DOHRN, co-editor with Bill Ayers, Race Discourse: Against White Supremacy."

In the book, "Mythologies of State and Monopoly Power," Tigar emphasizes the Marxist notion that "the law is not what is says but what it does." Not liking the "dire human consequences" of the law as it exists, Tigar is not above twisting the law to his own ends.

Klayman suspects that Tigar, something of a superstar in Marxist circles, was recruited by the committee chairman, Anthony Fitch to sit on the committee with him. The two appeared chummy throughout the proceeding, and Fitch seemed downright deferential.

Throughout the proceeding, Tigar could barely conceal his disdain for the conservative, pro-capitalist, pro-Israel, pro-Trump activist Klayman.

In testifying as to why he founded Judicial Watch, Klayman explained his objections to the fact that federal judges were often chosen on the basis of political contributions by their law firms, labor unions or corporations.

As a result, said Klayman, "the best and the brightest" do not always make their way onto the bench. At this, Tigar grew visibly angry and shot back that his son, Jon Tigar, also a graduate of Berkeley Law School, was a federal judge.

President Barack Obama had appointed young Tigar to the federal bench in San Francisco. Klayman said he did not mean to impugn Tigar's son, but Judge Tigar deserved impugning. Tigar is the same federal judge who willy-nilly enjoined President Trump's asylum policy for illegal immigrants.

In its [article on Klayman's recommended suspension,](#) the Washington Post observed, that the "conservative" Klayman "is a notably combative litigant whose no-holds-barred tactics and robust use of the Freedom of Information Act have made him a dreaded – and sometimes loathed – inquisitor."

The Post also noted that Klayman writes for "WorldNetDaily, a right-wing news aggregator site." As to the left-wing politics of Fitch and Tigar, the Post predictably made no mention at all and failed to take seriously Klayman's claim that "It was a very politicized hearing committee."

The case itself has little to do with politics. It involves Klayman's pro-bono defense of a female Persian broadcaster at Voice of America. When she did not get the result she wanted, she turned on Klayman.

Both the Florida and Pennsylvania Bars dismissed identical complaints six years earlier. Following Trump's election, the head of the D.C. Bar Disciplinary Counsel resurrected the complaint six years after the woman had abandoned it.

Klayman believes that it was his high-profile legal advocacy on Trump's behalf that awakened legal radicals to the political potential of what is now a 10-year-old case.

"For Tigar, I am a conservative scalp," says Klayman, who is still able to practice law in D.C. during the appeal, "and one that he obviously harbors an animus toward, particularly given my support of Trump."

The 78-year-old Tigar has been an unapologetic disciple of the hard left from his student days. In his memoir, he boasts of his fond feelings for the brothers Castro and his attendance at the notorious Soviet-sponsored World Festival of Youth and Students in Helsinki in 1962.



Tigar's radicalism alarmed even liberal Supreme Court Chief Justice Earl Warren. According to Tigar, in 1965 Warren ordered Justice William Brennan to fire Tigar, then clerking for Brennan, and Brennan did just that.

Michael Tigar with Ramon Castro, the oldest of the Castro brothers, in 1978.

Tigar has not mellowed as he has grown older.
In fact, he has turned as the larger progressive movement has from defending free speech to suppressing it.

"Of all the remarkable developments of the past decade," argues British author Frank Furedi, "none has been more sinister than the West's gradual surrender of mankind's most important values: the twin ideals of freedom of speech and expression."

In Washington, that "surrender" has been imposed almost exclusively on the political right. Enforcing it are attorneys like Tigar and Fitch, the Democrats in Congress, federal judges of the Jon Tigar mold, and the intel agencies, all with the indispensable support of an increasingly leftist media.

The same Michael Tigar who supported the free speech movement while a law student at Berkeley in the 1960s is now working actively to silence Larry Klayman. It is hard to interpret Tigar's behavior otherwise.



The #1
*New York Times*
Bestseller

# THE
# BRETHREN
## INSIDE THE SUPREME COURT

## BOB WOODWARD
## SCOTT ARMSTRONG

"Explosive. . . . The most controversial book on the Supreme Court yet written."
—*Los Angeles Times Book Review*

...mendation for a rebuttal. Douglas called his close friend, Clark
...ford, a former Secretary of Defense under President Johnson.
..."Nixon has sicked his gorillas on me," he told him. It was the work
...Nixon and Mitchell, and Ford was the front man. Douglas knew
...administration was willing to play politics with the Court and
...it had used "friendly persuasion" to get Fortas off the bench.
...asked Clifford to lead the defense. Clifford declined. He rea-
...that he was too closely identified with the Democratic Party;
...whole thing would look too much like a political brawl.
...finally engaged Simon Rifkind, a onetime classmate at
...Columbia Law School. Rifkind was also a Democrat, but had
...as a federal judge for years.

...The attacks and investigations preoccupied Douglas. He was
...determined to outlast the Nixon presidency. But since there
...no forum for him as a Supreme Court Justice to defend him-
...he declined public comment. He turned inward and brooded,
...calling friends late at night. If they succeeded in impeaching and
...convicting him, what would be left of all the values and freedoms
...he had fought for all his life? How could the Court remain inde-
...pendent? His "side," already damaged by the departure of Warren
...and Fortas, would be irreparably weakened. The liberals were in
...trouble. Black, old and slowing up, had good and bad days. His
...memory problems cropped up at unpredictable times. Even
...worse, as Black aged he was becoming more conservative. He was
...no longer a certain liberal vote.

...Marshall was weak—a correct vote, a follower, but no leader, no
...fighter. He was not one to speak up articulately or forcefully. That
...left Brennan. "Bill's not a troublemaker," Douglas told an associate.
...Brennan was indeed a true friend, another correct vote, but really
...a man of the center, an organizer for the moderate-liberal position.
...Brennan was too willing to compromise. When things got tough,
...Douglas felt, Brennan did not stand up for his principles. In 1966,
...Brennan hired a University of California at Berkeley law gradu-
...ate, Michael Tigar, as a clerk. Tigar had been a leading radical ac-
...tivist. When conservative columnists attacked Brennan, it became
...a political issue. Brennan fired Tigar the week he arrived to start
...work. As Douglas saw it, Brennan sacrificed the clerk to protect his

personal position and his relationships with the moderate and conservative Justices. Douglas called it "scandalous," a "shocking cave-in."

During the impeachment investigation, friends and advisers from the old days would come to have lunch with Douglas, to help develop strategy and to offer suggestions. Douglas was often near tears of outrage. He felt powerless. Always suspicious, he was sure that the investigators would resort to any tactic, no matter how low or even illegal. He was more than ever convinced that his phone was tapped, that his office and perhaps even the conference room were bugged. (Even before Nixon's arrival, he had persuaded Earl Warren to have the conference room checked for listening devices. None was found.)

"Let's take a walk in the hall," Douglas told a friend who had come to discuss strategy. Many times during that year, Douglas came to Brennan's chambers and asked him to walk in the halls to discuss something privately. "I've got to go meet Bill out in the hall," Brennan would say to his clerks, his eyes twinkling. None of the other Justices seemed to take the investigation seriously enough, Douglas thought. Everyone seemed unconcerned.

Nixon wasn't sure that impeachment of Douglas was a very good idea. The evidence was thin, and Burger had signaled him that the attack was not good for the Court. Also, the President was more concerned with foreign affairs, particularly with the military escalation in Southeast Asia.

Later, when Nixon called Mitchell and said Ford should be told to "turn it off," Mitchell indicated that it would be difficult, since he himself had supplied Ford with some ammunition.* But he could put some distance between the administration and the impeachment move in a speech he was about to give to the Bar Association of the District of Columbia.

Mitchell's draft, condemning "irresponsible and malicious" criticism of the Court, was sent to Nixon, who forwarded it to Burger. Burger found it perfectly appropriate. When Burger tried to call

---

* See William Safire: *Before the Fall: An Inside View of the Pre-Watergate White House.*



MICHAEL E. TIGAR HAS WORKED FOR OVER FIFTY years with movements for social change as a human rights lawyer, law professor, and writer. As an attorney, Tigar argued seven cases before the U.S. Supreme Court, worked in opposition to the death penalty, and participated in international human rights cases. In 1980, with co-counsel Samuel Buffone, Tigar successfully represented the families of former Chilean Ambassador Orlando Letelier and Ronni Karpen Moffitt, who were killed by agents of Augusto Pinochet's military junta. His clients, over the years, have included H. Rap Brown (Jamil Abdullah Al-Amin), Angela Y. Davis, Leonard Peltier, and Lynne Stewart. As a professor, Tigar has taught at law schools in the United States, France, South Africa, and Japan. He is Emeritus Professor at Duke Law School and American University Washington College of Law. Tigar's literary career encompasses fifteen books, three plays, and scores of articles and essays. His book, *Law and the Rise of Capitalism*, first published by Monthly Review Press, has been translated into Spanish, Portuguese, Greek, Turkish, and Chinese. His memoir, published in 2002, is *Fighting Injustice*.



# Mythologies of State and Monopoly Power

## MICHAEL E. TIGAR



MONTHLY REVIEW PRESS
New York

# Contents

Introduction: Mythologies, Mental Shortcuts,
Rationalizations, Impressions | 7

**1. Mythologies of Racism | 19**
~ Fear, Loathing, and Myth I: The Japanese Internment
and Manipulated Fear | 19
~ Fear, Loathing, and Myth II: "Separate but Equal" and
the Land Where Supreme Court Justices Dwell | 22
~ The Last Gasp of "Separate but Equal" | 27
~ The Persistence of Racist Mythologies | 31

**2. Mythologies of Criminal Justice | 37**
~ Palladiums and Citadels | 37
~ Mass Incarceration and Social Control | 38
~ The Mythology of Fair Trial | 40
~ Plea Bargains: The Mythology of Consent | 45
~ Point: Orlando Hall, the "Other," and
Ineffective Counsel | 49
Objectively Ineffective | 53
~ Counterpoint: Clarence Darrow Confronts
Racist Mythology | 55
~ Albert Camus's *The Stranger*: Mythologies of
Trial and Colonial Mentality | 62
~ Battling for Defendant Rights | 68

### 3. Mythologies of Free Expression | 73
~ The Marketplace of Ideas | 73
~ State Repression | 75
~ Who Owns the Streets? | 77
~ But for Colporteurs, Maybe Anything Goes | 86
~ Abolishing "Feudalism": A Mythology of Freedom | 88
~ The Evanescence of Custom | 94
~ SLAPP-Happy: Fries with That | 95
~ A Lawsuit Lovely as a Tree | 98
~ Radio Days: The Property Norm Devours
the Mythology of Free Expression | 101
~ As Seen on TV | 104
— The Pentagon Papers: Privatizing John Adams's
"General Knowledge" | 107

### 4. Mythologies of Worker Rights | 111
~ Who Is Intimidating Whom? | 111
~ Contract, Conspiracy, and Worker Consent | 114
~ The Nineteenth-Century Worker in the Courts | 119
~ Shakespeare on Worker Consent | 122
~ Smithfield Redux: Community Organizing and
Employer Consent | 123
~ Sickening Opposition to Workers' Rights | 125

### 5. Mythologies of International Human Rights | 129
— The *Kiobel* Case: "United States Law . . . Does Not
Rule the World" | 129
~ O Tortured Workers, Won't You Make Me
a Mercedes-Benz | 136

Notes | 147
Index | 159

INTRODUCTION

# Mythologies, Mental Shortcuts, Impressions

THIS BOOK IS A COLLECTION of essays. Some of them focus on how mythologies mask state repression of democratic rights in the fields of racism, criminal justice, free expression, worker rights, and international human rights. Others deal with the ways that ordinary private law categories of property, contract, and tort perform the same social function.

Mythologies are structures of words and images that portray people, institutions, and events in ways that mask an underlying reality. In the days when France used the guillotine, the executioner cried, just after the blade dropped, "*Au nom du peuple français, justice est faite.*" In the name of the French people, justice is done. This cry had no rational relation to discourse about what is fair, right, decent, or in accord with evidence about conduct. "Justice" was a name given to an event, to elevate the act of killing into an acceptable and rational process.

To proclaim "Justice" committed two solecisms. First, it appropriated justice as the exclusive property of the state. Second, it assigned a fictitious value to the word, invoking a mythology of the universality of language.

In the United States, there is a department that calls itself Justice. Colloquially, we use the term "criminal justice

scene, for example, the Rouen Cathedral, over and over. Each of those paintings gives us a different impression of the same scene.

All of these terms, which I often use interchangeably, refer to ways of seeing and interpreting the world around us. As I say, most of them are harmless and even useful ways of getting through the day. Some, however, are ways we fool ourselves, or permit ourselves to be fooled, about what is really going on. William James said, "A great many people think they are thinking when they are merely rearranging their prejudices."

In human rights litigation, and indeed in all law practice, we must deconstruct the myths that have grown up around our clients, the groups to which they belong, and the conduct attributed to them. Based on our client's race, social class, sexual orientation, or some other characteristic, the state rationalizes its treating our client especially harshly.

When we litigate cases, we confront not only the evidence adduced and the legal principles being argued, but also the socially, culturally, and historically determined attitudes of judges and jurors. In a jury trial, we use *voir dire* to uncover those. We look up the biographies and prior decisions of judges.

I am a human rights lawyer. My most important task is to expose, analyze, and combat the mythologies that dominate legal ideology. These mythologies form a systematic justification for the way that state power and private economic power is wielded. The essays in this book focus on how mythologies may be understood and exposed. This "myth-busting" lies at the heart of the lawyer's work. We undertake to represent clients who are marginalized. To borrow a phrase from artist and art critic John Berger, we mediate between what is given and what is desired.

The essays in this collection address five groups of mythologies that help to rationalize the present system of social relations: racism, criminal justice, free expression, worker rights, and human rights. They deconstruct what the state and the wielders of monopoly power tell us, in order to seek out what is really going on.

Throughout these essays, I repeat a theme: the law is not what it says, but what it does. What "it does" is so often based on assumptions that time and the tide of events have shown to be false. Karl Marx wrote, "The law shows its *a posteriori* to the people, as God to his servant Moses." As Anatole France famously wrote: "'The majestic equality of the laws, which forbid the rich as well as the poor to sleep under bridges, to beg in the streets and to steal bread."

The "law" is itself an ideology, constructed to define, defend, and enforce a system of social relations. Its mythologies are enshrined as precedents. Jonathan Swift wrote in *Gulliver's Travels*:

> It is a maxim among these lawyers, that whatever hath been done before may legally be done again: and therefore they take special care to record all the decisions formerly made against common justice and the general reason of mankind. These, under the name of precedents, they produce as authorities, to justify the most iniquitous opinions; and the judges never fail of decreeing accordingly.

If we focus only on what "the law" says, we catch ourselves saying that "the law has evolved," which is like saying that "the market has crashed," or "the bank has failed," or "the car did not stop at the red light." This formulation reifies and mystifies legal rules, and if accepted leads to alienation

CURRENT AFFAIRS | LEGAL STUDIES

"Beautifully written, learned, and profoundly insightful. In a better world, Michael Tigar would be a justice on the United States Supreme Court."—MICHAEL STEVEN SMITH, Co-host, *Law and Disorder Radio*

"Elegant, brilliant, and timely . . . a breath of fresh air, busting open the mythologies of state power that overwhelm us. Tigar provides analytical tools that inspire and empower."—ROXANNE DUNBAR-ORTIZ, author, *Loaded: A Disarming History of the Second Amendment*

"Tigar identifies the vulnerabilities in, and cuts the heart out of, the destructive mythologies he addresses. These essays are particularly timely because the forces of greed, ignorance, and bigotry are now so firmly in power."—JERRY COHEN, former general counsel, United Farm Workers

"Tigar explores important issues through the lens of his extraordinary personal and professional experience, and through his analysis of some of the most important cases decided by the nation's courts. This book is a must-read."—ANGELA J. DAVIS, Professor, Washington College of Law; author, *Arbitrary Justice: The Power of the American Prosecutor*

"An incisive, unsparing, creative, and brilliant critique of capitalist law and its dire human consequences."—BERNARDINE DOHRN, co-editor with Bill Ayers, *Race Course: Against White Supremacy*

"Like Clarence Darrow, Tigar is a 'defender of the damned.' Ignore what he says, and we are all damned by a justice system that he shows to be anything but just."—CHARLES GLASS, author, *They Fought Alone: The True Story of the Starr Brothers, British Secret Agents in Nazi-Occupied France*

"For anyone concerned with the rule of law, or more generally with the real significance of freedom and justice, this highly informed and carefully argued study should be essential reading."—NOAM CHOMSKY

ISBN 978-1-5836774-2-1



9 781583 677421

Cover image: Honoré Daumier, *The Defender*, 1865.

MONTHLY REVIEW PRESS | NEW YORK



MR Store | MR Press | MR Online | MR (Castilian) | Climate & Capitalism | Money on the Left | LOG IN | Login

# MONTHLY REVIEW
AN INDEPENDENT SOCIALIST MAGAZINE

Search the MR Press Store

Subscribe | Solidarity Offer! | Store ▾ | Press ▾ | Browse ▾ | Contact ▾ | Help ▾ | My Account ▾ | 🛒 0 items - $0.00

## *The Michael Tigar Papers*: Amazing New Public Resource, much appreciated by Jeremy Corbyn

filed under News

**Michael E. Tigar**, author of the forthcoming *Mythologies of State and Monopoly Power*, is an eminent international human rights attorney as well as a teacher, scholar, journalist, playwright, and comrade. Recently School of Law at the University of Texas, Austin, created an online resource, offering documents, photos, and interviews reflecting years of Tigar's life and work. **The Michael Tigar Papers** website provides a glimpse of Tigar's career and life. It is organized around a digital collection of papers that Tigar donated to the Bernard and Audre Rapoport Center for Human Rights and Justice and the Dolph Briscoe Center for American History. It also includes excerpts from an oral history that the Rapoport Center conducted with him.



FROM THE MICHAEL TIGAR PAPERS: Tigar (right) with Ramón Castro, 1978

Visit **The Michael Tigar Papers archive** to see records from the well-lived life of **Michael Tigar**. And find out what UK Labour Party Leader and MP **Jeremy Corbyn** thinks of this:





Click to order

👍 Like | Facebook | Twitter | PrintFriendly | Reddit | Email | Share

## Connect

Subscribe to the Monthly Review e-newsletter (max of 1-3 per month).

E-mail | SUBMIT

### Subjects

Ecology
History
Imperialism
Inequality
Marxism
Media
Movements
Political Economy

### New from Monthly Review Press!



How the World Works: The Story of Human Labor from Prehistory to the Modern Day




Socialist Register 2020: Beyond Market Dystopia: New Ways of Living



The Punishment Monopoly: Tales of My Ancestors, Dispossession, and the Building of the United States

‹ Michael Tigar Busts More Myths on *Law & Disorder Radio*    New! *Can the Working Class Change the World?* ›

Monthly Review | Tel: 212-691-2555
134 W 29th St Rm 706, New York, NY 10001

© 2020 MONTHLY REVIEW FOUNDATION ALL RIGHTS RESERVED

Listen   ☰

LAW AND DISORDER : NATIONAL • NEWS & PUBLIC AFFAIRS

# Attorney Michael Tigar: The Mythologies of State and Monopoly Power

00:00        00:00

Podcast: **Play in new window** | **Download** (Duration: 57:21 — 65.6MB) | **Embed**

**LISTEN LIVE ON KKFI**
Every Tuesday at
9:00am

**ABOUT THE SHOW**



**Law and Disorder**
Law and Disorder is a
weekly, independent
radio program airing on
several stations across
the United States. Law
and Disorder gives
listeners access to rare
legal perspectives on
issues concerning civil

**Attorney Michael Tigar: The Mythologies of State and Monopoly Power**

The American criminal justice system is buttressed, sustained and perpetuated by various myths. These myths dominate legal ideology. The most important of these myths concern racism, criminal justice, free expression, workers rights, and international human rights. Ordinary private law categories of property, contract, and tort perform the same social function, Michael Tigar writes in his important new book Mythologies of State and Monopoly Power.

Michael Tigar has worked for more than 50 years with movements for social change as a human rights lawyer, law professor, and writer. He believes that busting these myths is the work of movement lawyers.

Noam Chomsky has written that for anyone concerned with the rule of law, or more generally with the real significance of freedom and justice, Michael Tigars book is a highly informed and carefully argued study that should be essential reading.

liberties, privacy, right to dissent and the horrendous practices of torture exercised by the US government.

The book is beautifully written, learned, and profoundly insightful. In a better world Michael Tigar would be a justice of the United States Supreme Court.

http://tigarbytes.blogspot.com/

Guest " Michael Tigar, emeritus professor of law at Duke University and at Washington College of Law. He has been a lawyer working on social change issues since the 1960s. He has argued numerous cases in United States Supreme Court and many Circuit Courts of Appeal. His books include Law and the Rise of Capitalism, Fighting Injustice , and the forthcoming Mythologist of State and Monopoly Power.

Law & Disorder host Michael Steven Smith, Michael Tiger and guest host attorney Jim Lafferty



SHARE THIS EPISODE



ON-AIR GUIDE

**PROGRAMS**
Music
News & Public Affairs
Arts & Culture

**EVENTS**

**SUPPORT**
Donate
Underwriting
Fundraisers

**VOLUNTEER**

**ABOUT**

**CONTACT**

**WEBSITE ISSUE**
Office: (816) 931.3122
On-Air Studio: (816) 931.KKFI (5534)
Toll-Free: (888) 931.0901
Fax: (816) 931.7078



REPUBLICA DE CUBA

PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

Ciudad de la Habana,
6 de diciembre de 1979

Sr. Michael Tigar
Washington, D.C.

Muy estimado amigo Tigar:

Me siento verdaderamente apenado con usted. Hubiese deseado escribirle de inmediato para expresarle mi más profundo agradecimiento por su gesto amistoso y sincero de enviar a nuestro país un magnífico ejemplar Santa Gertrudis. Puedo asegurarle que múltiples obligaciones y responsabilidades han ocupado mi atención y todo mi tiempo durante estos meses, lo que impidió expresarle de manera personal mi mayor reconocimiento ¿Podré pedirle aún la generosidad de que nos disculpe por esta demora involuntaria?

Como ya conocerá, el toro "Phoenix", que nos envió, llegó a Cuba con buenas condiciones, después de varios largos e inevitables períodos de cuarentena. Su estado de salud es satisfactorio, se adapta favorablemente, y pensamos que pronto estará en condiciones de entrar en producción. Creo que será un aporte de gran valor al desarrollo de nuestra masa de Santa Gertrudis, que cuidamos con esmero, y padre de animales de gran calidad. Estoy informado de todo el esfuerzo y las preocupaciones que le ocasionó el hacer llegar a nuestro país a este semental tan selecto. Por eso, aunque su obsequio es valiosísimo, todavía más valioso y más importante es para nosotros su gesto de amistad y de simpatía. Créame que me siento en una deuda de profunda y sincera gratitud hacia usted.

Habría deseado saludarle personalmente, junto a otros distinguidos amigos, en mi reciente visita a Nueva York, pero, como sabe, las circunstancias no fueron entonces las más propicias. Confío en que hallaremos la oportunidad para sostener este encuentro. Quizás sea en su propio país. ¿Y por qué no en Cuba?

Reciba el más cordial saludo de su amigo,

Fidel Castro Ruz

Sr. Michel Tigar
Esq. 1308 18 St. N.W.
Washington, D.C.
EE. UU.

REPUBLICA DE CUBA

PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

ar friend Tigar,

uly sorry with you. I would have liked to write to you immediately to express my utmost confidence in thanks for. His omitted or and sincere to send to our country a magnificent example. Saint Gertrude I can assure you that multiple ions and responsibilities have occupied my attention and all my time during these months, which prevented me from ally expressing my greatest recognition. Did you still ask for the generosity to excuse us for this involuntary delay? will know, the "Phoenix bull ", which he sent us, arrived in Cuba in good condition, after several long and inevitable of quarantine. His state of health is satisfactory, he adapts reliably, and we think he will soon be, in conditions of enter tion, I think it will be a valuable contribution to the development of our mass of Santa Gertrudis, which we take care of re, and the father of high quality animals, I am informed of all the effort and concerns caused by bringing our country to llion so select. That is why, although your gift is very valuable, even more valuable and more important for us is your of friendship and sympathy. Believe me that I feel in a debt of deep and sincere gratitude towards you.

l have liked to greet you personally, along with other distinguished friends, on my recent visit to New York, but, as you he circumstances were not the most favorable. I confess that we will find the opportunity to hold this meeting, It may be own country. Why not in Cuba?

e crying cordial greetings from your friend,

astro Ruz


*estimado amigo ligar:*

*siento verdaderamente apenado con usted. Hubiere deseado escribirle de inmediato para expresarle mi más pro fiando adecimiento por. su gesto omitios o y sincero de enviar a nuestro pais un magnifiieo ejemplar. Santa Gertrudis. Puedo urarle que múltiples obligaciones y responsabilidades kan ocupado mi atención y todo mi tiempo durante estos meses, lo impidió expresarle de manera personal mi mayor reconocimiento ¿PocLró pedirle aun la generosidad de que nos ulpe por esta demora involuntaria?*

*no ya conocerá, el toro 'Phoenix", que nos envió, llegó a Cuba con buenas condiciones, después de varios largos e itables periodos de cuarentena. Su estado de salud es satisfactorio, se adapta fiavorablemente, y pensamos que pronto rá, en condiciones de entrar en producción. Creo que será un aporte de gran valor al desarrollo de nuestra masa de ta Gertrudis, que cuidamos con esmero, y padre de animales de gran calidad. Estoy infiormado de todo el esfiuerzo y las ocupaciones que le ocasionó el hacer llegar a nuestro pais a este semental tan selecto. Por eso, aunque su obsequio es osísimo, todavía más valioso y más importante es para nosotros su gesto de amistad y de simpatía. Créeme que me siento na deuda de profunda y sincera gratitud hacia usted.*

*ría deseado saludarle personalmente, junto a otros distinguidos amigos, en mi reciente visita a Nueva Vork, pero, como , las circunstancias no fiueron entonces las más propicias. Confilo en que hallaremos la oportunidad para sostener este uentro, Quizás sea en su propio pais. ¿V por qué no en Cuba?*

*iba donfiás cordial saludo de su amigo,*

# 2 married couples on bomb case

### 1 pair works for Nichols, the other for McVeigh

**By Karen Abbott**

*Rocky Mountain News Staff Writer*

Both Oklahoma bombing defendants now have married couples on their legal defense teams.

"What about this case is not unusual?" a spokeswoman for one of the attorneys said.

Jane Tigar, who married Michael Tigar of Austin, Texas on Oct. 22, last week filed court documents officially adding her to the defense team for Terry Nichols. Michael Tigar is Nichols' chief defense attorney.

A spokeswoman in the Nichols team's Denver office said Jane Tigar joined the Nichols team in the summer of 1995, while she still was a law student at Columbia University. She was admitted to the Colorado bar in October.

The defense team for bombing suspect Timothy McVeigh, meanwhile, includes husband-and-wife lawyers Richard Burr and Mandy Welch of Houston. Both are specialists in defending against the death penalty.

Asked about the coincidence of two married couples being involved in the case as defense lawyers, lawyer Rob Nigh of the McVeigh team said from Enid, Okla., "The case is such that you call upon every available resource."

"Dick Burr knew that one of the best people to help him was Mandy Welch," Nigh said.

McVeigh and Nichols could face death sentences if they are convicted of the April 19, 1995, bombing of Oklahoma City's Alfred P. Murrah Federal Building. The blast killed 168 people and injured more than 500.

The two men will be tried in Denver's federal courthouse — McVeigh first, starting March 31. No trial date has been set for Nichols.

Each defendant has a court-appointed, taxpayer-funded defense team of about five lawyers. About 10 federal prosecutors, also paid by taxpayers, are working on the case. No side has been willing to disclose exactly how many lawyers are at work on the case, and expense records are sealed by court order until the case is over.

96
12-11-96
R.M.N.

WIKIPEDIA

# Michael Tigar

**Michael Edward Tigar** (born January 18, 1941 in Glendale, California)[1] is an American criminal defense attorney known for representing controversial clients. He is also an emeritus (retired) member of the Duke Law School and American University, Washington College of Law faculties.

| Michael Tigar | |
|---|---|
| **Born** | January 18, 1941 |
| **Nationality** | United States |
| **Alma mater** | University of California, Berkeley (B.A., J.D) |
| **Occupation** | Lawyer |

## Contents

Early life and education

Career in law

Notable cases and clients

Personal life

Books

Notes

References

External links

## Early life and education

Tigar earned his Bachelor of Arts from the University of California, Berkeley in 1962 and his J.D. from the University of California, Berkeley School of Law in 1966. As an undergraduate, he was elected to the ASUC (Associated Students of the University of California) Senate as a SLATE candidate. He also ran unsuccessfully for Student Body President. He interviewed Bertrand Russell during the 1962 Cuban Missile Crisis for Pacifica Radio. In law school he was a member of Order of the Coif and served as editor-in-chief of the *California Law Review*.

## Career in law

In 1966, he was hired as a law clerk by Justice William J. Brennan of the United States Supreme Court. Brennan, however, fired him the week he began his job, following complaints made by conservative columnists and FBI director J. Edgar Hoover, because of Tigar's activist background.[2][3] Tigar taught at the UCLA School of Law during the period 1968-1972. He taught evidence courses and a course in Selective Service Law. In 1967, he became the first Editor-in-Chief of the *Selective Service Law Reporter* (Public Law Education Institute, 1968–1973).[4] Tigar was a partner in the firm of Williams & Connolly of Washington, DC (1975–'78), where he worked closely with legendary trial attorney Edward Bennett Williams. He then formed his own firm with partner Samuel J. Buffone.[5] Tigar was a professor of law at the University of Texas School of Law from 1983 to 1998, holding the Joseph D. Jamail Centennial Chair in Law from '87-'98.[6] With a grant from

Texas plaintiffs' lawyers he and Jane B. Tigar founded the UNROW Human Rights Impact Litigation Clinic, where he served as the Clinic's first Executive Director and Supervising Attorney. He was then a professor at American University's Washington College of Law starting in 1998,[7] and later also at Duke Law School.

In his teaching, Tigar has worked with law students in clinical programs where students are counsel or law clerks in significant human rights litigation. He has made several trips to South Africa, working with organizations of African lawyers engaged in the struggle to end apartheid, and after the release of Nelson Mandela from prison, to lecture on human rights issues and to advise the African National Congress on issues in drafting a new constitution. He has been actively involved in efforts to bring to justice members of the Chilean junta, including former President Pinochet. Of Tigar's career, Justice William J. Brennan has written that his "tireless striving for justice stretches his arms towards perfection."

In 1999, the California Attorneys for Criminal Justice held a ballot for "Lawyer of the Century." Tigar was third in the balloting, behind Clarence Darrow and Thurgood Marshall. In 2003, the Texas Civil Rights Project named its new building in Austin, Texas, (purchased with a gift from attorney Wayne Reaud) the "Michael Tigar Human Rights Center."

In retirement, Tigar is professor of the practice of law emeritus at Duke Law School,[8] and research professor emeritus at the American University, Washington College of Law.[9] He has been visiting professor at the law faculty of the Paul Cézanne University, Aix-en-Provence, and has lectured at law schools in several countries.

In 2016, Tigar donated his papers to the University of Texas Law School Library, which held a symposium to launch the collection in 2018.[10]

# Notable cases and clients

- Fernando Chavez, Cesar Chavez's son, who refused induction into the military based on his pacifist beliefs.
- Lynne Stewart, who was charged with conspiracy and providing material support to terrorists
- Terry Nichols, of the Oklahoma City bombing
- Angela Davis, activist charged with murder, kidnapping, and conspiracy for her alleged involvement in the death of Judge Harold Haley[11]
- Kiko Martinez, Chicano activist
- John Demjanjuk, a Ukrainian-born immigrant accused of having been "Ivan the Terrible," a notorious Nazi concentration camp guard, whose conviction by courts in Israel was overturned but was stripped of U.S. citizenship on other grounds. He was retried by the U.S. Justice department and was convicted. Tiger represented Demjanjuk at the trial and appeal. Demjanjuk was deported to Germany where he died in prison.
- Scott McClellan, former press secretary to President George W. Bush, who testified before Congress regarding the role of the Bush Administration in the leak regarding the identity of former CIA agent Valerie Plame.

Tigar has argued seven cases before the United States Supreme Court,[12] and over 100 federal appellate cases. He has tried cases in all parts of the United States. In addition to activist clients, he has represented Sen. Kay Bailey Hutchison, Rep. Ronald Dellums, Rep. John M. Murphy (during the Abscam scandal), former Gov. John Connally, Fantasy Films and Mobil Oil.

# Personal life

Tigar has been married four times. He has been married to journalist-turned-attorney Jane Blanksteen Tigar since 1996.[3] He has three children by previous marriages,[13] including United States Federal Judge Jon S. Tigar.[14], addiction medicine specialist and capital case mitigation expert Katherine McQueen, M.D., and business consultant Elizabeth Torrey Tigar.

# Books

- *A Practice Manual of Selective Service Law* (1968)
- *Law Against the People* (1971) (co-author)
- *Law and the Rise of Capitalism* (1978) (co-author) review (https://www.jstor.org/pss/1340351)
- *The ministry of culture: Connections among art, money and politics* (1980) (contributor)
- *Federal Appeals: Jurisdiction and Practice* (1993)
- *Persuasion: the Litigator's Art* (1999, 2003)
- *Fighting Injustice* (2002)
- *Examining Witnesses* (2d ed., 2003). ISBN 1-59031-256-2
- *Thinking about Terrorism: The Threat to Civil Liberties in Times of National Emergency* (2007)
- *Trial Stories* (2008) (with Davis, ed.)
- *Nine Principles of Litigation and Life* (2009)
- *Mythologies of State and Monopoly Power* (2018) ISBN 978-1-58367-743-8

# Notes

1. Vile, J.R. (2001). ***Great American Lawyers: An Encyclopedia*** (https://books.google.com/books?id=XR1NPiqp5aQC). **1**. ABC-CLIO. p. 663. ISBN 9781576072028. Retrieved December 13, 2014.
2. Bob Woodward, *The Brethren: Inside the Supreme Court* (1979), p. 77.
3. Romano, Lois (1997-09-29). "A Man of Independent Means" (https://www.washingtonpost.com/wp-srv/national/longterm/oklahoma/stories/tn-lawyer.htm). Washington Post. Retrieved August 4, 2014.
4. LLMC, Book Preservation. "Military Law" (http://www.llmc.com/Historical_Millaw.asp#page_21). *LLMC Central*. Law Library Microform Consortium. Retrieved July 28, 2014.
5. BuckleySandler, Professionals. "Samuel J. Buffone" (http://www.buckleysandler.com/professionals-bio-detail/samuel-j-buffone). *buckleysandler.com*. BuckleySandler LLP. Retrieved September 1, 2014.
6. "http://www.utexas.edu/student/registrar/gopherfiles/catalog/cat-law/The_Faculty" (https://web.archive.org/web/20160124025050/http://www.utexas.edu/student/registrar/gopherfiles/catalog/cat-law/The_Faculty). utexas.edu. Archived from the original (http://www.utexas.edu/student/registrar/gopherfiles/catalog/cat-law/The_Faculty) on January 24, 2016. Retrieved December 13, 2014. External link in `title=` (help)
7. Association of American Law Schools Directory of Law Teachers 2007-08, p. 1095
8. "Michael E. Tigar | Duke University School of Law" (http://www.law.duke.edu/fac/tigar/). law.duke.edu. Retrieved December 13, 2014.
9. "Tigar, Michael - Faculty - American University Washington College of Law" (http://www.wcl.american.edu/faculty/tigar/). wcl.american.edu. Retrieved December 13, 2014.
10. "The Michael Tigar Papers" (https://law.utexas.edu/tigar-event/). *School of Law*. University of Texas at Austin. Retrieved 22 November 2018.

11. "Judge removes himself in Angela Davis case" (https://news.google.com/newspapers?id=hLkqAA AAIBAJ&sjid=S2YEAAAAIBAJ&pg=7271%2C480811). *Sarasota Herald-Tribune*. Sarasota, Florida. AP. March 18, 1971. p. 5-A.

12. using search term "Tigar" (http://www.oyez.org)

13. Vile, John R. *Great American Lawyers*. New York: ABC-CLIO, 2001.

14. Yulico, Nick (December 28, 2001). "Davis Nominates Santa Clara Judge to Sixth District Court of Appeal" (http://www.metnews.com/articles/judg122801.htm). *Metropolitan News-Enterprise*. Retrieved December 22, 2012.

# References

- Browning, John G. "Legally Speaking: When a Lawyer Goes Too Far" (http://www.setexasrecord.c om/arguments/202358-legally-speaking-when-a-lawyer-goes-too-far), "At trial, [Lynne Stewart] was represented by noted defense attorney Michael Tigar (a favorite of the left whose past clients have included '60s radical Angela Davis and Oklahoma City bombing defendant Terry Nichols), who argued..." *Southeast Texas Record,* 2007-10-10. Retrieved 2007-10-20.
- The Professional Education Group https://www.proedgroup.com/michael-tigar

# External links

- Books by Michael Tigar (https://books.google.com/books?as_auth=Michael+E+Tigar&ots=brvvr9t US1&sa=X&oi=print&ct=title&cad=author-navigational)
- Washington College of Law, American Univ., faculty page (http://www.wcl.american.edu/faculty/tig ar)
- Duke Law School faculty page (http://law.duke.edu/fac/tigar)
- TigarBytes (blog) (http://tigarbytes.blogspot.com)

---

Retrieved from "https://en.wikipedia.org/w/index.php?title=Michael_Tigar&oldid=933036534"

---

**This page was last edited on 29 December 2019, at 16:51 (UTC).**

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# EXHIBIT 3

 Gmail

Oliver Peer <oliver.peerfw@gmail.com>

---

## Fwd: Your letter of August 4

**Larry Klayman** <klaymanlaw@gmail.com>     Sun, Aug 9, 2020 at 5:06 PM
To: Phil Fox <FoxP@dcodc.org>, "Julia L. Porter" <porterj@dcodc.org>, "Julia L. Porter" <PorterJ@dcobc.org>, Clay Smith <smithc@dcodc.org>
Cc: Oliver Peer <oliver.peerfw@gmail.com>

Mr. Fox:

Again, I ask you to provide me with the authority in writing concerning your sending letters to courts and others informing them of the June 11, 2020 opinion of the District of Columbia Court of Appeals, which ruling I was contesting. Moreover, why was I not copied ) (cc'd) on these letters, and why did I only learn of them when the U.S. District Court for the Northern District of Texas put Mr. Bloom's letter on its "docket," after I asked if ex parte communications had been sent to this court.

It is clear that Mr. Bloom's letters have been written at your direction and the direction, at a minimum, of your deputy bar counsel Ms. Julia Porter, who is now under an internal bar ethics review herself, as recently confirmed to Mr. J.P. Szymkowicz by the Chairman of the Board of Professional Responsibility, for alleged unethical and illegal conduct in a thirteen year old proceeding that fortunately ended in Mr. Szymkowicz's and his father John's favor, but not without much emotional distress and great loss of time and expense. It would also appear that Ms. Porter either directed or put Mr. Michael Frisch, formerly of your office and now a Georgetown law professor, to defame him publicly after Mr. Syzkowicz and his father had been cleared of any unethical wrongoing. This is simply not only unethical, but also despicable.

Given the lack of cited authority and the failure to even copy me on Mr. Bloom's letters, I can only conclude that this not only constitutes yet another abuse of process by Bar Disciplinary Counsel, but also amounts to tortious interference in my legal practice outside of the District of Columbia, for which you have no authority or jurisdiction.

If you and your colleagues find the time to do your research, you would have learned that Texas has a four (4) year statute of limitations on ethics complaints, and the matter for which you took it upon yourself to try to harm my client, Buzz Photo and me, with regard to an on-going class action lawsuit against Communist China over the release of the COVID-19 virus, would be time barred in this state.

Moreover, I am a member of The Florida Bar, as you know, and Florida too generally does not countenance proceedings that are now about twelve years old, such as the instant proceeding that is the subject of the District of Columbia Court of Appeals order of June 11, 2020, as Professor Rotunda wrote in his opinion which found that I had not engaged in sanctionable conduct.

Notwithstanding the threats contained in your email, I will not use letterhead for my law practice which has a District of Columbia address during the duration of the 90 day suspension, until I am able to resume the practice of law in the district. However, given that I was challenging the June 11, 2020, order I did not have any intent to suggest I was still practicing law in the district. In any event, the letter was written to you, Mr. Bloom and Ms. Porter about a disciplinary proceeding, and it was written in my pro se capacity in my own defense, which is my constitutional right. Your threat is however noted and it is consistent, sadly, with the way you and your very leftist, politically and gender based partisan office has comported itself toward me. Previously, you, Ms. Porter and former deputy bar disciplinary counsel Ms. Elizabeth Herman disparaged me in person, while I was in your office in good faith to try to resolve matters, stating that your office does not like the way I practice law. During a meeting with me, you even physically charged at me in a threatening manner, shouting the same thing, which event has been documented.

And in another non-meritorious bar proceeding concerning my representation of Cliven Bundy, where the hearing committee could not find at the close of the hearing even "probable cause" of alleged unethical conduct, Ms. Porter incredibly and shamelessly called for my disbarment in her closing argument, telling the committee that I should no longer have the privilege of practicing law.

I would suggest that the shoe should fit on the other foot when it comes Ms. Porter, you, and others in your office over a pattern of unethical misconduct that has been set forth in court pleadings and elsewhere. But instead you hide behind a claim of immunity, which I do not believe will hold up upon judicial review, for the compelling reasons stated in my legal briefs now before various courts.

I THEREFORE POLITELY ASK AGAIN THAT YOU AND YOUR OFFICE, AS A MATTER OF ETHICS IF NOT SIMPLE PROFESSIONAL COURTESY, PROVIDE THE LETTERS WHICH YOU AND YOUR OFFICE SENT TO COURTS AND OTHERS EX PARTE WITHOUT MY BEING COPIED ON THEM. PLEASE PROVIDE THEM BY COB MONDAY AUGUST 10, 202O. YOU CAN SCAN THEM AND EMAIL THEM TO ME AT THIS EMAIL ADDRESS.

Please govern yourselves accordingly.

Larry Klayman, Esq
Licensed in Florida and Pro Se

[Quoted text hidden]

# KLAYMAN LAW GROUP
### A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.                2020 Pennsylvania Ave. N.W., #800            Tel: 310-595-0800
                                   Washington, DC, 20006                       Fax: 202-379-9289

Via Email, Fax and Mail

August 4, 2020

Lawrence K. Bloom
Senior Staff Attorney
Office of Disciplinary Counsel
515 5th St NW
Building A, Room 117
Washington, DC, 20001
Fax: 202-638-0862

Dear Mr. Bloom:

I am attaching as Exhibit 1 a letter, previously undisclosed, which you sent to the U.S. District Court for the Northern District of Texas informing them of the order of the District of Columbia Court of Appeals of June 11, 2020.

Please advise immediately under what authority you took it upon yourself, obviously at the direction of Bar Disciplinary Counsel Hamilton Fox, Deputy Bar Counsel Julia Porter and Assistant Bar Counsel H. Clay Smith, III, to send this letter. Notably, I was not cc'ed on the letter and only obtained it long after the fact from the Texas court.

Please also advise immediately if you have sent the same or similar letters to other courts and/or other parties and third parties.

As you and your colleagues know, at the time that this letter to the U.S. District Court for the Northern District of Texas was sent, I had pending before the District of Columbia Court of Appeal petitions for rehearing before the original panel and for rehearing en banc.

PLEASE PROVIDE TO ME IMMEDIATELY BY EMAIL ANY AND ALL SUCH LETTERS OR OTHER COMMUNICATIONS.

Thank you for your immediate compliance with my requests, and no later than by noon tomorrow, August 5, 2020.

Sincerely,

Larry Klayman, Esq.

cc: Hamilton Fox, Bar Disciplinary Counsel (Via Email)
    Julia Porter, Deputy Bar Disciplinary Counsel (Via Email)
    H. Clay Smith, III, Assistant Bar Disciplinary Counsel (Via Email)

# EXHIBIT 1



# OFFICE OF DISCIPLINARY COUNSEL

Hamilton P. Fox, III
*Disciplinary Counsel*

Julia L. Porter
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Myles V. Lynk
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik deBoer
Jerri U. Dunston
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Joseph C. Perry
William R. Ross
Clinton R. Shaw, Jr.
H. Clay Smith, III
Caroll Donayre Somoza
Traci M. Tait

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela Walker

*Manager, Forensic Investigations*
Charles M. Anderson

*Investigative Attorney*
Azadeh Matinpour

*Intake Investigator*
Melissa Rolffot

June 26, 2020

United States District Court
  for the Northern District of Texas
1100 Commerce Street, Room 1452
Dallas, TX  75242

          Re: *In re Larry Klayman*
             DCCA No. 18-BG-0100
             Disciplinary Docket No. 2008-D048
             <u>NOTICE OF SUSPENSION</u>

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of
Appeals disciplining the above-named attorney.  Our records reflect that
Respondent is also licensed to practice law in the United States District Court
for the Northern District of Texas.

If you require additional documents regarding this disciplinary matter, please
do not hesitate to contact me at (202) 638-1501.  *<u>Please note, we can only accept
expedited deliveries via USPS express mail</u>*.

          Sincerely,

          /s/ Lawrence K. Bloom
          Senior Staff Attorney

LKB/his

Enclosure:   DCCA Court Order for *In re Larry Klayman*
             Disciplinary Docket No. 2008-D048

***Notice:  This opinion is subject to formal revision before publication in the
Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the
Court of any formal errors so that corrections may be made before the bound
volumes go to press.***

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-BG-0100

IN RE LARRY KLAYMAN

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 334581)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-48-08)

(Argued September 17, 2019                    Decided June 11, 2020)

*Stephen A. Bogorad*, with whom *John Thorpe Richards, Jr.*, was on the brief,
for respondent.

*H. Clay Smith, III*, Assistant Disciplinary Counsel, with whom *Elizabeth A.
Herman*, Deputy Disciplinary Counsel, and *Jennifer P. Lyman*, Senior Assistant
Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before FISHER, THOMPSON, and BECKWITH, *Associate Judges*.

PER CURIAM:   The Board on Professional Responsibility (the "Board") has

recommended that this court suspend respondent Larry Klayman from the practice

of law for ninety days based on his representation of three clients in violation of Rule

1.9 (conflict-of-interest) of the District of Columbia Rules of Professional Conduct

(or its Florida equivalent).   In this matter, the Office of Disciplinary Counsel

("Disciplinary Counsel") takes exception to the Board's report and recommendation on three grounds.  First, Disciplinary Counsel challenges the Board's rejection of the finding by Hearing Committee Number Nine (the "Hearing Committee") that Mr. Klayman violated District of Columbia Rule of Professional Conduct 8.4(d). Second, Disciplinary Counsel takes exception to the Board's rejection of the Hearing Committee's finding that Mr. Klayman gave false testimony and made false representations to the Hearing Committee.  Finally, Disciplinary Counsel takes exception to the Board's recommendation that we impose a ninety-day suspension without a requirement that Mr. Klayman prove his fitness before being reinstated. For the reasons that follow, we accept the Board's recommendations.

## I.

The Board adopted most of the factual findings of the Hearing Committee, including as to the following, a summary regarding the three matters that underlie this disciplinary matter.  Mr. Klayman founded Judicial Watch and served as its in-house general counsel from its inception in 1994 until 2003.  During Mr. Klayman's tenure at Judicial Watch, Sandra Cobas served as the director of Judicial Watch's Miami Regional Office.  She complained to Judicial Watch about her employment

conditions, alleging that she was subject to a hostile work environment during several weeks in 2003.  As general counsel, Mr. Klayman provided legal advice to Judicial Watch concerning Cobas's claims.  After both Mr. Klayman and Ms. Cobas had ended their employment with Judicial Watch, Ms. Cobas filed a complaint against Judicial Watch in a Florida state court, making the same hostile-work-environment allegations.  The Florida trial court granted a motion to dismiss the case (calling the complaint "'silly and vindictive'").  Thereafter, without seeking consent from Judicial Watch, Mr. Klayman entered an appearance on Ms. Cobas's behalf and filed a motion requesting that the trial court vacate its order of dismissal.  When the motion was denied, Mr. Klayman filed a notice of appeal on Ms. Cobas's behalf and, later, a brief in a Florida appellate court, but the appellate court affirmed the dismissal.

In 2002, while still employed by Judicial Watch, Mr. Klayman solicited a donation from Louise Benson as part of a campaign to raise funds to purchase a building for the organization.  Klayman was acting as both chairman and general counsel of Judicial Watch when he solicited this donation from Benson.  Ms. Benson committed to donate $50,000 to the building fund, and thereafter paid $15,000 towards that pledge.  Judicial Watch did not purchase a building.  In 2006, after Mr. Klayman had left Judicial Watch, he and Ms. Benson filed a lawsuit against Judicial

Watch in federal court, where they were represented by attorney Daniel Dugan. Ultimately, the federal district court dismissed Ms. Benson's claims (but not Mr. Klayman's claims) on jurisdictional grounds. Shortly thereafter, Ms. Benson sued Judicial Watch in the Superior Court of the District of Columbia, alleging *inter alia* unjust enrichment and seeking a return of her donation. Initially, she was represented in that suit by Mr. Dugan. Eventually, and without seeking consent from Judicial Watch, Mr. Klayman entered an appearance in the case as co-counsel for Ms. Benson. Judicial Watch requested that Klayman withdraw, stating that he organized the fundraising effort that was at the center of Ms. Benson's complaint while he was Judicial Watch's attorney, and noting that Ms. Benson had identified him as a fact witness. When Mr. Klayman did not withdraw, Judicial Watch moved to disqualify him. The motion for disqualification was never decided, as the parties stipulated to the dismissal of the case.

In 2001, while Mr. Klayman was still employed by Judicial Watch, Judicial Watch and Peter Paul entered into a representation agreement, and a modification thereto, under which Judicial Watch agreed to evaluate legal issues emanating from Mr. Paul's fundraising activities during the election campaign for the New York State Senate in 2000 and to represent him in connection with an investigation into alleged criminal securities law violations and possible civil litigation stemming from

those fundraising activities.   Mr. Klayman drafted, edited, and approved the representation agreement and modification and authorized the signing of both documents as Judicial Watch's chairman and general counsel.   Judicial Watch later represented Mr. Paul in a civil lawsuit brought in California state court.   Following Mr. Klayman's departure from Judicial Watch, Judicial Watch withdrew from the representation.   Thereafter, Mr. Paul sued Judicial Watch in the United States District Court for the District of Columbia alleging, among other theories, that Judicial Watch breached its representation agreement with him.   While Mr. Paul initially was represented by Mr. Dugan, Mr. Klayman entered an appearance in the case without seeking Judicial Watch's consent.   Judicial Watch moved to disqualify Mr. Klayman.   The district court (the Honorable Royce Lamberth) granted the motion to disqualify, finding that Mr. Klayman's representation of Mr. Paul violated Rule 1.9.   The court found that Mr. Klayman was representing the plaintiff "in a matter directly arising from an agreement he signed in his capacity as [g]eneral [c]ounsel for the current defendant" and that Mr. Klayman's representation of Mr. Paul was "the very type of 'changing of sides in the matter' forbidden by Rule 1.9."


The Hearing Committee found that Mr. Klayman violated Rule 1.9 (or its Florida equivalent) in all three matters and violated Rule 8.4(d) in the Paul matter. It also found that Mr. Klayman gave false testimony before the Hearing Committee

Case 1:20-cv-03109-DLF   Document 46   Filed 05/10/21   Page 80 of 216
Case 3:20-mc-00043-B   Document 7   Filed 07/01/20   Page 7 of 14   PageID 129

6

and that his disciplinary history in Florida in connection with an unrelated matter was another aggravating factor. On the basis of all the foregoing, the Hearing Committee recommended that Mr. Klayman be suspended for ninety days, with reinstatement contingent upon a showing of his fitness to practice law. The Board, by contrast, recommended that Klayman be suspended for ninety days with no fitness requirement. The Board disagreed with the Hearing Committee's finding that Disciplinary Counsel proved a violation of Rule 8.4(d) and with its finding that Mr. Klayman provided false testimony.

Before this court, neither Mr. Klayman nor Disciplinary Counsel takes issue with the finding that Mr. Klayman violated Rule 1.9 or its Florida equivalent in the matters described above, and we therefore need not address that finding. Rather, as the Board did, we adopt the vast majority of the Hearing Committee's thorough analysis. However, as noted above, Disciplinary Counsel takes exception to the Board's findings regarding Rule 8.4(d) and false testimony, and to the Board's recommended sanction insofar as it omits a fitness requirement. We discuss these matters below.

**II.**

Disciplinary Counsel has the burden of proving a violation of the Rules of Professional Conduct by clear and convincing evidence. *In re Speights*, 173 A.3d 96, 99 n.3 (D.C. 2017). "When reviewing a recommended disciplinary sanction against an attorney, this court must accept the Board's findings of fact if they are supported by substantial evidence." *In re Sneed*, 673 A.2d 591, 593 (D.C. 1996). The Board "has the power to make its own factual findings" but "must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record." *In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013) (internal quotation marks and emphasis omitted). "Substantial evidence means enough evidence for a reasonable mind to find sufficient to support the conclusion reached." *In re Thompson*, 583 A.2d 1006, 1008 (D.C. 1990). "[T]he Board and this court owe no deference to the Hearing Committee's determination of 'ultimate facts,' which are really conclusions of law and thus are reviewed *de novo*." *Bradley*, 70 A.3d at 1194. "Whether [a] respondent gave sanctionable false testimony before the Hearing Committee is a question of ultimate legal fact that the Board and this court review *de novo*." *Id.* "[T]his court usually adopts the Board's recommended sanction 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted[.]'" *Sneed*, 673 A.2d at 593.

8

**III**.

Rule 8.4(d) establishes that it is professional misconduct for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice[.]" *Id.* For conduct to violate Rule 8.4(d), the conduct must be improper, "bear directly upon the judicial process," and "taint the judicial process in more than a *de minimis* way." *In re Carter*, 11 A.3d 1219, 1224 (D.C. 2011) (internal quotation marks omitted).

Disciplinary Counsel asserts that the "Board erred by overturning the Hearing Committee's conclusion that Mr. Klayman violated Rule 8.4(d) when he appeared on behalf of [Mr.] Paul with a 'clear conflict of interest' and litigated against disqualification for the second time." The Board cited a number of reasons for rejecting the Hearing Committee's conclusion, including its longstanding "concern[]" about the scope of Rule 8.4(d) in litigation-related disciplinary matters" and its view that any Rule 8.4(d) violation would be "derivative of the conflict[-]of[-]interest finding." But the Board primarily followed this court's lead in considering the views of the judge who presided over the litigation in which the disqualification motion was filed. *See In re White*, 11 A.3d 1226, 1232 (D.C. 2011). The Board found it "extra significan[t]" that Judge Lamberth, though he granted the motion to disqualify

Mr. Klayman, found "'a legitimate debate about [Mr. Klayman's] conduct'" and

further found that Mr. Paul was a needy client who could not otherwise have afforded

legal services.   In light of the "extraordinary situation" of Judge Lamberth's

"supportive testimony" to the Hearing Committee, the Board was unable to conclude

that Mr. Klayman's "behavior sufficiently tainted the judicial process to a degree

adequate to sustain the Rule 8.4(d) charge."[1]  We accept the Board's reasoning and

agree that no Rule 8.4(d) violation was proven by clear and convincing evidence.


## IV.


Before the Hearing Committee, Mr. Klayman testified, "I believed that Mr.

Dug[]an had given the advice of counsel that I could do this [i.e., represent Ms.

Benson], otherwise he [Dugan] wouldn't have prepared the pleading" opposing the

motion to disqualify Mr. Klayman based on Rule 1.9."   The Hearing Committee

found that this testimony was false, as was Mr. Klayman's testimony that Mr. Dugan

"was the one who prepared the response to that disqualification motion."

---

[1]  The Board noted that in *White*, by contrast, Judge Lamberth concluded that
White's conduct had tainted the proceedings; specifically, "[t]he entire litigation was
disrupted and delayed while the [d]istrict [c]ourt dealt with the motion to
disqualify[,]" and the court had to strike an entire deposition because of White's
presence.  *Id.* at 1232.

Disciplinary Counsel contends that this court should defer to the Hearing Committee's false-testimony findings as supported by substantial record evidence.

The Board found that Disciplinary Counsel failed to prove by clear and convincing evidence that Mr. Klayman gave false testimony. The Board observed that the Hearing Committee had relied almost entirely on Mr. Dugan's testimony that he did not endorse Mr. Klayman's appearance in the Benson matter. The Board reasoned, however, that the forcefulness of Mr. Dugan's testimony was undercut by his repeated inability to recall the substance of key conversations that took place between him and Mr. Klayman eight years earlier. In addition, the Board cited prior, "apparently inconsistent" statements that Mr. Dugan had made about the matter (e.g., Mr. Dugan's apparent statement to Judicial Watch's counsel, referred to in Judicial Watch's memorandum in support of its motion to disqualify, that there was "no ethical issue arising from" Mr. Klayman's representation of Ms. Benson).

The Board's description of Mr. Dugan's "diminished recollection" of his discussions with Mr. Klayman about the latter's entry of his appearance in the Benson matter, and about Judicial Watch's demand that Mr. Klayman withdraw from the representation, is supported by the record. Further, while the Hearing Committee reasoned that Mr. Klayman "cannot have inferred" that Mr. Dugan

blessed his entry of appearance in the Benson matter from Mr. Dugan's filing of the opposition to the motion to disqualify since Mr. Dugan "did not write the opposition[,]" Mr. Dugan acknowledged that his associate may have edited the draft opposition before it was filed, acknowledged that he (Dugan) did *sign* the opposition, and testified that he would not have done so if he had thought that it was frivolous or thought it violated any ethics or pleadings rules.  Additionally, Mr. Klayman's testimony was to the effect that the circumstances caused him to *believe* that Mr. Dugan had given the advice of counsel.  We agree with the Board that there was not proof by clear and convincing evidence that Mr. Klayman testified dishonestly as to his belief and recollection.  Accordingly, we accept the Board's conclusion rejecting the finding that Mr. Klayman testified falsely.

## V.

In explaining its sanction recommendation, the Hearing Committee found that Mr. Klayman's misconduct was aggravated by his prior discipline in Florida and his denial of responsibility as to the underlying conduct.  He received a public reprimand in that jurisdiction after he failed to timely pay the full amount ($5,000) he had agreed to repay to a former client after mediation to resolve a fee dispute.  The Board gave this matter little weight because of Mr. Klayman's explanation that a serious

car accident had rendered him unable to work at full capacity and caused him "significant financial difficulties" that affected his ability to pay.  We accept that evaluation.

We also accept the Board's conclusion that Disciplinary Counsel did not show that a fitness requirement is warranted in this case.  To be sure, Disciplinary Counsel proved that Mr. Klayman flagrantly violated Rule 1.9 on three occasions.  His misconduct was not isolated, and, it appears, he acted vindictively and "motivated by animus toward Judicial Watch" (with which he had developed an acrimonious relationship).  We agree with the Board and the Hearing Committee that his misconduct was intentional rather than inadvertent or innocent.  We also readily agree with the Board that his misconduct — involving a "switch[ing of] sides" that strikes at the integrity of the legal profession — deserves the serious sanction of a ninety-day suspension.  Nevertheless, we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically.  *In re Adams*, 191 A.3d 1114, 1120 (D.C. 2018).  Accordingly, we decline to impose a fitness requirement.  We do, however, concur with Disciplinary Counsel's original recommendation that Mr. Klayman be ordered to complete a continuing legal education ("CLE") course on conflicts of interest.

Wherefore, effective thirty days after entry of this order, Mr. Klayman is suspended from the practice of law.   The period of suspension is ninety days, commencing after he has filed the affidavit required by D.C. Bar R. XI, § 14(g). Before reinstatement, he must also complete a CLE course on conflicts of interest.[2]

*So ordered.*

---

[2] The pending motion by his counsel to withdraw is hereby granted.

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

**In Re: Larry Klayman**

Case No.:  3:20-mc-00043-B

## INTERIM RESPONSE TO ORDER TO SHOW CAUSE

Larry Klayman hereby puts the Court on notice, on an interim basis, that he will file petitions  for rehearing by the division and if necessary en banc with regard to the June 11, 2020 order of the District of Columbia Court of Appeals, within 14 days and 30 days respectively.  Thus, the order of the District of Columbia Court of Appeals is not final. Mr. Klayman will at the appropriate time, should the June 11, 2020, order become final, show cause why reciprocal discipline should not be imposed.

Further, Mr. Klayman respectfully requests the reason why and basis for the Court issuing its show cause order on June 15, 2020. In this regard, an inquiry was with the Court on June 15, 2020, and Mr. Klayman left a voicemail on the answering service for chambers.  Today, Mr. Klayman received a return call from someone who identified herself as Janelle, but she advised that she could not shed light as to why the Court issued the show cause order at this time, before Mr. Klayman exhausts all of his legal rights.

Mr. Klayman respectfully requests an expeditious explanation in this regard, including who brought the June 11, 2020 order of the District of Columbia Court of Appeals to this Court's attention, since the District of Columbia Bar and its Disciplinary Counsel would not have so notified this Court, especially at this time, given its established procedures.

1

Dated: June 16, 2020                                  Respectfully submitted,

                                                      */s/ Larry Klayman*
                                                      Larry Klayman, Esq.
                                                      KLAYMAN LAW GROUP P.A.
                                                      7050 W. Palmetto Park Rd
                                                      Boca Raton, FL, 33433
                                                      Tel: 561-558-5536
                                                      Email: leklayman@gmail.com

# KLAYMAN LAW GROUP
### A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.                    7050 W. Palmetto Park Rd                    Tel: 561-558-5336
                                       Boca Raton, FL. 33433

Via Electronic Filing and FedEx

December 10, 2020

Mathew Kaiser, Esq.
Chairman
Board of Professional Responsibility
District of Columbia Bar
901 4th Street, NW
Washington, D.C. 20001

**Re**: **Failure by the Board of Responsibility to Remove Suspension of Larry Klayman in *In re: Klayman*, 18-BG-0100; *In re Klayman*, 20-BG-483, 17-BD-063 (Revised)**

Dear Mr. Kaiser:

After I had submitted my Petition for Reinstatement in In re Klayman, 18-BG-0100 weeks ago, the Bar's Disciplinary apparatus dragged its heels in reinstating me, but just now, after I protested,  I have  just a short while ago today finally received notice of this reinstatement, but not after my interests and those of my clients were prejudiced and harmed further. But regrettably there are also other matters that are harming me and my clients which also must be immediately remedied.

In this regard, I have also been informed that ODC has apparently been sending *ex parte* letters and/or other types of communication to other courts and bars letting them know that I have other disciplinary matters pending, and to be on the lookout for those. One of those disciplinary matters, *In Re: Klayman,* 20-BG-483, 17-BD-063, involves a fatally flawed Board Report, which you apparently wrote in whole or in large part and, when I respectfully asked you as a matter of due process and equal protection under the law, as well as professional ethics, to correct the glaring misstatements and  false factual "findings" contained in this Board Report,  you refused. As previously also detailed in a prior letter to you, the D.C. Bar's disciplinary apparatus also acted in concert with Politico to defame me in the public domain, to harm me and my clients even further. A lawsuit against the reporter Josh Gerstein and Politico, who and which quotes D.C. Bar officials, has been filed. *Klayman v. Politico LLC, et al*, 502020CA011868XXXXMB (15th Jud. Cir. Fl.). **You are on notice to preserve any and all communications by you or any of your agents in the D.C. disciplinary apparatus showing communications, including internal notes, with Josh Gerstein and Politico and related documents concerning me and my clients.**

These concerted actions are yet a further attempt to prejudice, interfere with and damage my standing and the interests of my clients in other courts and bars with a non-final disciplinary matter, which ODC and the bar's disciplinary apparatus as whole, which you oversee, has absolutely no authority to do. This is part and parcel with the discriminatory D.C. Bar's disciplinary apparatus' agenda to remove me from the practice law by using all inappropriate measures. This is entirely improper, unethical and simply not legal. See enclosure with regard to the Ninth Circuit.

Accordingly, and notwithstanding all of this, as Chairman of the Board of Professional Responsibility, as the head of the District of Columbia Bar's disciplinary apparatus, it is incumbent upon you to immediately seek to remedy these unethical and illegal actions and thus injustice.

I also call upon you to order that ODC cease prejudicial and damaging *ex parte* communications with other courts and bars in order to try to harm me and my clients in other jurisdictions, which ODC has absolutely no authority to do. These communications were sent ex parte and I have asked for copies. Please insure these that these ex-parte communications are immediately provided to me, as ODC has its pliant counsel have refused to do so. An internal review of all of these concerted unethical and illegal actions must also be undertaken immediately. Please confirm to me with 48 hours that this is being done.

I hope to avoid further litigation, but if this is not remedied at once I will regrettably have no choice but to protect the interests of me and my clients. Fairness and ethics are a "two-way" street and you and your subordinates and agents in the D.C. Bar's disciplinary apparatus must abide by the same ethics rules and legal strictures that are expected of other members of the Bar. Using as an excuse to act unethically and illegally claims of absolute immunity is inappropriate given your mission, particularly since this alleged absolute immunity has no basis in law, given that it was not legislated by the District of Columbia City Counsel and instead was declared by extra-legal fiat. This claim of absolute immunity is currently subject to challenge in the courts and, if necessary, I will seek to take this meritorious and necessary legal recourse all the way to the Supreme Court.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman, Esq.

cc:    Hamilton Fox III, Esq., Office of Disciplinary Counsel
        H. Clay Smith, III, Assistant Bar Counsel
        Lawrence Bloom, Assistant Bar Counsel
        Mark MacDougall, Esq., Akin Gump Strauss Hauer & Feld LLP

FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

DEC 2 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

In re:

LARRY E. KLAYMAN, Esq., Admitted
to the bar of the Ninth Circuit January 12,
2000,

                Respondent.

No.   20-80112

ORDER

Before:  Peter L. Shaw, Appellate Commissioner.

The court is informed by the Office of Disciplinary Counsel of the District

of Columbia Bar that, at the conclusion of his 90-day suspension, respondent Larry

E. Klayman was eligible to be readmitted to the bar, and the Office of Disciplinary

Counsel did not oppose his reinstatement.  In view of that development, this

court's August 3, 2020 order to show cause is discharged.  This disposition is

without prejudice to the initiation of reciprocal discipline proceedings based on

unrelated attorney discipline proceedings pending at the District of Columbia

Court of Appeals.

ES/Appellate Commissioner

EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LARRY KLAYMAN

        Plaintiff,

v.

JULIA PORTER, et al

        Defendants.

**CASE NO: 20-cv-3109**

## AFFIDAVIT OF BRANDON SNESKO

I, Brandon Snesko, being over eighteen years of age and duly competent to testify, hereby swear and affirm under oath, to the best of my personal belief and knowledge, as follows:

1.    I am one of the owners of Same Day Process along with my father, Tony Snesko, and I manage its day-to-day operations.

2.    I have reviewed the declarations of Lawrence Bloom, Julia Porter and Hamilton P. Fox, III and they are false in several respects.

3.    First, my process server Kion Lathan and all of my process servers are instructed to and do wear masks when affecting service of process and they will testify that they did so in serving process on Mr. Bloom and Ms. Porter. He was in each instance instructed, as the audio recording on our telephone answering message states and confirms, to follow all social distancing norms and Covid-19 safety protocols and did so in serving process for Mr. Klayman.

4.    Second, Mr. Lathan did not "force his way into or break into" Mr. Bloom's building, which contrary to Mr. Bloom's false representations is not a condominium but an apartment building, which under the law does not require authorization to enter to affect service

of process. Moreover, federal law prohibits a person inhibiting, obstructing and preventing service of process at 18 U.S. Code 1501.

5.      Third, my process server who served Mr. Fox had been met with and subjected to profanity by Mr. Fox's wife, including use of the "F" word. To the contrary, he had been courteous and respectful of her and Mr. Fox.

6.      Fourth, having hired and supervised Mr. Lathan, I have never received a complaint that he was rude, disrespectful and violated any law.

7.      Fifth, before COVID-19, we had tried to affect service of process on Mr. Fox and Ms. Porter in the past for Mr. Klayman at the offices of the District of Columbia Bar Disciplinary Counsel at 515 Fifth Street, N.W., Building A, Suite 117, Washington, D.C. 20001, and my process servers have been prevented from making service there, which is the place of business of Mr. Fox and Ms. Porter.

8.      Finally, during COVID-19, as persons work from home, including Bar Disciplinary Counsel, one can only affect service of process at their residence. This has become both necessary and routine.


SWORN TO UNDER PENALTY OF PERJURY THIS 10th DAY OF MAY 2021.

Brandon Snesko

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| LARRY KLAYMAN<br>7050 W. Palmetto Park Rd<br>Boca Raton, FL, 33433<br><br>               Plaintiff,<br><br>v.<br><br>MATTHEW KAISER<br>c/o 1099 14th St NW<br>8th Floor West<br>Washington, DC, 20005<br><br>and<br><br><br>JULIA PORTER<br>515 5th St NW<br>Washington, DC 20001<br><br>and<br><br>HAMILTON FOX, III,<br>515 5th St NW<br>Washington, DC 20001<br><br>and<br><br>LAWRENCE K. BLOOM<br>515 5th St NW<br>Washington, DC 20001<br><br>and<br><br>JOHN DOES 1 TO 5<br>515 5th Street NW<br>Washington, D.C. 20001<br><br><br>              Defendants. | **COMPLAINT** |

## COMPLAINT

Plaintiff LARRY KLAYMAN ("Plaintiff or Mr. Klayman") hereby files this action against MATTHEW KAISER ("Kaiser"), JULIA PORTER ("Porter"), HAMILTON FOX, III ("Fox"), H. CLAY SMITH ("Smith"), and LAWRENCE BLOOM ("Bloom") (collectively "Defendants") as joint tortfeasors acting in concert for defamation per se, defamation, and defamation by implication.

## JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(3) in that this is a district in which the defendants are subject to the court's personal jurisdiction with respect to this action as the acts and practices alleged herein occurred and caused damage in this district.

## THE PARTIES

3.     Plaintiff Larry Klayman is a citizen of Florida and resident of Palm Beach County. He is a public interest and private lawyer, an author, columnist and syndicated radio talk show host on Radio America, who depends on his credibility and reputation for honestly to earn a living and to present his message and further his mission to promote an honest government and legal system. See Exhibit 1; Klayman Sworn Affidavit with Exhibits A through C incorporated herein by reference.

4.     Defendant Kaiser is a citizen of District of Columbia and the chairperson of the District of Columbia Board on Professional Responsibility.

2

5.      Defendant Porter is a citizen of District of Columbia and employed by the District of Columbia Office of Disciplinary Counsel as Deputy Bar Disciplinary Counsel.

6.      Defendant Fox is a citizen of District of Columbia and employed by the District of Columbia Office of Disciplinary Counsel as the Bar Disciplinary Counsel.

7.      Defendant Smith is a citizen of District of Columbia and employed by the District of Columbia Office of Disciplinary Counsel as Assistant Bar Counsel.

8.      Defendant Bloom is a citizen of District of Columbia and employed by the District of Columbia Office of Disciplinary Counsel as Senior Staff Attorney.

## **BACKGROUND FACTS**

9.      Defendants, working together in concert, have published malicious, false, and defamatory statements of and concerning Mr. Klayman to Josh Gerstein ("Gerstein"), a writer for Politco, a "prominent" leftist publication that is widely known to be anti-conservative and pro-Democrat party in ideology.

10.      Defendants published these malicious, false, and defamatory statements of and concerning Mr. Klayman to Gerstein with the instruction, expectation, and direction to re-publish them in a Politico article, which Gerstein did, on or about September 16, 2020 (the "Gerstein Article")

11.      On information and belief, the entire Gerstein Article was written at the direction of Defendants, rendering Defendants liable for all of the false, malicious, and defamatory statements contained therein,  which were calculated to severely damage Plaintiff Klayman and are on-going.

12.      Defendants made these false, misleading, deceptive, and defamatory statements about Mr. Klayman with actual and constitutional malice,  and intentionally and maliciously

3

intended to severely harm not just Mr. Klayman's personal and professional reputations but also to severely harm his public interest advocacy as the founder of both Judicial Watch, Inc. and now Freedom Watch, Inc., both ethics organizations whose mission is to promote and protect ethics in government and the legal system as a whole.  Mr. Klayman, prior to forming both public interest groups, was a former prosecutor in the Antitrust Division of the U.S. Department of Justice, where he was on the trial team that broke up the AT&T monopoly during the Reagan administration. Mr. Klayman, after years in private practice, and after he left Judicial Watch in the fall of 2003, ran for the U.S. Senate in his home state of Florida. After the election he formed Freedom Watch, where he is the president and general counsel today. Mr. Klayman also practices privately with his law firm Klayman Law Group, P.A., which is a Florida professional corporation, and the acts and practices alleged herein were intended to intentionally and maliciously severely harm his private legal practice as well as his clients in this circuit, thus destroying Mr. Klayman's and his family's livelihood and well-being.  The acts of Defendants were also maliciously designed to harm Mr. Klayman's other endeavors. Plaintiff was at all material times a member of the District of Columbia Bar for forty (40) years and a member continuously in good standing of The Florida Bar for 43 years, his having been sworn in when he as an associate of the Miami law firm of Blackwell, Walker on December 7, 1977.

13.     Defendants are very partisan leftists and donate heavily and/or are sympathetic to and support Democrat politicians and government officials who Klayman has sued in his public interest capacity, as can be confirmed by political donation records of the Federal Election Commission among other indicia of their leftist ideology. They set out to severely harm and damag Plaintiff's legal practices and other endeavors as set forth above, as well to negatively influence on-going bar disciplinary proceedings and court cases in order to work prejudice

against Plaintiff Klayman and his mostly conservative activist clients such as Laura Loomer, Sheriff Joe Apaio, Chief Justice Roy Moore, Cliven Bundy, Dr. Jerome Corsi, Kara Robles, Demetrick Pennie and others, to name just a few.

14. On information and belief, based on objective evidence and a pattern and practice of similar acts, the Defendants acted in concert with Michael Tigar and Anthony Fitch, both having sat on an District of Columbia Bar Ad Hoc Hearing Committee, and then manufactured false recommended findings that Plaintiff had acted unethically in representing a woman who claimed, now disproven, to have been sexually harassed by another host at Voice of America while herself an Iranian host on Voice of America's Persian News Network. Importantly, the subject Gerstein article references this case, but fails to disclose that both Tigar and Fitch are radical leftists and in Tigar's case incredibly even a proud and avowed communist (the ideological opposite of Plaintiff Klayman) who was fired by Supreme Court Justice William Brennan for his communist ties to Fidel Castro and his equally murderous brothers, as even reported by famed Washington Post investigative reporter and editor in his landmark treatise on the Supreme Court, titled "The Brethren."

15. Of equal importance, as set forth below, Tigar, along with about fifteen (15) other leftist law professors filed a frivolous ethics complaint before the District of Columbia Bar Disciplinary Counsel against then Trump White House Counsel Kellyanne Conway, and then unethically publicized this complaint to the media to harm both Ms. Conway and President Trump, thus underscoring the use of  leftist media, such as Gerstein and Politico, to harm conservatives like Mr. Klayman. Thus, there is a history and thus a pattern and practice  of District of Columbia Bar officials unethically using leftist media vehicles such as Gerstein and Politico to further their partisan agenda and harm conservatives such as Mr. Klayman. They have

5

also done so again recently with regard to an article published by the National Law Journal on March 16, 20021 which will be the subject of other litigation in the near future.

16.     Mr. Klayman had asked Defendant Kaiser for an internal review of this unethical public use of a bar disciplinary proceeding to defame Mr. Klayman through Defendants false and defamatory publication, and asked him if he was a participant as well, and in a letter of October 29, 2020 from the District of Columbia Board on Professional Responsibility, he did not deny Mr. Klayman's allegations much less even address Mr. Klayman's allegations, while also refusing to conduct an internal review, but instead stated disingenuously that he would  only entertain a new request after the conclusion of the proceeding before the District of Columbia Court of Appeals. Defendant Kaiser thus effectively admitted his and  other officials of the District of Columbia Bar disciplinary apparatus's involvement in this unethical and defamatory conduct in collaboration and in concert with Defendants to maliciously defame Mr. Klayman.

17.     Specifically, the September 16, 2020, Politico article written by Gerstein directly quoted malicious, false and defamatory statements by Defendants, as he publishes falsely and misleadingly "D.C. Bar officials contend the famously litigious Klayman misrepresented facts, filed meritless pleadings and brought frivolous demands for recusal and an ethics complaint against a judge who rejected the hard-charging lawyer's bid to join the defense team at Bundy's request." In fact and truth, there has never been any finding by the District of Columbia Bar disciplinary apparatus, or for that matter any other state bar, that Mr. Klayman has been dishonest, among other false and misleading representations in this published statement

18.     Furthermore, Gerstein admits, in falsely and misleadingly publishing that Mr. Klayman will be removed from the practice of law, to the detriment of himself, his family and his clients: "The danger for Klayman at present is not so much the Bundy related complaint but

the series of ethics cases he faces taken together. Bar officials say the record is mounting that Klayman is unfit to practice law."

19.     This clearly shows that Defendants published false, malicious and defamatory statements to Gerstein with the expectation, instruction, and direction to republish them in Politico, as Defendants are quoted in these statements.

20.     Such a public statement by the Defendants was not only unethical in and of itself, concerning on-going disciplinary proceedings, which are not meant for public relations purposes to further political agendas and ideologies, particularly in this age of Donald Trump where anyone who supported his presidency and is a conservative such as Plaintiff  is considered an "enemy of the state," but instead was calculated to severely damage Mr. Klayman whatever the ultimate result of the disciplinary proceedings. They were the result of Defendants not being confident that on the merits they could remove Mr. Klayman from the practice of law.

21.     On information and belief, they therefore put up and collaborated with Gerstein and Politico, who are of the same ideological and partisan ilk, and despise if not loathe Mr. Klayman for his public interest advocacy in bringing lawsuits against the Clintons, Barack Obama, and Joe Biden in particular, to do their "dirty work" by defaming Plaintiff.

22.     This is the same group of Defendants which is currently entertaining ethics complaints against Kellyanne Conway for remarks she made on MSNBC and Attorney General William Barr, for his dropping charges against General Michael Flynn and for remarks he made on cable news. Not coincidentally, all former presidents of the District of Columbia Bar signed and filed this ethics complaint against AG Barr, as well as a former Senior Assistant Bar Disciplinary Counsel.[1] The District of Columbia Bar is singularly comprised of rabidly partisan

---

[1] https://www.politico.com/news/2020/07/22/bill-barr-bar-association-probe-377272;

"leadership" of the left and is pro-Democrat and vehemently anti-Trump and anti-conservative ,
as is nearly every other institution in the nation's capital these days.

23.     It is the same group of Defendants  that  engaged in selective prosecution and
turns the other cheek when ethics complaints are filed against leftist and pro-Democrat lawyers,
such as David Kendall of Williams & Connolly, who has represented and continues to represent
Bill and Hillary Clinton and who was alleged to have obstructed justice and suborned perjury for
Hillary Clinton over the destruction of 33,000 emails when she was Obama's Secretary of State.[2]

24.     The District of Columbia Bar, much like everything else in the rabidly highly
politicized  world of the nation's capital, which many call "the swamp," has become partisan and
severely compromised and corrupt, to put it most diplomatically.

25.     In this regard, the allegations of this Complaint are not isolated when it comes to
District of Columbia Bar disciplinary apparatus and officialdom smearing and harming lawyers
whose politics or ideology they do not like. The same thing occurred with regard to a father and
son law firm of J.P. and John Szymkowicz, after an outrageous and unconscionable contrived
and fraudulent bar disciplinary proceeding that lasted thirteen (13) years, drove them to the brink
of bankruptcy by causing them to lose clients, and caused extreme emotional distress, and where
Bar Disciplinary Counsel, as with Mr. Klayman, unjustly sought their removal from the practice
of law. And, to add insult to severe injury, when the Bar disciplinary apparatus and officialdom
did not succeed and the Szymkowiczs where totally exonerated, they characteristically  put up a
former Senior Assistant  Bar Disciplinary Counsel Michael Frisch, now a leftist professor at
Georgetown Law School to defame them in his public blog postings.  *See* Exhibit 2. Such is the

---

https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html.
[2] https://lawflog.com/?p=1389

vindictive and malicious conduct of District of Columba Bar disciplinary apparatus and officialdom, as set forth above with Mr. Klayman as well.  Not coincidentally, J.P. Szymkowicz is the only Republican official in the district's government. And, not coincidentally, Mr. Frisch is one of the signatories, along with four (4) former presidents of the District of Columbia Bar, in the ethics complaint recently filed against AG Barr, which was then publicized by them, as has unethically occurred with Mr. Klayman and Trump White House Counsel Kellyanne Conway, and others.

26.     Of particular enmity among Defendants is Mr. Klayman advocacy in attempting to bring Bill and Hillary Clinton to justice, as Plaintiff has deemed them to "Bonnie and Clyde of American politics." And it is no surprise that even Defendant Kaiser, among others at the highest level of the District of Columbia  disciplinary apparatus and officialdom, has made substantial political contributions to the Clintons (as well as President Obama and Hillary Clinton) while at the same time writing columns for "Above the Law," a leftist legal publication trashing President Donald Trump and attesting to the "honesty" of Hillary Clinton.[3]

27.      It thus comes as no surprise that a recent Board report, written by and/or on behalf of Defendant Kaiser effectively hinges in part on Mr. Klayman having sued Mrs. Clinton in the past in his public interest capacity, while wholly irrelevant in the context of this case.

28.     Defendants malicious, false and defamatory statements, republished in this district and throughout the world through the Gerstein and Politico article thus is intended, with actual and constitutional malice, to portray a picture to the reader that Mr. Klayman has been deemed unfit to practice law and will soon and inevitably be removed from the practice of law, that is disbarment is imminent.

---

[3] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/
https://abovethelaw.com/2016/07/trump-and-tyranny/

29.     The title to the column by the Gerstein, written in concert with and at the direction of Defendants, sets the defamatory theme. It publishes: "A Conservative Gadfly Faces the Music." It then ratches up the defamation as follows in the subparagraph by publishing " Larry Klayman pioneered slash-and-burn legal tactics that have become the feature of American politics. Now, he faces the prospect of his own legal demise."

30.     Not to be content with and to drive into the reader this lead in to the defamatory article, Gerstein, in concert with and at the direction of Defendants, then published: "While many on the Washington scene have been waiting for decades for Larry Klayman to get his comeuppance in court, three different ethics cases he is now embroiled in raise questions about how to police a legal system that generally imposes few consequences for filing marginal lawsuits and complaints."   This defamatory publication states that Mr. Klayman files (only) marginal cases and obviously given his many successes this is false and misleading. Exhibit 1.

31.     Then, Gerstein, in concert with and at the direction of Defendants, falsely publish that Mr. Klayman has predicted his own demise by writing "To hear Mr. Klayman conservative gadfly (who Defendants despise) and attorney Larry Klayman tell it, the end of this legal career haranguing the Washington political establishment could be nigh." To the contrary, Plaintiff never has said any such thing and in fact Defendants know full well that Mr. Klayman is a fighter and will never roll over to the left and its sycophants of the District of Columbia Bar disciplinary apparatus and officialdom..

32.     Then, Gerstein, in concert with and at the direction of Defendants, while unmasking their own political biases and inclinations, published: "During the 1990s, as he headed Judicial Watch, Klayman became reviled by many in the Clinton administration for forcing aides into bizarre, almost postmodern depositions that often led the witnesses to incur

tens of thousands of dollars in legal bills. His antics eventually inspired the writers of "The West Wing" to create a toxic, scandal-chasing character, Harry Klaypool of Freedom Watch. Klayman was thrilled and – after an rancorous breakup with other leaders of Freedom Watch – adopted the fictional name from the TV show as the name of his new organization."

33.      This published statement is defamatory in ways which include but are not limited to first stating that Mr. Klayman forced Clinton aids into deposition, when in truth and fact they were sanctioned and approved of by the Honorable Royce C. Lamberth of the U.S. District Court for the District of Columbia, after Mr. Klayman's deposition notices were challenged. Second, the published statement brands Mr. Klayman's public interest advocacy concerning seeking legal redress the myriad of Clinton scandals, which continue to this day, as "antics," are hardly truthful given Mr. Klayman's successes. Third, the published statement, among others, represents that Mr. Klayman was thrilled by the Harry Klaypool character on "West Wing," which was created by Aaron Sorkin and other Clinton loyalists such as Lawrence O'Donnell and former Clinton White House press secretary Dee Dee Myers, when in truth and fact Defendants do not know this one way or the other.

34.      Indeed, while admittedly communicating, plotting and colluding and acting in concert with Defendants, Gerstein and Politico incredibly  never even sought a comment from Mr. Klayman before widely publishing this defamatory article in this circuit, nationally and internationally. These are just a few of the false and misleading defamatory statements in this published representation and article.

35.      Gerstein, in concert with and at the direction of Defendants, also writes "While many on the Washington scene having been waiting for decades for Klayman to get his comeuppance in court, three ethics cases he is now embroiled in raise questions about how to

11

police a legal system that generally imposes few consequences for filing marginal and lawsuits and complaints." The defamatory nature of this malicious statement speaks for itself, particularly given Mr. Klayman's many successes in his  public interest and private practice legal advocacy.

36.     As further evidence of the fact that Gerstein and Politico were working in concert with and at the direction of Defendants, the article tries to paint Defendant Porter favorably: " But she (Julia Porter, Deputy Bar Disciplinary Counsel) reserved her harshest criticism for Klayman's practice of targeting judges and bar officials with suits, recusal motions and ethics complaints when he finds himself on the losing side of a legal decision. … They are consistent with Mr. Klayman's pattern of retaliation and intimidation of people who either act against him, Porter said. … She should know. He's filed at least three federal lawsuits against Porter and her office over their actions toward him. Two of the suits have been dismissed, although appeals are pending."

37.     Not mentioned was that Ms. Porter was ordered to be under an internal review ethics investigation by the District of Columbia Bar by a prior Chairman of the Board of Professional Responsibility, Robert Bernius, over her pattern and practice of lying and engaging in other unethical and illegal acts with regard to the Szymkowiczs' case, which lasted thirteen years and resulted in their "acquittal," but not after they were taken to the brink of bankruptcy and severe emotional breakdown, losing clients and business in the long interim. To make matters worse, she then put up her former colleague Michael Frisch, a then a leftist law professor at Georgetown, to publically defame Mr. Klayman. Exhibit 2.

38.     Then while Defendant Porter and her Office of Disciplinary Counsel presented no witnesses in the principal disciplinary matter involving the Bundy matter mentioned in the defamatory article, Gerstein, in concert with and at the direction of Defendants, then mock and

disparage Mr. Klayman's material witnesses, even mocking and belittling their race when it suits the theme of their defamatory article. Ironic indeed, as the left has maintained its mantra that conservatives are inherently racist.

39.     For instance, Gerstein, in concert with and at the direction of Defendants, publishes: "For Klayman, that meant showcasing witnesses who would testify to his character. The result was a cavalcade of right-wing personalities, including two former presidential candidates: ex-Rep. Bob Barr (R-Ga.) and former Ambassador Alan Keyes. … Also singing Klayman's praises were conservative talk show host Armstrong Williams, author and conspiracy theorist Jerome Corsi and no fewer than four members of the Bundy family two of whom appeared to be testifying while sitting in farm equipment."

40.     This published statements obviously show not just Defendants' leftist mocking of conservatives, and Ambassador Alan Keyes is a black conservative, but also of the Bundy family, who Defendants characterize as hicks, the equivalent of the Beverly  Hillbillies, and it is false that they all testified while sitting in farm equipment.

41.     Then to continue their condescension, contributing to this defamatory hit piece on Mr. Klayman, Gerstein, in concert with and at the direction of Defendants publishes: "A key element of Klayman's defense before the ethics panel was to downplay his Republican ties and emphasize instead that he has sued presidents and other political figures from both major political parties. The second and slightly less explicit thrust of his defense was that he has many friends and clients who are African American."  The latter reference in particular, was intended to suggest that Mr. Klayman exploited his African American friends and clients, heightening and compounding the "cleverly crafted" mocking, condescending, disparaging and defamatory content and tone of the defamatory article. It is also the height of hypocrisy that Defendants

generally view and brand conservatives as racists, a constant theme these days in all sectors of the left wing media, some even claiming that whites are born with a biological racist gene.

42.      As a further example of Gerstein's, in concert with and at the direction of Defendants, mocking and condescension, they published: "I've told people that if I had won, you would have been my choice for attorney general," Keyes told Klayman during the hearing, beaming in on Zoom from the anchor desk of a television studio…."

43.      Then with regard to conservative black television and radio personality and pundit Armstrong Williams, Gerstein, in concert with and at the direction of Defendants, continuing the mocking, condescending, belittling, devaluing and disparaging and defamatory theme about Mr. Klayman's African-American witnesses much less colleagues and friends, they published: "You and I have never had an issue when it comes to character, integrity, and your honoring your word," said Williams, who spoke sitting in front of a tea-shirt from Ben Carson's (also African American) 2016 presidential campaign…. That I can absolutely say is true, yest. You always honor your word – even as a lawyer, yes. … Steadman Graham, you actually are partners with him, that was Oprah's boyfriend for a while, right?, Klayman asked Williams. … Yeah .. I don't know why its relevant, but it's true, Williams said, prompting a visible eye roll and chuckle from the lawyer overseeing the hearing, Buffy Mims."

44.      In fact and truth there was not such eye roll from this African American hearing committee chair, thus furthering the defamatory theme of Defendants' article and putting down Mr. Klayman's African American witnesses, colleagues and friends such as Armstrong Williams, which Defendants conspicuously did not do to this extent with Mr. Klayman's white witnesses. Indeed, it is ironic, but typical, that these leftist Defendants chose to mock Mr. Klayman's black witnesses, colleagues and friends, as there is no limit when it comes to their

despicable defamation and hatred of conservatives, black or white or whatever shade or color race, ethnicity  or religion, in Mr. Klayman's case a Jew who believes in Jesus and has become and is  a Jewish Christian.

45.     Then, Gerstein, in concert with and at the direction of Defendants, work on Mr. Klayman's African American policeman client and friend Demetrick Pennie, who is not coincidentally running for Congress is Texas. They publish: "Klayman also called Dallas police sergeant and GOP congressional candidate Tre Pennie as a character witness. He represented Pennie in an unusual suit that sought to tie shootings of Dallas police officers to rhetoric from Black Lives Matter, President Barack Obama, Sen. Hillary Clinton and others. … How do we refer to each other? Klayman asked. As brothers, replied Pennie."

46.     Gerstein, in concert with and at the direction of Defendants, misleadingly distorted their characterization of the Pennie lawsuit, whose primary target defendant was Louis Farrakhan of the Nation of Islam, who just days before the Dallas police massacre, in which Pennie was assaulted as well,  called for his disciples, such as Micah Johnson, who obediently carried out the massacre, to kill white cops in particular. By calling the suit "unusual" this contributed to the defamatory theme of Gerstein article, which was intended maliciously to defame any case or any endeavor Mr. Klayman had engaged into over his forty three plus successful legal career. It was also intended as a condescending, mocking, and belittling put down, if not devaluation, of a brave African American police officer who stuck his neck out to obtain justice, and for so doing had his life and those of his loved ones threatened with death by those radical leftists who Defendants support and are sympathetic with.

47.     Then Gerstein,  in concert with and at the direction of Defendants, continue this defamatory smear and attack on Plaintiff, by publishing: "At another point, Klayman called the

15

panel's attention to a recent success: a ruling he won in Manhattan federal court earlier this year allowing former U.S. Senate candidate Roy Moore (R-Ala.) to proceed to discovery in a defamation suit against comedian and filmmaker Sasha Baron Cohen. .. An Obama-appointed, African American judge allowed the case to go forward, a very fair man, Andrew Carter. A very fine judge, Klayman told the committee. … Klayman never directly explained the relevance of the judge's race or Pennie's, but two of the three members of the bar committee hearing the ethics case are African American and the on-line biography of the panel's chairwoman, Mims, prominently describes her as the co-chair of the Diversity & Inclusion Committee at her law firm."

48.    Again, Defendants, acting in concert with Gerstein and Politico, use race in a despicable condescending  way to mock, belittle, and devalue, Mr. Klayman's material witnesses, and the Gerstein article conspicuously omits and fails to point out that Defendants failed to present even one, repeat even one, witness in this entire disciplinary proceeding.

49.     It is therefore Defendants who are using race to compound the defamatory nature of the subject article, making fun of African Americans when it suits their malicious purposes to collaborate with District of Columbia Bar disciplinary apparatus and officialdom   to harm Mr. Klayman over his conservative advocacy and credentials, and who has taken on those, such as the Clintons, Obama and Biden, who they support.

50.    Not to be deterred from the continuing defamatory attack, Defendants, acting in concert with Gerstein and Politico, then mocked and belittled accolades by Mr. Klayman's clients and other others who admire and have appreciated his public interest and private legal advocacy. Indeed, these references were admitted into evidence and it was not "unusual" that an advocate like Mr. Klayman would use them to show his ethical, moral and honest character. But

not to be undone, Gerstein, in concert with and at the direction of Defendants published: "Klayman's effort to demonstrate his exemplary character took other unusual turns, as he read from jacket blurbs of his own books and from articles written by his supporters. As always there was no understatement." *See* Exhibit 1 – Klayman Sworn Affidavit

51.     For Defendants, everything that Mr. Klayman has done and does is either "unusual," unethical, frivolous, marginal, lacking merit, harassing or has some other nefarious illegitimate purpose – you name it so long as it defames Plaintiff. These venomous and malicious attacks on Mr. Klayman, his legal practice and his character comports with their leftist agenda, which is to defame and  harm if not destroy conservatives, libertarians and people of faith, such as conservative Jews and African Americans in particular.

52.     In this regard, Defendants, when it suited their false and misleading hit defamatory hit piece,  even misleadingly belittled another leftist, but unlike them  a distinguished and an ethical one, Dean Erwin Chemerinsky, of the University of California School of Law, known as "Boalt Hall," one of the top law schools academically in the nation, published in the subject article: "A leading liberal constitutional law expert, University of California at Berkeley law dean Erwin Chemerinsky also testified on Klayman's behalf earlier in the ethics case stemming from the Bundy prosecution. The esteemed law professor concluded there was no ethical violation by Klayman in the Bundy case. Klayman told the panel." Then Defendants added gratuitously, to undercut Dean Chemerinsky's sworn testimony as a legal expert on behalf of Mr. Klayman, "(Chemerinsky confirmed to POLITICO Tuesday that he testified for Klayman, but the professor said he could not recall the details.).

53.     Not only is this representation about Dean Chemerinsky not recalling the details misleading and false, but there was no objective or even subjective reason to make this statement

since the sworn hearing testimony of Dean Chemerinsky was entered into evidence and made a hearing exhibit, referred to by Mr. Klayman at the hearing which Defendants watched by Zoom, and was publically available to the Defendants, to which Mr. Klayman had referred to at the hearing. This cheap shot, false as it was, attests to the actual and constitutional malice set forth in the article which is the subject of this suit. Defendants, acting in concert with Gerstein and Politico, themselves feel free to lie and mislead whenever it suits their malicious ends.

54.     Then another misleading and false statement is made when Gerstein,  again in concert with and at the direction of Defendants, publishes: "While many view Klayman as an early pioneer of a political weapon he seemed to lament that phenomenon during this week's session, ruling what he called 'the age of the politics of personal destruction' in an ironic echo of a famous Bill Clinton line."  To the contrary, Mr. Klayman did not lament about his successful and storied legal and other careers; only the partisan and hateful attacks of the left to try to take him down, which he vigorously resists.

55.     And then as a final salvo, revealing their collaboration and complicity with Gerstein and Politico, of which they are comrades ideologically and in practice, Defendants brazenly reveal their joint tortfeasor status: "The danger for Klayman at present is not so much the Bundy-related complaint but the series of ethics cases he faces taken together. Bar ethics officials say the record is mounting that Klayman is unfit to practice."

56.     Then to top it all off, Gerstein, in concert with and at the direction of Defendants, maliciously and intentionally lied again by characterizing the reaction of committee panel members in the Bundy case, when they published: "Klayman also asked for leniency by saying he serves as a lawyer of last resort for many of his clients" and again made it appear that the hearing panel found Mr. Klayman's defense to be a joke.

57.     Gerstein, in concert with and at the direction of Defendants, wrote: "The other panel members (in addition to the chair Mims), former Federal Trade Commission deputy general counsel Christian White and prison rehabilitation advocate Robin Bell, occasionally broke out bemused smiles at some of Klayman's antics…"

58.     To the contrary, Plaintiff advocated that he acted ethically at all times and did not ask for even imply leniency, as he forthrightly told the panel members that discipline was not warranted in any of the politically motivated bar proceedings. Nor did the panel members treat Mr. Klayman's defense at a joke. Indeed, during the initial hearing, which preceded this one, they could not find clear and convincing evidence that Mr. Klayman  committed any ethics violations. Thus, there logically was no need for Mr. Klayman to throw himself on the mercy of the panel and beg for leniency – a total fabrication by Defendants, in concert with Gerstein and Politico.

59.     Importantly, none of the Defendants, including Defendant Mathew Kaiser, the Chairman of the Board of Professional Responsibility who oversees and directs all of the other Defendants here,  when presented with the opportunity by Plaintiff Klayman to deny directing and acting in concert with Gerstein and Politico to commit the acts set forth herein, would do so, creating an admission that all indeed they did so act in concert with Gerstein and Politico with the malicious intent to defame and harm Plaintiff in his trade and professions and personally, as well as to negatively influence and create bias and prejudice against Plaintiff Klayman and his clients, unethically and illegally in on-going bar and court proceedings.

**First Cause of Action – Defamation**

60.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

61.     Plaintiff has been severely harmed and damaged by these false and misleading statements of by Defendants because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

62.     These defamatory statements were published with actual and constitutional malice as they were known by Defendants be false and misleading, as Defendants have closely followed and is intimately familiar Plaintiff's legal career and other endeavors, particularly since Defendants loathe and oppose his conservative ideology.

63.     Alternatively, Defendants' false and misleading published statements were made with reckless disregard for the truth. The foundation facts for this actual and constitutional malice are set forth with specificity in previous paragraphs of this Complaint.

64.     Plaintiff has been damaged by these false and misleading statements because they severely injured Plaintiff Klayman in his profession and businesses, as well as severely injured and damaged him personally, financially and in terms of his good will and reputation.

<u>**Second Cause of Action – Defamation Per Se**</u>

65.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

66.     Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

67.     These defamatory statements were published with actual and constitutional malice as they were known by Defendants to be false and misleading , as they have closely followed and are intimately familiar Plaintiff's legal career and other endeavors, particularly since they loathe and opposes his conservative ideology.

68.     Alternatively, Defendants' false and misleading published statements were made with reckless disregard for the truth. The foundation facts for this actual and constitutional malice are set forth with specificity in previous paragraphs of this Complaint.

69.     These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Klayman in his trade and professions as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally, and has severely damaged Plaintiff's reputation, good will, and financial well-being and ability to earn a living for him and his family.

## Third Cause of Action - Defamation by Implication

70.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

71.     These defamatory statements were published with actual and constitutional malice as they were known by Defendants to be false and misleading, as they have closely followed and are intimately familiar Plaintiff's legal career and other endeavors, particularly since they loathe and opposes his conservative and pro-Trump ideology, and has sued the Clintons, Obama and Biden in his public interest and personal capacities.

72.     Alternatively, Defendants' false and misleading published statements were made with reckless disregard for the truth. The foundation facts for this actual and constitutional malice are set forth with specificity in previous paragraphs of this Complaint.

73.     Defendants have made statements which carry a strong defamatory implication as to Plaintiff.

74.     Defamation by implication stems not from what is literally stated, but from what is implied. *Nunes v. WP Co. LLC*, No. 20-cv-01403 (APM), 2020 U.S. Dist. LEXIS 242227, at *8 (D.D.C. Dec. 24, 2020). "To establish defamation by implication, the plaintiff must demonstrate (1) that "a defamatory inference can reasonably be drawn" and (2) that "the particular manner or language in which the true facts are conveyed" supplies "additional, affirmative evidence suggesting that the defendant *intends or endorses* the defamatory inference." *Id*.

75.     Defendants' statements all carry a defamatory inference, which can reasonably be drawn by the reader.

76.     Plaintiff has been severely harmed and damaged by these false and misleading published statements, taken as a whole as set forth in detail in the preceding paragraphs, because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

77.     These malicious false, misleading, and defamatory statements are defamatory *by implication* and these false and misleading statements severely harmed and damaged Plaintiff Klayman in his trade and professions as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally,  and has damaged Plaintiff's reputation, good will, and financial well-being and ability to earn a living for him and his family, as well as negatively harmed him by prejudicing on-going disciplinary proceedings and court cases concerning him and his clients as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally as joint tortfeasors who also acted in concert between themselves and with District of Columbia

Bar disciplinary apparatus and officialdom (and as yet unnamed subject to discovery "volunteer" hearing committee members communist Michael Tigar and his ultra- leftist colleague Anthony Fitch),  as follows:

a.      Awarding Plaintiff compensatory including actual, consequential, incidental  for malicious defamatory concerted conduct, jointly and severally, in an amount to be determined at trial and in excess of $55,000,000.00 for the damages caused to his personal, and professional reputations and good will and well-being  in his trades and professions, as well as past and prospective financial losses, personally and professionally.

b.      Awarding Plaintiff punitive damages.

c.      Awarding Plaintiff attorney fees and costs.

d.      Granting such other relief as the Court deems appropriate and necessary.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.

Dated: March 19, 2021                                              Respectfully Submitted,


                                                                       */s/ Larry Klayman*
                                                                    Larry Klayman, Esq.
                                                                    Florida Bar. No. 246220
                                                                    7050 W. Palmetto Park Rd
                                                                    Boca Raton FL 33433
                                                                    Telephone: 561-558-5336
                                                                    Email: leklayman@gmail.com

                                                                    *PLAINTIFF PRO SE*

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

LARRY KLAYMAN, ESQ.

        Plaintiff

    v.

MATTHEW KAISER, et al

                            Case Number:

        Defendants

_____

**SWORN AFFIDAVIT OF LARRY KLAYMAN**

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

**A BRIEF HISTORY OF MY BACKGROUND**

1.    I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.    I am a citizen of Florida and have, at all material times, done business in this judicial circuit.

3.    In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

1

4.      I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

5.      I passed The Florida Bar the first time I took the exam.

6.      I passed all bar exams on my first attempt, including the District of Columbia Bar.

7.      I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl ("Blackwell"), which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit. Attached as Exhibit A is a copy of my abbreviated biography.

8.      I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

9.      In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

10.      In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

2

11.     I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

12.     For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by Burroughs-Wellcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

13.     I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

14.     Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

15.     Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some

3

months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

16.     Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

17.     There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and another antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

18.     I also won a Section 302 case involving paper from Brazil.

19.     All of the Section 337 cases were judge-tried and I won every one of them.

20.     I won a jury trial against Makita over power tools, another jury trial against a domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

21.     Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm,

4

which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

22.     I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

23.     On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

24.     Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

25.     I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

26.     My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

27.     It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Defendant Stone did, and second because of my legal skill and acumen. Dr. Corsi is a material witness in the Russian Collusion investigation by Special Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Defendant Stone's Mueller indictment.

28.     I have had many other successes in addition to the above-listed victories.

29.     I myself authored a book titled "Whores: Why and How I Came to Fight the Establishment" published in 2009. In it, I wrote about my unfortunate experience with Defendant Stone. *See* Exhibit B. I authored this book myself without a ghostwriter and I came runner-up at an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out of the maximum 5 stars.

30.     Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See* Exhibit B.

31.     Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison and Henry. *See* Exhibit B.

32.     Louis Jacobson of the National Journal said this of me: " . . . through his challenge of secrecy rules, Larry Klayman has become a force in Washington. *See* <u>Exhibit B</u>.

33.     Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a door some public official has marked secret . . . Larry Klayman is himself a conservative, but there's nothing partisan bout his indignation."

34.     Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I appreciate your own maverick – if we can still use that word! – thinking and stands." *See also* Advance Praise for "It Takes a Revolution: Forget the Scandal Industry." <u>Exhibit B</u>.

35.     These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit A and incorporated herein by reference; *see also* <u>Exhibit C,</u> "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

36.     I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. Judicial Watch, under Fitton, who is not a lawyer, changed its mission after I left to run for the U.S. Senate. It now primarily focuses on Freedom of Information Act requests, seeking mostly documents, but generally does not bring hard-hitting lawsuits to mete out justice. Thus, I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I am also a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show with Radio America called "Special Prosecutor with Larry Klayman."

**<u>DAMAGES</u>**

7

37.     As an attorney, I rely on my virtue and integrity, as my reputation and good will determines the amount of clients that come to me to earn a living for their legal matters in the public interest and privately.

38.     Any damage done to my reputation harms my ability to practice law as a lawyer, particularly in this circuit, which is my community. This also harms my work as an author, columnist and syndicated radio talk show host, all of which depend on reputation and good will.

39.     Defendants' statements in this instance have caused harm to my reputation, good will and well being in this circuit, throughout Florida, the United States, and globally, as I am also an international lawyer as previously set forth in this affidavit.

40.     Defendants acted with malice when they published all of the defamatory statements. They knew the statements were false or had a reckless disregard for their truth. They had reason to know his false and misleading statements were false.

41.     I was damaged financially, as well as to my reputation and good will, and emotionally, by the defamatory and other tortious acts of Defendants.

Affiant Sayeth Not

SWORN TO UNDER OATH THIS 19TH DAY OF MARCH OF 2021.

_____
Larry Klayman

# EXHIBIT A

# About Larry Klayman

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: [Harry Klaypool of Freedom Watch](). His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "[Larry Klayman - The One Man TEA Party]()," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at [www.FreedomWatchUSA.org]()**

# EXHIBIT B



©1998, The Washington Post. Photography by Larry Morris. Reprinted with permission.

*...his idea of fun is trying to kick down a door some public official has marked secret...Larry Klayman is himself a conservative, but there's nothing partisan about his indignation.*
—BILL MOYERS, "NOW" PBS

*Larry...I appreciate your own maverick—if we can still use that word!—thinking and stands.*
—FRANK RICH, COLUMNIST FOR *THE NEW YORK TIMES*

*That* Time *magazine has yet to name Larry Klayman "Man of the Year" is a failure of* Time, *not Klayman's. The work he and Judicial Watch did on the Brown case is stunning.*
—JACK CASHILL, AUTHOR OF *RON BROWN'S BODY*

*Larry Klayman is my hero because he has integrity—enough to prevent him from blind loyalty to party or ideology...That's because he is fearless and relentless in the pursuit of justice...There were other men like Larry through American history. Their names were Washington, Jefferson, Madison and Henry.*
—JOSEPH FARAH, WORLDNETDAILY.COM

*...through his challenge of secrecy rules, Larry Klayman has become a force in Washington.*
—LOUIS JACOBSON, *NATIONAL JOURNAL*

*Nobody ever accused Larry Klayman of thinking small, but his latest suit may be outsized by even his standards. The former head of conservative watchdog Judicial Watch who now runs Freedom Watch has filed a $10 trillion class action against Iran at the U.S. District Court for the District of Columbia.*
—*THE NATIONAL LAW JOURNAL*

$26.95

ISBN: 978-0-9792012-2-6

5 2 6 9 5

9 780979 201226

"Larry Klayman stood in the stead for my family and me under very trying circumstances. He is persistent, loyal, and a great believer in the Constitution, as my sons and I are as well. I respect his wisdom and strength and cherish his friendship."

—Cliven Bundy, Nevada Rancher

"While others talk of corruption and injustice in our federal courts, Larry Klayman is a man who has done something about it. As founder of Judicial Watch and Freedom Watch, Larry Klayman became a household name to those of us who want to stop the runaway power of federal judges and restore honesty and integrity to our federal court system. Echoing the sentiments of our Founding Fathers like Thomas Jefferson and James Madison, Larry Klayman has fought for a return to the principles and foundation of our Constitutional Republic wherein people are the source of all power. With over forty years of experience in the practice of law, Larry Klayman has represented defendants across America in defense of their right to 'life, liberty, and the pursuit of happiness.' Larry is a valiant warrior for truth and justice, and a man I am proud to call my friend. I hope that you will enjoy his noble work, *It Takes a Revolution: Forget the Scandal Industry!*"

—Chief Justice Roy Moore

"Klayman's work *It Takes a Revolution: Forget the Scandal Industry!* is brilliant, however unorthodox. But Larry is always right!"

—Ben Stein, Lawyer, Actor, Writer

"As the father of Navy SEAL Ty Woods, who was killed at Benghazi, I highly recommend this book. Just as Ty was a warrior as a Navy SEAL, as a fellow lawyer and as his friend I can attest to Larry being a warrior in the courtroom."

—Charles Woods, Father of Navy SEAL Ty Woods

"I admire Larry, because he is first and foremost a patriot. He not only believes in the words of the Constitution, he practices those words in all of his endeavors. He was there when I needed him."

—Laura Luhn, Sexual Abuse Victim of Roger Ailes

"Larry Klayman is one of the most principled and intellectual minds in the world of litigation. He believes in fighting for justice at all costs to protect our constitutional freedoms! I am honored to be able to call him a friend and mentor. God brings people into your life for different reasons. I believe that God connected us because he wanted me to have a big brother to encourage me to maximize my potential and guide me in the right direction. Thank you, Larry!"

—Sergeant Demetrick Pennie, President of the Dallas Fallen Officer Foundation

"Larry Klayman was the only attorney who had the guts to stand beside us and go against the government to get answers when our son, Michael, was killed in Afghanistan aboard Extortion 17 on 08/06/2011. Larry is a bulldog in the courtroom! He helped us win against the NSA, the first time in American history!"

—Charles Strange, Gold Star Father of PO1 Michael Strange (DEVGRU)

# EXHIBIT C

**FREEDOM**WATCH     JOIN OUR FIGHT AT WWW.FWUSA.ORG

# LARRY KLAYMAN – THE ONE MAN TEA PARTY

By Dr. Richard Swier (Scribe)
RedCounty.com
July 31, 2010

Long before there was a TEA Party, Glenn Beck 912 movement, 13 Patriots and thousands of others, there was Larry Klayman. Larry believes it is more important to be virtuous than be liked.

**Larry believes there is an ultimate right and wrong.**

Some of you may not know Larry Klayman but you should. If you believe in the Constitution of the United States and that the Executive, Legislative and Judicial branches of our federal government are corrupt to the core then you need to read Larry's book, *WHORES: Why and How I Came to Fight the Establishment.*

If you see our courts legislating from the bench rather than enforcing the law as in Arizona then you will love Larry Klayman. If you love politics and want to understand what really happens behind the scenes get his book. I just finished reading WHORES and could not put it down. It is a mosaic of both the man and his struggles against an out of control government bent on aggrandizing itself at the expense of the people and the law. It is about corruption on the part of both parties writ large. I found it particularly interesting because of Larry's insights into Florida politics. You see Larry ran for the very same U.S. Senate seat Marco Rubio is seeking. Larry ran against, among others, Bill McCollum and Mel Martinez. If you want to learn more about Florida politics and political insiders, read this book.

Larry is the founder of Judicial Watch and Freedom Watch USA. Freedom Watch USA "is the only group that speaks through actions, rather than just words." When reading his book I found it a fascinating personal and professional journey that reflects the work of a real patriot. Larry has won my patriot award for being a thorn in the side of Iran, Hugo Chavez, Bill and Hillary Clinton, Dick Cheney, George W. Bush and Barack Obama. Not a bad record if I say so myself.

I really felt a symbiotic relationship with Larry as I read his story. When you speak truth to power you are always attacked. The progressive model is identify the target, marginalize it and then demonize it. That is the cross that Larry, TEA Party members and others who are like minded bear today.

**Larry was fighting the establishment since the early 1990s and he continues to do so even today with the filing of a lawsuit against Elena Kagan, President Obama's nominee for the U.S. Supreme Court.**

According to the WorldNetDaily.com column, *Papers prepped to disbar Elena Kagan*:

One of Washington, D.C.'s most feared and fearless corruption watchers has told WND he intends to file an ethics complaint to have Supreme Court nominee Elena Kagan disbarred from practicing before the court she aspires to join – and possibly subjected to criminal prosecution – for her role in an escalating controversy over partial-birth abortion.

As WND reported, dozens of pro-life organizations are already asking the Senate to investigate Kagan's 1997 amendment to an American College of Obstetricians and Gynecologists report, which was then used by the Supreme Court as justification for overturning Nebraska's partial-birth abortion ban in 2000.

In her confirmation hearings, Kagan defended the amendment, saying, "My only dealings with (the College) were about talking with them about how to ensure that their statement expressed their views."

Several analyses have concluded, however, that Kagan's amendment dramatically changed the meaning of the organization statement, and court records show the statement was passed off on the Supreme Court as official scientific opinion, even though the organization's panel of scientists never approved Kagan's wording.

Klayman told WND he believes Kagan's behind-the-scenes work constitutes "conspiracy to defraud the Supreme Court," and he intends to take the evidence that has been compiled by the pro-life groups to file a complaint before the clerk's office of the U.S. Supreme Court, seeking to have Kagan disbarred as a practicing lawyer infront of the Supreme Court.

So the battle goes on for Larry, you and me. I hope you will read Larry's book and make it a point to learn more about the great work he is doing to stop corruption in our courts, at the White House and in Congress. Larry has been a one man TEA Party, now it is time for us to join with him as we together fight in the same cause – a grass roots revolution to save the Republic.

http://www.redcounty.com/content/larry-klayman-one-man-tea-party

## YOUR HELP IS URGENTLY NEEDED!

Support our cause and join our fight!

Go to www.freedomwatchusa.org/donate

Or call 844 FW ETHIC to contribute to Freedom Watch now



# EXHIBIT 2



OFFICE OF DISCIPLINARY COUNSEL

MAR 2 9 2019

RECEIVED

MAR 2 9 2019

MAR 2 9 2019

**J.P. Szymkowicz**
**Szymkowicz & Szymkowicz, LLP**
**P.O. Box 57333**
**Washington, DC  20037-0333**
**(202) 862-8500**
**jp@szymkowicz.com**

March 29, 2019

The Honorable Anna Blackburne-Rigsby
Chief Judge
District of Columbia Court of Appeals
430 E Street N.W.
Washington, DC  20001

Robert C. Bernius, Esquire
Chairperson
District of Columbia Board on Professional Responsibility
430 E Street N.W., Suite 138
Washington, DC  20001

James T. Phalen, Esquire
Executive Attorney
District of Columbia Board on Professional Responsibility
430 E Street N.W., Suite 138
Washington, DC  20001

Hamilton P. Fox, III, Esquire
Disciplinary Counsel
District of Columbia Office of Disciplinary Counsel
Building A, Suite 117
515 Fifth Street, N.W.
Washington, DC  20001

     Re:  Complaint Against Deputy Disciplinary Counsel Julia L. Porter based upon
     her Actions and Inactions in Prosecuting Bar Docket #2007-D050 (In the Matter
     of J.P. Szymkowicz)

Dear Chief Judge Blackburne-Rigsby, Mr. Bernius, Mr. Phalen and Mr. Fox:

     This is a letter of complaint against Deputy Disciplinary Counsel Julia L. Porter
that arises out of her conduct during her investigation and prosecution of my father,

RX0791

John T. Szymkowicz, and me, that began with a bar complaint filed on May 24, 2005, continued with Disciplinary Counsel's filing of a Specification of Charges dated March 30, 2009,[1] and ended on November 23, 2018, with the expiration of Disciplinary Counsel's time to file a motion for *en banc* review of the *per curiam* opinion of the District of Columbia Court of Appeals accepting the Board on Professional Responsibility's conclusion that my father and I did not violate the Rules of Professional Conduct.  This case lasted for 13 years, 6 months and 30 days.

I ask that the Board on Professional Responsibility appoint Mr. Phalen, as the Executive Attorney, to "act as Special Disciplinary Counsel" pursuant to Rule XI, Section 7 (a) (8) of the Rules Governing the District of Columbia Bar, and investigate this matter pursuant to Rule XI, Section 8 (a) of the Rules Governing the District of Columbia Bar in order to avoid the conflict of interest that would result if the Office of Disciplinary Counsel were to investigate this matter.

## I.    BACKGROUND OF ACKERMAN LITIGATION AND DISCIPLINARY COUNSEL'S SPECIFICATION OF CHARGES.

Ms. Porter's prosecution of my father and me was based on my law firm's representation of Dr. Stephen J. Ackerman, Jr. and his mother, Genevieve Ackerman, with regard to a "Revocable Trust" established on May 21, 2002.  Hearing Committee's Findings of Fact 8.  Mrs. Ackerman and her husband, Stephen Ackerman, Sr., had two children, Mrs. Abbott and Dr. Ackerman.  Ms. Abbott, "took the lead in establishing the trusts for her parents by engaging the services of [Tas Coroneos, an attorney who is now working as a real estate agent in Florida], who drafted the documents and supervised their execution."  *Id.  See also* https://www.taspowerof2.com.  "Mrs. Abbott signed [the trust documents] on behalf of both of her parents as their attorney-in-fact pursuant to Powers of Attorney in favor of Mrs. Abbott."  *Id.*

Beginning in 2002, my law firm represented Dr. Ackerman in the District of Columbia Superior Court in his effort to "reform the trust to [Mrs. Ackerman's intent]," but the Superior Court ruled against Dr. Ackerman.  *Id.* at 10.  My law firm also represented Mrs. Ackerman by filing an action in the Superior Court "for the purpose of revoking the trust and returning control of the trust assets to Mrs. Ackerman."  *Id.* at 10-11.  After the trustee's counsel notified my father that he intended to call my father as a witness during the trial in Mrs. Ackerman's case, my father was forced to withdraw as Mrs. Ackerman's counsel pursuant to Rule 3.7 of the District of Columbia Rules of Professional Conduct, and successor counsel, Leslie Silverman, began representing Mrs. Ackerman.  *Id.* at 11.  My law firm continued, however, to represent Dr. Ackerman in a proceeding brought by the trustee in the Superior Court to transfer a home on North

---

[1]    Pursuant to the Rules Governing the District of Columbia Bar, Ms. Porter verified the Specification of Charges dated March 30, 2009 by stating "I do affirm that I verily believe the facts stated in the Specification of Charges to be true."

RX0792

Carolina Avenue into Mrs. Ackerman's trust.  *Id.*  Ultimately, Mrs. Ackerman and Dr. Ackerman lost in all of the actions filed in the Superior Court.  *Id.* at 11-12.

In a 35-page Specification of Charges dated March 30, 2009, Ms. Porter charged my father and me with several violations of the Rules of Professional Conduct, which the Hearing Committee summarized as follows:

> Bar Counsel charges that, during their representation of Mrs. Ackerman, Respondents engaged in conflicts of interest, dishonesty, fraud, and other ethical violations . . . Bar Counsel's prosecution rests on the contention that Mrs. Ackerman is 'incompetent' because she suffers from dementia, 'cognitive impairment' and 'memory problems,' and therefore was mentally incapable of hiring or directing a lawyer, and was unable to understand or process anything of a complex nature.  Bar Counsel asserts that Mrs. Ackerman was an unknowing party to litigation that was brought in her name, because it was not in her interest.  Instead, Bar Counsel argues that the litigation was intended only or primarily to benefit her son, Dr. Ackerman, to Mrs. Ackerman's financial detriment.  These contentions were initiated and are primarily supported by the testimony of Bar Counsel's complaining witness, Mrs. Abbott.  *Hearing Committee's Findings of Fact 12-13.*[2]

> Moreover, the Hearing Committee found that there was a "close connection between the case Mrs. Abbott prepared for Bar Counsel to support Mrs. Abbott's complaints and the case Bar Counsel actually presented against Respondents."  *Hearing Committee's Findings of Fact 18-19*.

## II.     SUMMARY OF DISCIPLINARY PROCEEDINGS.

### A.     Proceedings Before the Hearing Committee.

The proceedings before the Hearing Committee began on October 13, 2009, and ended after 12 days of testimony on March 10, 2010.  The Hearing Committee's Findings of Fact and Proposed Recommendations of Law, which were issued on September 28, 2012, covered 161 pages, not including a 62-page appendix that cited to evidence introduced during the proceedings.  The Hearing Committee that:

---

[2]     The Hearing Committee found that "Mrs. Abbott's anger and resulting hostility to Respondents makes her *opinion* [emphasis in original] testimony against Respondents unreliable."   Hearing Committee's Findings of Fact 21.  Moreover, the Hearing Committee found that "Mrs. Abbott's hostile, bitter statements and uncorroborated testimony cannot be accepted as reliable or even relevant evidence against Respondents."   *Id.*

RX0793

¶306.  The Hearing Committee has listened to arguments and testimony for twelve hearing days, carefully reviewed over 3,800 pages of transcript (including the two pre-hearing conferences) and several more thousand pages comprising the 228 exhibits admitted in evidence, and considered the arguments set forth in the approximately 300 pages of briefs submitted by the parties.  This careful review enables us to say, with confidence, that **there is no credible evidence, much less clear and convincing evidence, supporting any of Bar Counsel's charges**.  [emphasis added].

. . .

¶307.  It is easy to understand why Mrs. Ackerman yearned for peace in her family. Throughout the years described in this record, there was no peace in the Ackerman family. It is also easy to understand Mrs. Abbott's anger at the situation with which all participants in this tragic drama were faced. The palpable anger and resulting hostility of Mrs. Abbott towards the Respondents is misplaced, however.

¶308.  We do not contest her right to express her opinions on any topic of her choosing, including the behavior of Respondents. However, that anger should not have affected Bar Counsel's investigation in this matter. It is nevertheless clear that Mrs. Abbott's "case" against the Respondents became Bar Counsel's "case" against Respondents.[3] Bar Counsel asked Mrs. Abbott to attest to the truthfulness of her complaining letters.  But Bar Counsel's charges were substantially undermined by Mrs. Abbott's hostility and bias against Respondents, as clearly demonstrated in Mrs. Abbott's cross-examination. Further, Bar Counsel's serious misunderstanding of District of Columbia law with respect to mental capacity and consequently her failure to show that Mrs. Ackerman lacked capacity to interact with Respondents requires that the charges be dismissed against all Respondents, [expect for the Rule 1.5 violation by Mrs. Ackerman's subsequent counsel, Robert King].  *Findings of Fact 155-56.*

---

[3]      In an email dated November 8, 2008 at 10:31 p.m. from Mrs. Abbott to Ms. Porter, Mrs. Abbott describes her filing of an ethics complaint about an accountant in order to obtain information instead of "go[ing] to court to force the issue."  In response to that ethics complaint, Mrs. Abbott's counsel "very soon heard from [the accountant's counsel], we made our demands, and everything we requested has been provided." Mrs. Abbott's email concludes by stating, "So thank you, Julia, for what I have learned. I figure I saved over $8,000 by filing an ethical complaint as opposed to going back to court – probably even more.  Til later, thanks again – Fran."

RX0794

**B.     Proceedings Before the Board on Professional Responsibility.**

The Board on Professional Responsibility, in a 35-page opinion issued on July 25, 2014, dismissed all charges against my father and me.  The Board found that "[d]espite the *quantity* of evidence urged by Bar Counsel, when we account for the Hearing Committee's *qualitative* credibility determinations, we agree that Bar Counsel has not clearly and convincingly proved the charges against Respondents." [italics in original].  *Opinion* 3.  The Board also found that "[a]lthough Bar Counsel decries as 'almost philosophical' some of the legal issues discussed by the Hearing Committee, there is no meaningful challenge to the germane legal reasoning contained in the Committee's report."  *Opinion* 3.  The Board found that I "never interacted personally with Mrs. Ackerman."  *Opinion* 16.  The Board further observed that:

> Denigrating the Hearing Committee's rejection of its evidence, Bar Counsel aggressively criticizes its 'failure to consider much, if not most, of the evidence' or 'even to acknowledge it,' and characterizes this purported failing as a 'dereliction of [its] responsibility.'  (Bar Counsel's Brief before the Board at 48-49).  The *ad hominem* attack on the Hearing Committee's work product is unfortunate. The Hearing Committee did consider countervailing evidence (see, e.g. Hearing Committee's Findings of Fact at 79-93).  The fact that it did not swell its report beyond 219 pages, further to detail evidence it found unpersuasive, does not mean the Committee ignored it."  *Opinion 17.*

The Board, with regard to me, found:

> [W]e reject Bar Counsel's claim that J.P. Szymkowicz violated Rule 1.7 (b) (2) for an additional reason.  Although he appeared on behalf of Mrs. Ackerman in the litigation, his role was entirely secondary to his father's. He never spoke to Mrs. Ackerman.  He had no reason to discuss any conflict issues with her because his father had 'satisfied any inquiry he had about that.  His father had a demonstrated history of being sensitive to, and vetting, conflicts in the past.  J.P. Szymkowicz understood that his father would 'not do anything on behalf of his clients unless they understand what's going on, and the ramifications of what they are going to do.  If there is a potential conflict, any potential conflict, . . . he's very, very thorough and takes sometimes hours discussing these kind of issues with clients, and that happens in every case.'  J.P. Szymkowicz was entitled to rely on [John T. Szymkowicz's] determination of Mrs. Ackerman's capacity.  He neither knew of, nor ratified, any improper conduct of his father.  As a consequence, he did not have disciplinary liability for any failure of his father in that regard.  [*citing* D.C. Bar Rule of Professional Conduct 5.1, Comment 6].  *Opinion 27.*

5

**C.** **Proceedings Before the Court of Appeals.**

In a 27-page *per curiam* opinion issued on September 17, 2015, the Court of Appeals dismissed all charges against my firm, except that it remanded the case to the Board on Professional Responsibility for "further consideration of the conflict-of-interest charges" because "the Szymkowiczes could not properly represent both Ms. Ackerman and Dr. Ackerman without obtaining informed consent to the joint representation. Because it concluded that informed consent was not required, the Board did not decide whether informed consent was obtained." *Opinion 21-22, 27.* The Court of Appeals further found that:

> The Board ruled in the alternative that Mr. J.P. Szymkowicz did not violate the conflict-of-interest rule because he reasonably relied on Mr. J.T. Szymkowicz's assurances that any conflict issues had adequately been addressed. Because it is possible that the Board's assessment of that issue could be affected by the Board's determinations on remand, we also remand as to the conflict-of-interest charge against Mr. J.P. Szymkowicz. *Opinion 22 n.2.*

**D.** **Proceedings on Remand Before the Board on Professional Responsibility.**

On May 19, 2017, the Board on Professional Responsibility issued a 36-page report and recommendation on remand from the Court of Appeals. This report, after a lengthy discussion of the law on capacity and burdens of proof, found that "Disciplinary Counsel failed to prove by clear and convincing evidence that the Szymkowiczes failed to obtain informed consent pursuant to Rule 1.7 (c) after [John T. Szymkowicz] offered evidence of informed consent." *Report 23.* This report also finds that "[b]ased on this conclusion, we also see no reason to revisit our previous finding that [J.P. Szymkowicz] reasonably relied on his father's assurances that he had obtained Mrs. Ackerman's informed consent under Rule 5.2 (subordinate lawyers)." *Report 25.* Thus, the Board "recommends that the case against the Szymkowiczes be dismissed." *Report 35.*

**E.** **Proceedings in the Court of Appeals after Remand to the Board on Professional Responsibility.**

On November 8, 2018, the Court of Appeals held, in a 16-page opinion, that the record supports the Board's conclusion that Disciplinary Counsel failed to carry the burden of proving by clear and convincing evidence that Mrs. Ackerman did not give informed consent to my firm's representation. With regard to me, the Court found that:

> Although John P. Szymkowicz did not personally discuss conflicts of interest with Ms. Ackerman, the Board concluded that John P.

RX0796

Szymkowicz reasonably relied upon assurances from his father on the issue.  We do not understand Disciplinary Counsel to argue at this juncture that John P. Szymkowicz violated Rule 1.7 even if his father did not.  *Opinion 6-7.*

## III.   MRS. ABBOTT'S COUNSEL NEVER ASKED A COURT TO IMPOSE SANCTIONS DURING LITIGATION AND NEVER FILED A BAR COMPLAINT.

During the litigation of the cases underlying this disciplinary proceeding, Mrs. Abbott's counsel, George Huckabay, never asked a court to impose sanctions for frivolous behavior and did not file a bar complaint to Disciplinary Counsel as he was required to do under Rule 8.3 (a) of the Rules of Professional Conduct if he believed that my father or I committed a disciplinary violation.  Rule 8.3 (a)  states:

A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

Mr. Huckabay also did not testify against me or my father during the proceedings before the Hearing Committee, even though he had numerous dealings with my father in the various cases involving Dr. Ackerman and Mrs. Ackerman.  Had he testified before the Hearing Committee, Mr. Huckabay would have testified that he never had a substantive discussion about the Ackerman matters with me, and that his interactions with me were limited to such things as asking to speak with my father or communications on non-substantive matters, such as when documents would be produced or what days were good for scheduling purposes.

## IV.   MS. PORTER'S ACTIONS THAT VIOLATE THE RULES OF PROFESSIONAL CONDUCT.

### A.   Ms. Porter's Four Year Investigation of the Charges against My Law Firm.

Ms. Porter's initial investigation of the facts surrounding Mrs. Abbott's bar complaint lasted between May 24, 2005, when the complaint was made, and March 30, 2009, when she filed the Petition Instituting Formal Disciplinary Proceedings with the Board on Professional Responsibility.  During the entire time that this action was pending, six central witnesses in this case died, including Genevieve Ackerman, who was the key figure in the drama; Stephen J. Ackerman, Sr., her husband; Herbert Callihan, her attorney prior to the time my law firm represented her; Kenneth Loewinger, her court-appointed attorney after my firm's representation of her ended; George Huckabay, her daughter's attorney in all of the proceedings in which my firm represented Ms. Ackerman and her son; and finally, her son, Stephen J Ackerman, Jr.

RX0797

By the time the Hearing Committee began its 12 days of hearing, Mrs. Ackerman was unable to testify on my firm's behalf due to injuries she suffered in a fall in 2007, and Stephen J. Ackerman, Sr. and Mr. Callihan were dead.  By the time my firm began its defense before the Hearing Committee on December 1, 2009, Mr. Loewinger had died as well.  Melvin Bergman, the attorney for Co-Respondents Leslie Silverman and Robert King, died prior to the final resolution in the Court of Appeals.

The result of Ms. Porter's almost four-year delay in filing her Petition Instituting Formal Disciplinary Proceedings was that my firm did not have the ability to call witnesses (including Mrs. Ackerman herself) who would have corroborated my father's testimony that Mrs. Ackerman possessed the capacity to enter into a legal contract, that she had the ability to convey her wishes to my father and that she had the ability to receive information and provide informed consent to the legal strategy employed by my father on her behalf.  Instead, the Hearing Committee was not able to hear from those individuals, and thus, as a result of Ms. Porter's delay, my father could defend himself against Ms. Porter's allegations by calling only three witnesses besides my father and me to testify before the Hearing Committee:  Dr. Richard Ratner, who evaluated Mrs. Ackerman as a psychiatrist, and Mrs. Ackerman's successor counsel, Leslie Silverman and Robert King.  Had proceedings before the Hearing Committee began within a few months of Ms. Porter receiving Mrs. Abbott's bar complaint in May 2005, the Hearing Committee would have heard directly from Mrs. Ackerman and determined for themselves that she possessed the capacity to enter into a legal contract, that she had the ability to convey her wishes to my father and that she had the ability to receive information and provide informed consent to the legal strategy employed by my father on her behalf.  If testimony from Mrs. Ackerman was not enough to exonerate my law firm, my father would have also called Herbert Callihan, who was Mrs. Ackerman's previous attorney, and Kenneth Loewinger, her court-appointed counsel, to testify as to Mrs. Ackerman's capacity, wishes and informed consent to my father's legal strategy.  Instead, Ms. Porter's four-year delay in bringing this case to trial left my father with no "third-party" witness except for Dr. Ratner to corroborate my father's testimony.

I believe that the evidence is clear that Ms. Porter used delay as a procedural weapon against my law firm since she "ran out the clock" on Mrs. Ackerman's ability to recall facts and events (Mrs. Ackerman was almost 88 years old in May 2005, when Mrs. Abbott first complained to the Disciplinary Counsel about my law firm) by waiting almost four years to file her Petition Instituting Formal Disciplinary Proceedings.  It is not difficult to imagine that an 88-year-old's memory of detailed facts related to legal proceedings would fade after four years.  In fact, by the time the Hearing Committee heard the case in late-2009, Mrs. Ackerman had fallen (sometime in 2007), and apparently, lost much, if not all, of her ability to remember simple day-to-day details of her life, and thus, Mrs. Ackerman was therefore unable to testify before the Hearing Committee.  This extensive delay significantly prejudiced my firm's defense against Ms. Porter's charges.

8

In "*Lowering the Bar:  How Lawyer Discipline in New York Fails to Protect the Public*," 17 N.Y.U. J. Legis. & Pub. Pol'y 485, 496 (2014), Professor Stephen Gillers of the New York University Law School, states that an "[u]nacceptable delay" "undermines the goals of discipline" and provides the following example of an "unconscionably long" delay – "Imagine misconduct in year one, charges in year two, and suspension from practice or disbarment in year four.  A lawyer who deserves suspension will have been able to practice for three years after the misconduct that supports the suspension or disbarment."  It is important to again note that Ms. Porter waited almost four years to file the Petition Instituting Formal Disciplinary Proceedings, and during this long period of time, Mrs. Ackerman's memory faded with advanced age and other witnesses died.

Should Ms. Porter claim that she waited to file the Petition Instituting Formal Disciplinary Proceedings until the conclusion of all of the proceedings involving Mrs. Ackerman, I urge you to consider the American Bar Association Report of the Commission on Evaluation of Disciplinary Enforcement dated September 18, 2018.  This report states in the comment section of Recommendation 12 that "A disciplinary case should not be suspended or delayed because of a pending civil or criminal case involving the same facts except upon a determination by the state disciplinary board that good cause exists to do so, consistent with [the ABA Model Rules for Lawyer Disciplinary Enforcement]."

The  Standing Committee on Professional Discipline of the American Bar Association's Center for Professional Responsibility, in its "2016 Survey on Lawyer Discipline Systems," found at https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/2016sold_results.pdf, published a Chart, found at Chart VI, entitled "Case Processing Times."  This chart published the number of days it took for a particular disciplinary case to proceed through the system at different stages of the process for most of the jurisdictions in the United States.  One chart that is relevant to my case is the "Average Time from Receipt of Complaint to Filing of Formal Charges."  Most states accomplish this goal within a year; only six states reported times greater than one year.  Ms. Porter took almost four years to file formal charges against my father and me.

Ms. Porter, on page 16 of Disciplinary Counsel's March 29, 2018 brief to the Court of Appeals, cavalierly treats my law firm's delay and due process arguments:

> The charges in this case were submitted in March 2009, six months before the Szymkowiczes stopped litigating against Ms. Ackerman's trust.  Disciplinary matters take time to resolve, particularly when years elapse over the course of the hearing, the Committee's report, the Board report, and the appeal.  . . . They have been permitted to practice law during the entire period these matters were pending and a sanction for their misconduct has yet to be imposed.  . . . Their complaint about the expense also has no place in this appeal.  They chose to retain counsel.

RX0799

I believe that the evidence is clear that Ms. Porter used delay as an offensive weapon against my law firm in order to run out the clock on my firm's ability to call Mrs. Ackerman and others as witnesses during the proceedings before the Hearing Committee.

### 1.   Ms. Porter's November 2005 interview with Mrs. Ackerman.

In 2005, after receiving Ms. Porter's request for information about Mrs. Ackerman's case, my father invited and encouraged Ms. Porter to meet with Mrs. Ackerman, outside of the presence of my father and her son, Stephen J. Ackerman, Jr., so that Ms. Porter could hear directly from Mrs. Ackerman what the elderly woman wanted and what information my father had provided to Mrs. Ackerman with regard to the course of action ultimately undertaken by my law firm.  Upon information and belief, Ms. Porter and an investigator from the Office of Disciplinary Counsel met with Mrs. Ackerman in November 2005 as suggested by my father.  This meeting is significant because one of two things occurred at that time, either:  (1) Mrs. Ackerman was fully aware of the case filed by my law firm and had received information from my father sufficient to provide him with informed consent to the plan for litigation that my father employed, or (2) Mrs. Ackerman lacked the capacity to understand the nature and effect of her actions, and thus, could not provide informed consent to my father's litigation plan.  If Mrs. Ackerman was fully aware of the case filed by my law firm and had received information from my father sufficient to provide him with informed consent of the plan for litigation that my father employed, Ms. Porter's investigation should have ended there.  If Ms. Porter found that Mrs. Ackerman lacked the capacity to understand the nature and effect of her actions, she had the duty to immediately file a Petition Instituting Formal Disciplinary Proceedings, rather than waiting more than three years - until March 30, 2009 - to do so, in order to protect Mrs. Ackerman from further harm and to protect the general public from an unethical attorney.

> ### a.   Ms. Porter should have recused herself from prosecuting her case against my father and me based on the fact that she interviewed Mrs. Ackerman.

Once Disciplinary Counsel filed the Petition Instituting Disciplinary Proceedings, Ms. Porter should have recused herself under Rule 3.7 of the Rules of Professional Conduct (which requires lawyers to recuse themselves if they are likely to be a necessary witness during trial) so that she and her investigator could have testified against my father in the proceedings before the Hearing Committee (assuming that she found that Mrs. Ackerman lacked the capacity to understand the nature and effect of her actions).  While Ms. Porter called many witnesses before the Hearing Committee to testify generally about Mrs. Ackerman's purported incapacity, she did not testify herself or call her investigator to testify.  This omission is glaring because if she or her investigator had believed that Mrs. Ackerman lacked capacity to understand the nature

RX0800

and effect of her actions, based on their November 2005 meeting with the central figure in this case, surely Ms. Porter would have introduced this evidence during the proceedings before the Hearing Committee.  The obvious answer is that Ms. Porter and her investigator did not find that Mrs. Ackerman lacked capacity to understand the nature and effect of her actions during their interview, and rather, found Mrs. Ackerman to be, as my father testified, steadfast in her desire to take the actions suggested by my father after he provided her with information that was sufficient to allow her to provide informed consent to this plan of action.

**B.    Ms. Porter's Failure to Dismiss the Case Against Me after the Hearing Committee Issued its Report and Recommendations in September 2012.**

While Mrs. Abbott did not originally include me in her May 24, 2005 bar complaint against my father, she later filed a separate bar complaint against me on February 12, 2007.  In response to that bar complaint, I sent Ms. Porter a letter on March 28, 2007 that rebutted each and every statement in Mrs. Abbott's February 12, 2007 complaint against me.  This letter detailed what I did - and what I did not do - with respect to the various proceedings in the Ackerman cases.  The Hearing Committee found that "JPS had a limited role with respect to in-person meetings with both Dr. Ackerman and Mrs. Ackerman and with respect to appearing in court in all relevant matters for those clients. *Findings of Fact 94.*  The Hearing Committee cited Rule 5.2 of the Rules of Professional Responsibility in its Findings of Fact:

¶191.  Rule 5.2 governs the responsibilities of subordinate lawyers.  In its entirety, Rule 5.2 states:

(a)     A lawyer is bound by the Rules of Professional Conduct notwithstanding that the lawyer acted at the direction of another person.

(b)     A subordinate lawyer does not violate the Rules of Professional Conduct if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.

Comment (2) to Rule 5.2 further provides:

When lawyers in a supervisor-subordinate relationship encounter a matter involving professional judgment as to ethical duty, the supervisor may assume responsibility for making the judgment. Otherwise a consistent course of action or position could not be taken. If the question can reasonably be answered only one way, the duty of both lawyers is clear and they are equally responsible for fulfilling it. However, if the question is reasonably arguable,

RX0801

someone has to decide upon the course of action. That authority ordinarily reposes in the supervisor, and a subordinate may be guided accordingly. *For example, if a question arises whether the interests of two clients conflict under Rule 1.7, the supervisor's reasonable resolution of the question should protect the subordinate professionally if the resolution is subsequently challenged.* [*italics in original*].

. . .

¶193.  Thus, JPS was entitled to rely on the judgment of JTS as to whether Mrs. Ackerman had validly waived the conflict of interest with Dr. Ackerman, so long as JTS' resolution of that issue was 'reasonable' which we have found to be the case.  JPS was therefore entitled to rely on JTS' resolution of that issue.  *Findings of Fact 97-98.*

After the Hearing Committee issued its Findings of Fact, Ms. Porter had a duty to dismiss me from the proceedings unless she could prove that my reliance on my father's resolution of the issue that Mrs. Ackerman waived the conflict of interest with her son was "unreasonable."  Rather than dismissing me from the proceedings, Ms. Porter filed Exceptions to the Hearing Committee's Findings of Fact and Conclusions of Law before the Board on Professional Responsibility, Exceptions to the Board's Order before the Court of Appeals, a Brief before the Board on Professional Responsibility on remand, and finally, a brief before the Court of Appeals after remand to the Board on Professional Responsibility.

On pages 42 to 45 of Disciplinary Counsel's brief before the Court of Appeals dated December 12, 2014, pages 22 to 23 of Disciplinary Counsel's Brief on remand to the Board on Professional Responsibility dated November 23, 2015 and pages 15 to 16 of Disciplinary Counsel's brief before the Court of Appeals dated March 29, 2018, Ms. Porter attempted to address, the reasonableness of my reliance on my father's belief that Mrs. Ackerman had capacity to understand the nature and effect of her actions and that my father had obtained Mrs. Ackerman's consent to the legal strategy employed. Instead of discussing whether my reliance on my father's statements to me about the Ackerman litigation was reasonable or not, Ms. Porter made arguments such as "[J.P. Szymkowicz] took no steps to ascertain that his father had made the necessary disclosures, or that Mrs. Ackerman understood and appreciated her risks and alternatives" and "[w]ith access to the medical reports and Ms. Ackerman's testimony showing her cognitive and memory deficits, [J.P. Szymkowicz] cannot escape responsibility for knowing of her compromised condition," ," *Disciplinary Counsel's December 12, 2014 Brief to Court of Appeals 45*; *Disciplinary Counsel's March 29, 2018 Brief to Court of Appeals 16.*

12

The transcript of the proceedings before the Hearing Committee shows that there was extensive testimony that concerns (a) my reliance on my father's statements that Mrs. Ackerman was competent [*See Tr. 1671, 1770-1771*], (b) my reliance on my father's statements that Mrs. Ackerman waived any conflict of interest between her and her son [*See Tr. 1705-1706, 1910-1912*] and (c) my belief of my father's truthfulness based on years of knowing him [*See Tr. 1682-1685, 1910-1912*].  Rather than address Rule 5.2, concerning the responsibility of "subordinate lawyers," Ms. Porter attempted to "lump" me in with my father with regard to distinct acts in which he allegedly participated in order to "keep me in the case."

###    1.    Ms. Porter's false statements to the Board on Professional Responsibility and the Court of Appeals that were made to "keep me in the case."

Ms. Porter made false statements to the Board on Professional Responsibility and the Court of Appeals about what I did (or did not do) that had no support in the record whatsoever.  Ms. Porter made these false statements with the purpose of clouding the issue of what specifically I did or did not do and did so in an effort to have the Board and Court punish me, in addition to my father, in case he was found to have committed violations of the Rules of Professional Conduct.  Ms. Porter's actions to "lump" me  in with my father with regard to his interactions with Mrs. Ackerman did not occur before the Hearing Committee, presumably because the Hearing Committee would have "caught" her in her deception, but did occur during proceedings before the Board on Professional Responsibility and the Court of Appeals (which did not have the detailed recollection of the facts that the Hearing Committee had).  For example, before the Hearing Committee, Ms. Porter, used language that did not include me, such as "JTS and SA Jr. induced Mrs. Ackerman to sign a new complaint against Frank Abbott by telling her that it would end the litigation."  Disciplinary Counsel's April 19, 2010 Brief to the Hearing Committee 35.  Ms. Porter's choice of language in filings before the Board on Professional Responsibility and the Court of Appeals was intentional, in the sense that she had actual knowledge that what she wrote was misleading, at best, or outright false, at worst, and her falsehoods were material to the proceeding, in the sense that she wanted to "exaggerate" my involvement (or lack thereof) in the case to keep me in the case after the Hearing Committee found in my favor.  These false statements include:

a.    "the Szymkowiczes had promised Mrs. Ackerman that they would drop the litigation if she revoked the trust."  *Disciplinary Counsel's Brief before the Court of Appeals dated December 12, 2014 at 13.*  [There is no evidence in the record that I "promised" Mrs. Ackerman anything].

b.    "the other Respondents, Silverman and King – even when they were brought in – first, they were brought in by the Szymkowiczes and the son."  *Transcript of June 3, 2015 Oral Argument before the Court of*

RX0803

*Appeals 13.* [There is no evidence in the record that I "brought in" Ms. Silverman or Mr. King].

c.      "The Szymkowiczes and [Dr.] Ackerman persuaded Ms. Ackerman to sign the complaint initiating Ackerman II, by promising her that her son would dismiss or drop his own case and 'end the litigation.'" *Disciplinary Counsel's Brief before the Board on Professional Responsibility dated November 23, 2015 at 12.* [There is no evidence in the record that I "persuaded" Mrs. Ackerman to do anything].

d.      "The POAs and other documents that the Szymkowiczes had Ms. Ackerman sign in favor of her son also gave rise to conflicts." *Disciplinary Counsel's Brief before the Board on Professional Responsibility dated November 23, 2015 at 13.* [There is no evidence in the record that I "had Mrs. Ackerman sign" anything].

e.      "[I]n November 2005, the Szymkowiczes had Ms. Ackerman execute a new POA in favor of her son, as well as other documents including a revocation of her trust, that also benefitted her son." *Disciplinary Counsel's Brief before the Board on Professional Responsibility dated November 23, 2015 at 14.* [There is no evidence in the record that I "had Mrs. Ackerman execute" anything].

f.      "The Szymkowiczes first assisted the son in filing a lawsuit, to dispute the trust and secure one of the properties for himself, despite the clause disinheriting beneficiaries who challenged the trust.  Three years later they undertook to represent his mother at the same time, promising that her son would drop his suit if she litigated to under to trust herself." *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 2-3.* [There is no evidence in the record that I ever "promised" Mrs. Ackerman anything].

g.      "The Szymkowiczes secured other POAs in the son's favor on November 22, 2005, and then repeatedly had his mother execute new POAs in his favor over the next 15 months." *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 10.* [There is no evidence in the record that I "secured" any document from Mrs. Ackerman].

h.      "One or both Szymkowiczes took part in many of these communications [with successor counsel Leslie Silverman and Robert King]." *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 15.* [There is no evidence in the record that I "took part" in any substantive "communications" with Ms. Silverman or Mr. King].

14

i.        "None of the lawyers discussed the documents [Mrs. Ackerman's new will and an assignment of assets to Dr. Ackerman] with her, or the risks, alternatives, or implications of signing them.  They gave them to her son, informing him that he could sign the Assignment for her under authority of a POA."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 15*.  [There is no evidence in the record that I "gave" Dr. Ackerman a copy of Mrs. Ackerman's will or assignment of assets or "informed" him that he could sign the Assignment to her under authority of a POA].

j.        "in November 2007, Stephen Ackerman, Jr. tried an almost opposite approach – with cooperation from all four lawyers.  After contacting the D.C. Agency on Aging, he petitioned the Probate Court for appointment as his mother's guardian and conservator because she was incapacitated (he claimed, as a result of macular degeneration, but he verified that she lacked capacity to care for herself or to obtain, administer or dispose of property and income)."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 18-19*.  [There is no evidence in the record that I "cooperated" with Stephen Ackerman, Jr. in "contacting the D.C. Agency on Aging or "petitioning" the Probate Court].

k.        "The record evidence does not support the Board's finding that the Szymkowiczes ended their representation of Ms. Ackerman on March 7, 2017 – the day JTSzymkowicz and Silverman filed a praecipe in Ackerman II substituting the latter for the former as Ms. Ackerman's counsel in the litigation.  Rather, clear record evidence demonstrated that the Szymkowiczes continued to act as counsel for Ms. Ackerman in their subsequent meetings, and when they prepared legal documents for her to sign that they maintained and used."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 44*.  [There is no evidence in the record that I "prepared legal documents" for Mrs. Ackerman to sign].

l.        "Silverman and King acted in concert with Stephen Ackerman, Jr. and the Szymkowiczes from whom they got their information."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 47*.  [There is no evidence in the record that I provided "information" to Ms. Silverman or Mr. King].

m.       "That the Szymkowiczes withdrew as counsel in Ackerman II because Mr. Szymkowicz was going to be a witness.  The assignment was actually signed in August of 2007 which was around the time that Mr. Szymkowicz or the Szymkowiczes created the document."  *Timestamp*

RX0805

*14:32 of the April 11, 2018 oral argument in the Court of Appeals.*  [There is no evidence in the record that I "created" this assignment].

n.      "I think there's more than clear and convincing evidence in the record, particularly from the perspective of Ms. Ackerman, who, while the Szymkowiczes may - who withdrew as counsel in the Ackerman II case, continued to be involved in every legal matter that she – going forward.  It was basically a seamless, I guess, representation as far as Ms. Ackerman was concerned."  *Timestamp 25:38 of the April 11, 2018 oral argument in the Court of Appeals.*  [There is no evidence in the record that I was "involved" in Stephen Ackerman, Jr.'s Petition for Guardianship of Mrs. Ackerman, Probate Intervention Case Number 407-07. Stephen Ackerman, Jr. originally filed this Petition *pro se*, but later retained Claude Roxborough, Esquire as his counsel in this proceeding].

o.      "The power of attorney.  Her daughter had been taking care of all of her needs, all of her financial obligations since her stroke in the late nineties.  This was going to change things dramatically.  And, again, no disclosure, no explanation about the risk, the alternatives, so it didn't give Ms. Ackerman the information that she needed, not only with respect to the litigation, but with respect to the other, I guess, transactions, or documents that the Szymkowiczes had Ms. Ackerman sign."  *Timestamp 31:34 of the April 11, 2018 oral argument in the Court of Appeals.*  [There is no evidence in the record that I "had Mrs. Ackerman sign" anything].

The result of Ms. Porter's false and misleading statements to the Board on Professional Responsibility and the Court of Appeals is that I was "kept in the case" for six more years after the Hearing Committee found that I "reasonably rel[ied] on JTS's determination of Mrs. Ackerman's capacity and her waiver of any conflict."  Hearing Committee's Findings of Fact and Proposed Conclusions of Law at 101.

**C.      The Investigation into Ms. Porter's Conduct should look into whether Ms. Porter used her Former Colleague, Professor Michael Frisch, and his "Legal Profession Blog" to Tarnish my Law Firm in the Legal Community and Improperly Influence the Board on Professional Responsibility and Court of Appeals (and its Law Clerks) to Side with Disciplinary Counsel against my Law Firm.**[4]

The investigation into Ms. Porter's conduct should look into whether Ms. Porter used her former colleague at the Office of Disciplinary Counsel and current colleague at Georgetown University Law Center, Professor Michael Frisch, to tarnish my law firm's

---

[4]      Printouts of Professor Frisch's blog posts related to this case are attached in the Appendix attached to this letter.

RX0806

reputation in the legal community and improperly influence the Board on Professional Responsibility and Court of Appeals (and its law clerks) to side with Disciplinary Counsel against my law firm.  Professor Frisch publishes an influential "Legal Profession Blog," found at https://lawprofessorstypepad.com/legal_profession. Professor Frisch and Ms. Porter are both adjunct professors of law at the Georgetown University Law Center who teach courses in professional responsibility. *https:www.law.georgetown.edu/faculty/michael-s-Frisch/* and *https:www.law.georgetown.edu/faculty/julia-l-porter/.*

I do not recall that Professor Frisch attended any of the proceedings before the Hearing Committee in my case; accordingly, he would not have had the personal knowledge sufficient to provide any "color" to the reporting on my case that he provided on his blog.  The statements he published in his blog about my case provided a "slanted" view against my firm and in favor of Mrs. Abbott and Ms. Porter, and it would have been virtually impossible for him to have come to the conclusions that he made based on a reading of the Hearing Committee's Findings of Fact and Conclusions of Law alone.

In an article published on Professor Frisch's blog on August 17, 2018 entitled "D.C. Disciplinary Counsel has New Leadership," Professor Frisch stated:

> The District of Columbia Office of Disciplinary Counsel has its top positions in place with the elevation of Julia Porter to Deputy Disciplinary Counsel.  With Phil Fox and Ms. Porter at the helm, the office is blessed with effective leadership for the first time in decades.  Thus one will likely see fewer of the cases that take eight or more years to investigate and a decade or more to go from soup to nuts. . . . Disclosure: Deputy Porter and I were colleagues at Bar Counsel for a decade, regularly co-counseled cases and have co-taught ethics courses at Georgetown Law for many years.  **I am biased in her favor**.  [emphasis added].

An investigation into Ms. Porter's conduct in my case might also consider looking into whether Ms. Porter was connected to an article published in the Summer 2014 issue of the Georgetown Journal of Legal Ethics entitled "Clients with Diminished Capacity Seek Attorneys with Augmented Integrity" by Georgetown Law student Liza Magley.  *27 Geo. J. Legal Ethics 705*.

**1.      Professor Frisch's October 22, 2012 Blog Post.**

The first article that Professor Frisch wrote about my case is "The Worst Hearing Committee Report in D.C. History," published on his blog on October 22, 2012.  This article states:

RX0807

I have been carefully reviewing a District of Columbia hearing committee report issued recently that exonerates four attorneys on charges of conflicts of interest and dishonesty in a case involving the alleged abuse and manipulation of an elderly woman "client."

The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him.  The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations.  In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct.  The hearing committee simply chose to ignore it.

In particular, the hearing committee viciously attacks the complainant (the woman's loving daughter) as biased and incredible.

The reason?

She was angry and upset with the attorneys and was not a lawyer or legal ethics expert herself.  Thus, her entire testimony was ignored due to so-called "bias."
In my opinion, she had every right to be furious with the attorneys who had manipulated and endangered her mother and, based on this execrable report, has every right to regard the self-regulated legal profession as a fraud on the public.

As to the conflict, the hearing committee reasoned that the woman loved her son and wished for "peace in the family."  Thus, there was no need to explore the significant conflicts in the dual representations or deal with the overwhelming evidence of her incompetence and inability to consent to the conflict when she "retained" them.

RX0808

In sum, the report reflects the most superficial reasoning and failure to comprehend fundamental principles of legal ethics that I've seen in nearly 30 years of reading these reports.

When I read the report, I wondered about the background of the committee chair and surprise, surprise: He's an elder care lawyer. He signed (and presumably authored) an opinion that makes it nearly impossible to prosecute lawyer elder abuse.  A classic "fox guards henhouse" approach to bar discipline.

And then, this from the committee chair's law partner hits my in box:

> My partner, John Quinn, chaired a Board on Professional Responsibility panel which decided the attached case against Bar Counsel and in favor of the lawyers involved. The case spanned several years and the opinion is 219 pages.  It is the only case known to the Hearing Committee that squarely deals with the difference between legal competency and legal capacity.  I recommend reading it in that it involved charges of Bar Counsel of conflicts of interest, dishonesty, fraud and other ethical violations against several attorneys alleging that they represented a client who Bar Counsel alleged was "incompetent…suffered from cognitive impairment…and memory problems."  The report cites the relevant cases and other authorities that are pertinent and useful to practitioners.

I find this shocking, but at least it makes the agenda of this report crystal clear: protect the profession, trash the victim of misconduct (and discourage other victims from coming forward), make future Bar Counsel prosecutions virtually impossible and use the whole thing as a marketing tool.

It also is noteworthy that it took the hearing committee over 2 1/2 years to produce this whitewash, notwithstanding a rule that requires that the report be filed within 120 days of the close of the hearing.

        **a.     Ms. Porter referenced, without attribution, Professor Frisch's allegation that the law partner of the Hearing Committee's chairman, John Quinn, wrote the email that Professor Frisch discussed in his October 22, 2012 blog post.**

RX0809

Ms. Porter referenced, without attribution, Professor Frisch's allegation that the law partner of the Hearing Committee's chairman, John Quinn, wrote the email that Professor Frisch discussed in his October 22, 2012 blog post when she stated on page 17 of Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018, "The Hearing Committee touted the visibility of this case, to the rest of the bar."

**2.      Professor Frisch's December 24, 2012 Blog Post.**

Professor Frisch's contact with Ms. Porter becomes more likely than not when reading his blog post entitled, "Worst to First" published on December 24, 2012, which stated

> Readers of this blog may recall that I recently severely criticized a District of Columbia hearing committee for absolving four attorneys on charges of elder abuse by failing to deal with the evidence and attacking the complainant and Bar Counsel rather than resolving the case.
>
> With typical understatement, I called the report the worst in D.C. bar history.
>
> Bar Counsel has appealed the case to the Board on Professional Responsibility.  Hopefully, justice will eventually prevail.

> **a.      Notices of Appeal and Briefs filed before the Board on Professional Responsibility are not found on the internet and are only available by viewing the Board's files in person or by receiving them from someone intimately involved in the case – such as Ms. Porter.**

The reason that it is more likely than not that Professor Frisch and Ms. Porter were in contact about my case is the fact that Notices of Appeal and Briefs filed before the Board on Professional Responsibility are not found on the internet and are only available by viewing the Board's files in person or by receiving them from someone intimately involved in the case – such as Ms. Porter.

**3.      Professor Frisch's July 28, 2014 Blog Post.**

Professor Frisch published another blog on Monday July 28, 2014 (just three days after the Board on Professional Responsibility posted its order dismissing all charges against my firm on Friday July 25, 2014).  This blog post was entitled "Worst Report Affirmed," and stated, in relevant part:

> In October 2012, I posted a comment about a report of a District of Columbia hearing committee that absolved four lawyers who I believe

RX0810

were proven to have engaged in serious misconduct involving the abuse of an elderly woman suffering from dementia.

The post was titled The Worst Hearing Committee Report in D.C. Bar History.

. . .

Well, two years have passed and the Board on Professional Responsibility affirmed the findings last week.

The majority opinion calls the case one that is resolved by the hearing committee's "credibility" determinations, thereby absolving themselves of the work of actually studying the record and evaluating the wealth of evidence that the hearing committee simply ignored in aid of its steadfast desire to find no misconduct.

. . .

In other words, it's fine to ignore the findings of judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not know that their so-called "client" was incapable of decision-making.

. . .

[T]his is a "sad case," but not for the reasons set forth. The case sadly reflects the inability of the BPR to deal meaningfully with a case in which the hearing committee entirely failed to do its job.

### 4.      Professor Frisch's September 17, 2015 Blog Post.

After the Court of Appeals remanded the case to the Board on Professional Responsibility on September 17, 2015, Professor Frisch published a blog post that same day that stated, in relevant part:

The District of Columbia Court of Appeals has remanded the case involving The Worst Hearing Committee Report in D.C. Bar history.

The court sustained the Board of Professional Responsibility's rejection of dishonesty charges and remanded for further consideration of conflict of interest charges.

RX0811

There are several aspects of this action that I find unfortunate in a case that was so poisoned by counterfactual fact findings.

. . .

My review of the record inescapably leads to a contrary conclusion to the findings of a[n] obviously rogue hearing committee.

Second, the court should never remand matters to the BPR when it clearly is on record that it believes no misconduct occurred.

Well, as a judge of the court once said, I have a vote and you (loyal blogger) do not.

. . .

I view this result as somewhat better than a Get Out of Jail Free Card but have little hope that the board will treat the matter with the seriousness it richly deserves.

### 5.    Professor Frisch's May 22, 2017 Blog Post.

Professor Frisch published another blog post on May 22, 2017 entitled "The Most Blatant Regulatory Failure in D.C. Bar History Nears A Conclusion."  This blog post stated, in relevant part:

> The seemingly endless saga caused by The Worst Hearing Committee Report in D.C. Bar History continues with a report on remand from the District of Columbia Court of Appeals to its Board on Professional Responsibility that absolves four attorneys from the most horrific case of elder abuse conflicts of interest I have ever seen.
>
> . . .
>
> In other words, it's fine to ignore the findings of multiple judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not know that their so-called "client" was incapable of decision-making.
>
> The majority's logic would absolve an attorney of conversion if the lawyer denied that the money was gone, even if the bank records proved it.
>
> A concurring opinion would find that the attorneys were aware that their "client" was incapacitated and that her interests conflicted with those of

22

RX0812

her son.  Somehow, and for reasons that escape me, those conclusions did not lead to findings of serious ethical violations.

. . .

Here, in May 2017, the board made true my prediction.  Disciplinary Counsel can appeal this atrocity to the court, which will face the moral dilemma of attempting to honor its fact finding standard of review (deferring to a hearing committee that utterly failed to do its job and a board unwilling to police it) and the undeniable facts that justify the severest discipline.  If there ever was a case in D.C. where the disciplinary system perpetrated a greater injustice and more fully failed in its stated public protection purpose, it has escaped my attention.  For those of sufficiently strong stomach, the report in *In re Szymkowicz*, Szymkowicz, Silverman & King can be accessed through this link [. . .].

### 6.    Professor Frisch's November 8, 2018 Blog Post.

Within a few minutes after the Court of Appeals posted its final opinion in my firm's case on the Court's website on November 8, 2018, Professor Frisch published a blog post that was updated several times over the next few days.  The final post was entitled "District of Columbia Court Absolves Attorneys of Horrific Elder Abuse Conflict." This blog post states:

The District of Columbia Court of Appeals has in a *per curiam* decision affirmed the most pro-attorney, anti-public protection recommendation in the history of the D.C. discipline system.  As a consequence, attorneys who clearly engaged in a gross conflict of interest get off scot-free for horrific elder abuse.
A hollow tsk tsk is all the court can muster

> In sum, although we fully understand Disciplinary Counsel's concerns about the Szymkowiczes' conduct in this case, we accept the Board's conclusion that the Szymkowiczes were not shown by clear and convincing evidence to have violated Rule 1.7.

The court majority's "full understanding" offers faint if no hope to future victims. And does nothing to instruct the Bar and public on the ethics of elder care abuse.  Rather, the court's discussion of burden shifting has no practical consequence but to tie the hands of Disciplinary Counsel in proving conflicts.  There is no case in the history of the D.C. disciplinary where a hearing committee, the board and the court so studiously ignored the proven facts to achieve the desired result.

23

. . .

The injustice perpetrated in these disgraceful proceedings was a direct result of the court and board's unwarranted deference to the agenda of the hearing committee chair . . .

. . .

During the pendency of these proceedings, I reached out to respected members of the probate bar who uniformly expressed horror at what these lawyers did but were reluctant to speak out in public.  This is - simply put - Exhibit One in anyone's indictment of the "self-regulating" District of Columbia legal profession.

A very disappointing day.

## V.    CONCLUSION.

### A.    Potential Charges Against Ms. Porter.

I believe that the facts support charges that Ms. Porter violated several Rules of the District of Columbia Rules of Professional Conduct, including:

- Rule 3.2 (a), entitled "Expediting Litigation," which states, "In representing a client, a lawyer shall not delay a proceeding when the lawyer knows or when it is obvious that such action would serve solely to harass or maliciously injure another."[5]

- Rule 3.1, entitled "Meritorious Claims and Contentions," which states, in relevant part, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not

---

[5]    Comment 1 to Rule 3.2 states, "Dilatory practices bring the administration of justice into disrepute. Delay should not be indulged merely for the convenience of the advocates, or for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client."

RX0814

frivolous, which includes a good-faith argument for the extension, modification, or reversal of existing law."[6]

- Rule 3.3 (a), entitled "Candor to Tribunal," which states, in relevant part, "A lawyer shall not knowingly:  (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." . . . (4) Offer evidence that the lawyer knows to be false."[7]

- Rule 3.4 (e), entitled "Fairness to Opposing Party and Counsel," which states, in relevant part, "A lawyer shall not: . . . (e) In trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused."

- Rule 3.5 (a), entitled "Impartiality and Decorum of the Tribunal," which states, in relevant part, "A lawyer shall not: (a) Seek to influence a judge, juror, prospective juror, or other official by means prohibited by law."

- Rule 3.7 (a), entitled "Lawyer as Witness," which states "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:  (1) The testimony relates to an uncontested issue; (2) The testimony

_____

[6]     Comment 1 to Rule 3.1 states, in relevant part, "The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure.  Comment 2 to Rule 3.1 states, in relevant part, that lawyers "are required to inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."

[7]     Comment 2 to Rule 3.3 states, in relevant part, "An assertion purported to be made by the lawyer, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry.  There may be circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.  If the lawyer comes to know that a statement of material fact or law that the lawyer previously made to a tribunal is false, the lawyer has a duty to correct the statement."  Comment 3 to Rule 3.3 states, in relevant part, "Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal.  A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. . . . The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case."

RX0815

relates to the nature and value of legal services rendered in the case; or (3) Disqualification of the lawyer would work substantial hardship on the client."

- Rule 3.8, entitled "Special Responsibilities of a Prosecutor," which states, in relevant part, "The prosecutor in a criminal case shall not: . . . (b) File in court or maintain a charge that the prosecutor knows is not supported by probable cause; (c) Prosecute to trial a charge that the prosecutor knows is not supported by evidence sufficient to establish a prima facie showing of guilt; (d) Intentionally avoid pursuit of evidence or information because it may damage the prosecution's case or aid the defense; (e) Intentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense, or in connection with sentencing, intentionally fail to disclose to the defense upon request any unprivileged mitigating information known to the prosecutor and not reasonably available to the defense, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; [and] (f) Except for statements which are necessary to inform the public of the nature and extent of the prosecutor's action and which serve a legitimate law enforcement purpose, make extrajudicial comments which serve to heighten condemnation of the accused."[8]

- Rule 8.4, entitled "Misconduct," which states, in relevant part, "It is professional misconduct for a lawyer to: . . . (c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; [and] (d) Engage in conduct that seriously interferes with the administration of justice."

### B.    Information to Seek in an Investigation of Ms. Porter.

I believe that the following information may be relevant in determining whether Ms. Porter violated any Rules of the District of Columbia Rules of Professional Conduct during her prosecution of my case:

- Information concerning the November 2005 meeting between Mrs. Ackerman, on the one hand, and Ms. Porter and her investigator, on the other hand.

- All communications between the Office of Disciplinary Counsel and Mary Frances Abbott

---

[8]    Comment 1 to Rule 3.8 states, in relevant part, "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.  This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."

RX0816

- All communications between the Office of Disciplinary Counsel and Mrs. Ackerman's first attorney, Herbert Callihan.

- All communications between the Office of Disciplinary Counsel and Mrs. Ackerman's court-appointed attorney, Kenneth Loewinger.

- All communications between the Office of Disciplinary Counsel and Mary Frances Abbott's attorney, George Huckabay.

- All communications Ms. Porter and Professor Frisch concerning my case.

### C.    Conclusion.

Thank you for taking the time to review the contents of this letter and I look forward to speaking with your investigators and responding to any request for additional information.

Respectfully submitted,

J.P. Szymkowicz

# APPENDIX

# PROFESSOR FRISCH'S BLOG POSTS

RX0818

**Professor Frisch's Blog Post**
**"The Worst Hearing Committee Report**
**in D.C. Bar History"**
**October 22, 2012**

RX0819

Legal Profession Blog

Monday, October 22, 2012

## The Worst Hearing Committee Report In D.C. Bar History

By Legal Profession Prof

I have been carefully reviewing a District of Columbia hearing committee report issued recently that exonerates four attorneys on charges of conflicts of interest and dishonesty in a case involving the alleged abuse and manipulation of an elderly woman "client."

The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

In particular, the hearing committee viciously attacks the complainant (the woman's loving daughter) as biased and incredible.

The reason?

She was angry and upset with the attorneys and was not a lawyer or legal ethics expert herself. Thus, her entire testimony was ignored due to so-called "bias."

In my opinion, she had every right to be furious with the attorneys who had manipulated and endangered her mother and, based on this execrable report, has every right to regard the self-regulated legal profession as a fraud on the public.

As to the conflict, the hearing committee reasoned that the woman loved her son and wished for "peace in the family." Thus, there was no need to explore the significant conflicts in the dual representations or deal with the overwhelming evidence of her incompetence and inability to consent to the conflict when she "retained" them.

In sum, the report reflects the most superficial reasoning and failure to comprehend fundamental principles of legal ethics that I've seen in nearly 30 years of reading these reports.

When I read the report, I wondered about the background of the committee chair and surprise, surprise: He's an elder care lawyer. He signed (and presumably authored) an opinion that makes it nearly impossible to prosecute lawyer elder abuse. A classic "fox guards henhouse" approach to bar discipline.

And then, this from the committee chair's law partner hits my in box:

> My partner, John Quinn, chaired a Board on Professional Responsibility panel which decided the attached case against Bar Counsel and in favor of the lawyers involved.The case spanned several years and the opinion is 219 pages. It is the only case known to the Hearing Committee that squarely deals with the difference between legal competency and legal capacity.  I recommend reading it in that it involved charges of Bar Counsel of conflicts of interest, dishonesty, fraud and other ethical violations against several attorneys alleging that they represented a client who Bar Counsel alleged was "incompetent…suffered from cognitive impairment..and memory problems."  The report cites the relevant cases and other authorities that are pertinent and useful to practitioners.

> https://www.dropbox.com/s/iyu7z002yfm1q5r/Ackerman__Hearing_Committee's_Final_Decision_Order_dated_September_28_2012.pdf

I find this shocking, but at least it makes the agenda of this report crystal clear: protect the profession, trash the victim of misconduct (and discourage other victims from coming forward), make future Bar Counsel prosecutions virtually impossible and use the whole thing as a marketing tool.

 It also is noteworthy that it took the hearing committee over 2 1/2 years to produce this whitewash, notwithstanding a rule that requires that the report be filed within 120 days of the close of the hearing.

RX0820

The title to this post reflects my opinion. It calls to mind one of my favorite Seinfeld lines from Elaine to Jerry: "Just when I think you are the shallowest man I've ever met, you manage to drain a little more out of the pool."

Just when I think these reports can't possibly get any worse, one like this one shows up. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2012/10/the-worst-hearing-committee-report-in-dc-bar-history.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

RX0821

**Professor Frisch's Blog Post
"Worst to First"
December 24, 2012**

RX0822

Legal Profession Blog: Worst To First                                                    1/3/13 4:44 PM

# Legal Profession Blog

## A Member of the Law Professor Blogs Network

### Blog Editors

**S. Alan Childress**
Conrad Meyer III Professor of Law
Tulane Univ. Law School
• achildr[at]tulane.edu
• Website

**Michael S. Frisch**
Ethics Counsel
Georgetown Law Center
• frischm[at]law.georgetown.edu
• Profile

**Jeffrey M. Lipshaw**
Associate Professor of Law
Suffolk Law School
• jlipshaw[at]suffolk.edu
• Profile
• SSRN Author Page

### Contributing Editor

**Nancy B. Rapoport**
Gordon Silver Professor of Law
William S. Boyd School of Law, UNLV
• nancy.rapoport[at]unlv.edu
• Profile
• SSRN Author Page

### News Readers & Feeds

FeedBurner Subscription Service



Enter your Email

[                    ]

[ Subscribe me! ]

Powered by FeedBlitz

*View Recent Posts from Network Blog Feeds*

### Search This Blog

[                 ] [ Search ]

« The Trouble With Tribble | Main | No Higher Power »

## December 24, 2012

## Worst To First

Readers of this blog may recall that I recently severely criticized a District of Columbia hearing committee for absolving four attorneys on charges of elder abuse by failing to deal with the evidence and attacking the complainant and Bar Counsel rather than resolving the case.

With typical understatement, I called the report **the worst in D.C. bar history.**

Bar Counsel has appealed the case to the Board on Professional Responsibility. Hopefully, justice will eventually prevail.

Well, I have just read another hearing committee report that is the exact opposite -- a thoroughly professional, 201 page analysis of the charges in two matters with a well-reasoned and appropriate recommendation of disbarment.

The main charges involve the attorney's representation of a plaintiff in a sex harassment case.

When the client became concerned about the attorney's behavior (in particular, his disrespect for a Superior Court judge), she discharged him.

He retaliated with a campaign to destroy her with court process that must be read to be believed. He instituted frivolous litigation, breached confidentiality, made false statements and created false evidence. As the client testified, the attorney 's conduct turned her life upside down.

The hearing committee's report may be found at this **link** by inserting the attorney's name --Ellis S. Frison.

Comment from Stephen Williams:

> The Court of Appeals is exclusively charged with
> regulating the practice of law in the District of



Wolters Kluwer
Law & Business

Best Friend at the Bar
The New Balance for Today's Woman Lawyer

Best Friends at the Bar
The *New Balance* for Today's Woman Lawyer

Blakely

Susan Smith Blakely

Learn More: WoltersKluwerLB.com
Contact Us: 1.800.950.5259

### Archives

**Recent Posts**

From Insider Trader To Inside Prison

Bill Henderson is the 2d Most Influential Person in Legal Education - National Jurist Magazine

South Of The Border

Stand By Me

Letters from Jail

The Wrong Way

An Unscheduled Landing Leads To A Legal Malpractice Claim

Attorney Not Crucified For Unprofessional Remark

Illinois Battle Over Breach of Fiduciary Duty Charges

An Inappropriate Colloquy Gets A Judge Admonished

Legal Profession Blog: Worst To First                                                                                    1/3/13 4:44 PM

**Resources**

**About Legal Profession Blog**
• Comments & Content to:
jlipshaw[at]suffolk.edu

**Find Legal Profession Profs**
• Google Scholar
• Law Schools
• SSRN

**Ethics**
• ABA Center for Professional Responsibility
• ABA Ethics Search
• ABA Links to State Ethics and Professional Responsibility Sites
• ABA Model Rules of Professional Conduct
• American Legal Ethics Library, Cornell Law School
• Louis Stein Center for Law and Ethics (Fordham Law School)
• Miller-Becker Center for Professional Responsibility (Akron Law)
• SSRN: Legal Ethics and Professional Responsibility
• The Georgetown Journal of Legal Ethics

**Bar Admission and Discipline**
• NOBC, National Organization of Bar Counsel
• APRL, The Association of Professional Responsibility Lawyers
• National Conference of Bar Examiners
• Halt

**Firm Management**
• Centre for Professional Service Firm Management, Univ. of Alberta
• Clifford Chance Centre for the Management of Professional Service Firms, Univ.of Oxford

**The Profession**
• Harvard Law School Program on the Legal Profession
• Law.com
• Mondaq

Columbia. Short of Congress removing this authority from the Court, the Court is the only entity that is able to fix this problem. And yet, you repeatedly refuse to lay these shortcomings at the feet of the Court which is where it really belongs.

Stephen

UPDATE: I respectfully disagree with the above comment. My article No Stone Left Unturned is premised on the proposition that the D.C. Court of appeals made a fundamental error in creating and deferring to a board dominated by volunteer lawyers.

When the court issues an opinion that I disagree with, I say so --here's **an example.** (Mike Frisch)

December 24, 2012 in Bar Discipline & Process | Permalink

## TrackBack

TrackBack URL for this entry:
http://www.typepad.com/services/trackback/6a00d8341bf

Listed below are links to weblogs that reference
**Worst To First**:

## Comments

## Post a comment

**Verify your Comment**

**Previewing your Comment**

Posted by: |

This is only a preview. Your comment has not yet been posted.

[ Post ]   [ Edit ]   ⟳

Your comment could not be posted. Error type:
Your comment has been saved. Comments are moderated and will not appear until approved by the author. **Post another comment**

The letters and numbers you entered did not match the image. Please try again.

As a final step before posting your comment, enter the letters and numbers you see in the image below. This prevents automated programs from posting comments.

**Topical Archive**

Abstracts Highlights - Academic Articles on the Legal Profession

Associates

Bar Discipline & Process

Billable Hours

Blogging

Books

Childress

CLE

Clients

Comparative Professions

Conferences & Symposia

Current Affairs

Economics

Ethics

Film

Food and Drink

Frisch

Games

General Counsel

Guest Bloggers from the Academy

Highlights from bepress and Law & Society Review

Hiring

Hot Topics

In-House

Interviewing

Judicial Ethics and the Courts

Law & Business

Law & Society

Law Firms

Lawyers & Popular Culture

Lipshaw

RX0824

• National Law Journal
• SSRN: Law & Society: The Legal Profession

**Other Blogs**
• LawBizBlog
• Legal Ethics Forum
• My Shingle
• Robert Ambrogi's LawSites

**Free Legal Web Sites**
• Findlaw
• JURIST

**Recent Comments**

Ashley Casas on Stand By Me

Stephen Williams on Illinois Battle Over Breach of Fiduciary Duty Charges

Stephen Williams on The Worst Hearing Committee Report In D.C. Bar History

Lavelle Coleman on Buying Into License Revocation

Stephen Williams on With God As My Witness

Steve on Till Death Do Us Disinherit

Robert Gould on Loyalty Trumps Mobility In New Mexico Decision

Rick Underwood on What I Did For Love

Rick Underwood on What I Did For Love

Peter Gulia on What I Did For Love

**Blog Traffic**

sitemeter
883,159

Since September 18, 2006

**Blogware**

Powered by TypePad

**Notices**

---

Having trouble reading this image? **View an alternate.**

[ Continue ]

Name:
[                    ]

Email Address:
[                    ]

URL:
[                    ]

Comments:
[                    ]

[ Preview ]  [ Post ]

☐ Remember personal info?

---

Monday Calendar of Programs and Events

Partners

Privilege

Pro Bono

Professional Responsibility

Rapoport

Religion

Science

Straddling the Fence

Teaching & Curriculum

Television

The Practice

Travel

Web/Tech

Weblogs

Weekly Top Ten: SSRN Legal Ethics & Professional Responsibility

The Archives

**Weekly Archives**

December 30, 2012 - January 5, 2013

December 23, 2012 - December 29, 2012

December 16, 2012 - December 22, 2012

December 9, 2012 - December 15, 2012

December 2, 2012 - December 8, 2012

November 25, 2012 - December 1, 2012

November 18, 2012 - November 24, 2012

November 11, 2012 - November 17, 2012

© Copyright All Rights Reserved
Contact post author for permissions

November 4, 2012 - November 10, 2012

October 28, 2012 - November 3, 2012

More...

RX0826

**Professor Frisch's Blog Post
"Worst Report Affirmed"
July 28, 2014**

RX0827

Legal Profession Blog                                                                                          7/29/14, 11:23 AM

Legal Profession Blog

# A Member of the Law Professor Blogs Network

Sponsored by Wolters Kluwer

Monday, July 28, 2014

### Worst Report Affirmed

By Legal Profession Prof

In October 2012, I posted a comment about a report of a District of Columbia hearing committee that absolved four lawyers who I believe were proven to have engaged in serious misconduct involving the abuse of an elderly woman suffering from dementia.

The post was titled The Worst Hearing Committee Report in D.C. Bar History.

My take

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

Well, two years have passed and the Board on Professional Responsibility affirmed the findings last week.

The majority opinion calls the case one that is resolved by the hearing committee's "credibility" determinations, thereby absolving themselves of the work of actually studying the record and evaluating the wealth of evidence that the hearing committee simply ignored in aid of its steadfast desire to find no misconduct.

From the BPR majority opinion

> We adopt the Hearing Committee's findings of fact because we agree that they are supported by substantial evidence. Despite the quantity of evidence urged by Bar Counsel, when we account for the Hearing Committee's qualitative credibility determinations, we agree that Bar Counsel has not clearly and convincingly proved the charges against Respondents. The facts argued by Bar Counsel certainly do not "produce … a firm belief or conviction" that the Hearing Committee got it wrong.

In other words, it's fine to ignore the findings of judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not *know* that their so-called "client" was incapable of decision-making.

The concurring opinion would find that the attorneys were aware that their "client" was incapacitated and that her interests conflicted with those of her son. Somehow, those conclusions did not lead to findings of serious ethical violations.

The concurrence concludes

> This is a sad case. It involves an unnecessary and bitter dispute between a brother and sister, neither of whom distinguished him or herself, over the financial affairs of their mother. Mrs. Ackerman was visually impaired, suffered from dementia, and was distressed by the dispute between her children. The dispute resulted in extensive litigation that was funded by the trust established to provide for Mrs. Ackerman in her later years. The costs of that litigation contributed to the depletion of the trust assets such that questions were raised as to the sufficiency of the trust to support Mrs. Ackerman.

> It is also a difficult case. Attorneys retained to handle matters in situations such as this face difficult decisions concerning the capacity of elderly clients to make informed and educated decisions. As noted, the Rules of Professional Conduct provide little guidance for when a lawyer must decline the representation, or withdraw from the representation of a client, who is suffering from dementia and other disabilities that impair her ability to function. That is particularly true in situations such as this where the client retains social graces, has an outward appearance of understanding, at some level, of what is happening, and where, as here, the client is relatively clear as to her wishes, even if she does not fully appreciate the consequences of her actions.

I agree that this is a "sad case," but not for the reasons set forth. The case sadly reflects the inability of the BPR to deal meaningfully with a case in which the hearing committee entirely failed to do its job.

RX0828

The disingenuous suggestion of the concurrence that the lawyers acted in a good-faith belief as to the mother's competence is belied by an overwhelming amount of record evidence.

And the false equivalence between brother and sister --the brother who tried (with the help of four lawyers) to loot his mother's estate and the sister who tried to protect her -- is deeply offensive to anyone who bothered to study the record of this sorry affair.

It's as if the BPR would find that the person who defends frivolous litigation is as blameworthy as the person who initiates it.

I expect Bar Counsel to appeal these dismissals to the Court of Appeals.

Regardless of the eventual outcome (and I have no optimism at this point) , the story of this case is Exhibit One to prove the failure of the volunteer disciplinary system in the District of Columbia.

In particular, this outcome serves as a warning to victims --don't bother to bring your concerns to the D.C.Bar, as you will only get attacked for your trouble.

To be fair, the hearing committee's gross and inexcusable failure to deal with the evidence put the BPR in a difficult position. One approach would have been to apply due diligence to study and learn the record; the other is the approach taken here --blow the whole thing off as a credibility contest and simply fail to deal with the evidence in a meaningful way.

These so-called guardians of the public trust should be thoroughly ashamed of themselves. In a just world, what happened to Fran Abbott (the complaining daughter) would happen to them.

The BPR report can be found at this link under the names Szykmowicz, Szymkowicz, Silverman and King. (Mike Frisch)

http://lawprofessors.typepad.com/legal_profession/2014/07/worst-report-affirmed.html

© Copyright 2004-2013 by Law Professor Blogs, LLC. All rights reserved.

RX0829

**Professor Frisch's Blog Post**
**"Worst Report Remanded"**
**September 17, 2015**

RX0830

Legal Profession Blog

Thursday, September 17, 2015

# Worst Report Remanded

By Legal Profession Prof

The District of Columbia Court of Appeals has remanded the case involving The Worst Hearing Committee Report in D.C. Bar history.

The court sustained the Board of Professional Responsibility's rejection of dishonesty charges and remanded for further consideration of conflict of interest charges.

There are several aspects of this action that I find unfortunate in a case that was so poisoned by counter-factual fact findings.

First, the court accepts the hearing committee's findings that the elderly victim of the gross misconduct was legally competent.

> We take as a given for these purposes the Board's conclusions that Ms. Ackerman had the legal capacity to make the decisions at issue; wanted to transfer her assets to Dr. Ackerman's control; wanted to provide for Dr. Ackerman, even to her financial detriment; did not want the trust to continue; did not want Mr. Abbott to continue as trustee; was willing to pursue litigation to achieve these objectives; and was aware of the risks and costs of litigation. Nevertheless, there was evidence (largely if not entirely undisputed) of numerous other circumstances indicating a risk of conflicting interests requiring informed consent to joint representation.

My review of the record inescapably leads to a contrary conclusion to the findings of a obviously rogue hearing committee.

Second, the court should never remand matters to the BPR when it clearly is on record that it believes no misconduct occurred.

Well, as a judge of the court once said, I have a vote and you (loyal blogger) do not.

The remand requires an exploration of informed consent

> In the circumstances of this case, we conclude that the Szymkowiczes could not properly represent both Ms. Ackerman and Dr. Ackerman without obtaining informed consent to the joint representation. Because it concluded that informed consent was not required, the Board did not decide whether informed consent was obtained. The Hearing Committee did conclude that Mr. J.T. Szymkowicz obtained Ms. Ackerman's informed consent. Nevertheless, "[r]ather than deciding [that] issue without the benefit of the Board's judgment, we leave [the issue] for the Board to consider on remand . . . ." In re Hopkins, 677 A.2d 55, 63 n.17 (D.C. 1996). We do, however, note several issues that may merit the Board's consideration: (1) whether, as Bar Counsel contends, respondents bear the burden of establishing that they obtained informed consent or whether instead Bar Counsel bears the burden in disciplinary proceedings of establishing the absence of informed consent; (2) whether, as the Hearing Committee appears to have assumed, the determination whether Ms. Ackerman gave informed consent

should be made under the standard applicable to the determination whether a party had capacity to engage in a transaction; (3) whether Rule 1.7 (b)(2) is violated whenever the requisite informed consent is not in fact obtained, or whether instead it is a defense under the Rule that the attorney reasonably but mistakenly believed that informed consent had been obtained; (4) the implications of Rule 1.14, which addresses the obligations of a lawyer representing a client with diminished capacity, a topic we discuss infra with respect to the conflict-of-interest charges against Ms. Silverman and Mr. King; and (5) the date on which the Szymkowiczes ended their representation of Ms. Ackerman.

The court concludes that "Ms. Ackerman's mental capacity was indisputably diminished to a degree" and asks that the implications of Rule 1.14 be addressed on remand.

I view this result as somewhat better than a Get Out of Jail Free Card but have little hope that the board will treat the matter with the seriousness it richly deserves. (Mike Frisch)

http://lawprofessors.typepad.com/legal_profession/2015/09/the-district-of-columbia-court-of-appeals-has-remanded-the-case-involving-the-worst-hearing-committee-report-in-dc-bar-hist.html

© Copyright 2004-2015 by Law Professor Blogs, LLC. All rights reserved.

RX0832

**Professor Frisch's Blog Post**
**"The Most Blatant Regulatory Failure in D.C. Bar**
**History Nears a Conclusion"**
**May 22, 2017**

RX0833

Legal Profession Blog

Monday, May 22, 2017

# The Most Blatant Regulatory Failure In D.C. Bar History Nears A Conclusion

By Legal Profession Prof

The seemingly endless saga caused by The Worst Hearing Committee Report In D.C. Bar History continues with a report on remand from the District of Columbia Court of Appeals to its Board on Professional Responsibility that absolves four attorneys from the most horrific case of elder abuse conflicts of interest I have ever seen.

From my summary of the hearing committee report

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

The hearing committee report was filed in October 2012.

Nearly two years later, the board filed its first report as we reported

> From the BPR majority opinion

> > We adopt the Hearing Committee's findings of fact because we agree that they are supported by substantial evidence. Despite the quantity of evidence urged by Bar Counsel, when we account for the Hearing Committee's qualitative credibility determinations, we agree that Bar Counsel has not clearly and convincingly proved the charges against Respondents. The facts argued by Bar Counsel certainly do not "produce … a firm belief or conviction" that the Hearing Committee got it wrong.

In other words, it's fine to ignore the findings of multiple judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not *know* that their so-called "client" was incapable of decision-making.

The majority's logic would absolve an attorney of conversion if the lawyer denied that the money was gone, even if the bank records proved it.

A concurring opinion would find that the attorneys were aware that their "client" was incapacitated and that her interests conflicted with those of her son. Somehow, and for reasons that escape me, those conclusions did not lead to findings of serious ethical violations.

We noted the concurring board opinion and expressed some views about it

The concurrence concludes

> This is a sad case. It involves an unnecessary and bitter dispute between a brother and sister, neither of whom distinguished him or herself, over the financial affairs of their mother. Mrs. Ackerman was visually impaired, suffered from dementia, and was distressed by the dispute between her children. The dispute resulted in extensive litigation that was funded by the trust established to provide for Mrs. Ackerman in her later years. The costs of that litigation contributed to the depletion of the trust assets such that questions were raised as to the sufficiency of the trust to support Mrs. Ackerman.

> It is also a difficult case. Attorneys retained to handle matters in situations such as this face difficult decisions concerning the capacity of elderly clients to make informed and educated decisions. As noted, the Rules of Professional Conduct provide little guidance for when a lawyer must decline the representation, or withdraw from the representation of a client, who is suffering from dementia and other disabilities that impair her ability to function. That is particularly true in situations such as this where the client retains social graces, has an outward appearance of understanding, at some level, of what is happening, and where, as here, the client is relatively clear as to her wishes, even if she does not fully appreciate the consequences of her actions.

I agree that this is a "sad case," but not for the reasons set forth. The case sadly reflects the inability of the BPR to deal meaningfully with a case in which the hearing committee entirely failed to do its job.

The disingenuous suggestion of the concurrence that the lawyers acted in a good-faith belief as to the mother's competence is belied by an overwhelming amount of record evidence.

And the false equivalence between brother and sister --the brother who tried (with the help of four lawyers) to loot his mother's estate and the sister who tried to protect her -- is deeply offensive to anyone who bothered to study the record of this sorry affair.

It's as if the BPR would find that the person who defends frivolous litigation is as blameworthy as the person who initiates it.

I expect Bar Counsel to appeal these dismissals to the Court of Appeals.

Regardless of the eventual outcome (and I have no optimism at this point) , the story of this case is Exhibit One to prove the failure of the volunteer disciplinary system in the District of Columbia.

In particular, this outcome serves as a warning to victims --don't bother to bring your concerns to the D.C.Bar, as you will only get attacked for your trouble.

To be fair, the hearing committee's gross and inexcusable failure to deal with the evidence put the BPR in a difficult position. One approach would have been to apply due diligence to study and learn the record; the other is the approach taken here --blow the whole thing off as a credibility contest and

simply fail to deal with the evidence in a meaningful way.

These so-called guardians of the public trust should be thoroughly ashamed of themselves. In a just world, what happened to Fran Abbott (the complaining daughter) would happen to them.

The court remanded the case back to the board in September 2015.

I said at the time

I view this result as somewhat better than a Get Out of Jail Free Card but have little hope that the board will treat the matter with the seriousness it richly deserves.

Here, in May 2017, the board made true my prediction.

Disciplinary Counsel can appeal this atrocity to the court, which will face the moral dilemma of attempting to honor its fact finding standard of review (deferring to a hearing committee that utterly failed to do its job and a board unwilling to police it) and the undeniable facts that justify the severest discipline.

If there ever was a case in D.C. where the disciplinary system perpetrated a greater injustice and more fully failed in its stated public protection purpose, it has escaped my attention.

For those of sufficiently strong stomach, the report in In re Szymkovicz, Szymkovicz, Silverman & King can be accessed through this link. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2017/05/the-seemingly-endless-saga-caused-by-the-worst-hearing-committee-report-in-dc-bar-history.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

RX0836

**Professor Frisch's Blog Post
"D.C. Disciplinary Counsel Has New Leadership"
August 17, 2018**

RX0837

Legal Profession Blog

Friday, August 17, 2018

## D.C. Disciplinary Counsel Has New Leadership

By Legal Profession Prof

The District of Columbia Office of Disciplinary Counsel has its top positions in place with the elevation of Julia Porter to Deputy Disciplinary Counsel.

With Phil Fox and Ms. Porter at the helm, the office is blessed with effective leadership for the first time in decades.

Thus one will likely see fewer of the cases that take eight or more years to investigate and a decade or more to go from soup to nuts.

A case docketed for investigation in 2010 has resulted in a hearing committee report proposing a 30-day suspension with fitness and the usual "no harm, no foul" approach to the delay.

> Respondent also asserts that Disciplinary Counsel's delays during the investigation should be considered in mitigating sanction. Delay may be considered a mitigating factor in determining an appropriate sanction. In re Williams, 513 A.2d 793, 798 (D.C. 1986) (per curiam). But, the Court has clarified that the circumstances must be "sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." In re Fowler, 642 A.2d 1327, 1331 (D.C. 1994). Delays that are necessary to the decision-making process or the result of a respondent's own actions or inaction do not qualify. Id.

The wrong approach of the accused attorney did not help him

> the Hearing Committee has concluded that, at times, Respondent was evasive and was non-responsive to questions posed by the Hearing Committee members concerning his conduct. Respondent avoided responding to questions that might elicit acknowledgment of his wrongful conduct.

As to fitness

> Here, Respondent admitted during the disciplinary hearing that he purposefully left earned fees in his IOLTA (FF 41-43, 47), that he lacked an accounting system to track funds despite having a total of six bank accounts for his various business entities (FF 15, 41; DX 2 at Bates 7), and that he had failed to exercise supervision over his non-lawyer employees' access to his signature stamp for the IOLTA (FF 38). Respondent failed to acknowledge the wrongfulness of this misconduct, and his testimony reflected his failure to appreciate his fiduciary responsibilities for the clients' entrusted funds. Thus, Respondent's conduct during the disciplinary hearing raises a serious doubt that he will act ethically and competently in the future when handling entrusted funds. The Hearing Committee recommends that Respondent be suspended from the practice of law for 30 standards, and (2) he has taken a continuing legal education class on law practice days. As part of his proof establishing his fitness, Respondent should show that (1) he has sufficient accounting mechanisms in place to comply with Bar Rules and fiduciary management and accounting.

RX0838

The case is In re Luis Salgado and can be found here.

Disclosure: Deputy Porter and I were colleagues  at Bar Counsel for a decade, regularly co-counseled cases (see, e.g.  here, here and  here)  and have co-taught ethics courses at Georgetown Law for many years.

I am biased in her favor. (Mike Frisch)

http://lawprofessors.typepad.com/legal_profession/2018/08/the-district-of-columbia-office-of-disciplinary-counsel-has-its-top-positions-in-place-with-the-elevation-of-julia-porter-to.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

RX0839

**Professor Frisch's Blog Post
"District of Columbia Court Absolves Attorneys
of Horrific Elder Abuse Conflict"
November 8, 2018**

**ORIGINAL POST**

RX0840

Legal Profession Blog

Thursday, November 8, 2018

## DIstrict Of Columbia Court Absolves Attorneys Of Horrific Elder Abuse Conflict

By Legal Profession Prof

The District of Columbia Court of Appeals has essentially affirmed the most pro-attorney, anti-public protection recommendation in the history of the D.C. discipline system .

As a consequence,  attorney s who clearly engaged in a gross conflict of interest get off scot-free for horrific elder abuse.

There is no case in the history of the D.C. disciplinary where a hearing committee, the board and the court so studiously ignored the proven facts to achieve the desired result.

A lone voice of integrity can be found in the dissent of Senior Judge John Steadman.

From my earlier post on this case

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

I will have much more to say. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2018/11/district-of-columbia-court-absolves-elder-abuse-conflict.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

RX0841

**Professor Frisch's Blog Post
"District of Columbia Court Absolves Attorneys
of Horrific Elder Abuse Conflict"
November 8, 2018**

**UPDATED POST**

RX0842

Legal Profession Blog

Thursday, November 8, 2018

## District Of Columbia Court Absolves Attorneys Of Horrific Elder Abuse Conflict

By Legal Profession Prof

The District of Columbia Court of Appeals has in a per curiam decision  affirmed the most pro-attorney, anti-public protection recommendation in the history of the D.C. discipline system .

As a consequence,  attorneys who clearly engaged in a gross conflict of interest get off scot-free for horrific elder abuse.

A hollow tsk tsk is all the court can muster

> In sum, although we fully understand Disciplinary Counsel's concerns about the Szymkowiczes' conduct in this case, we accept the Board's conclusion that the Szymkowiczes were not shown by clear and convincing evidence to have violated Rule 1.7.

The court majority's "full understanding" offers faint if no hope to future victims. And does nothing to instruct the Bar and public on the ethics of elder care abuse.

Rather, the court's discussion of burden shifting has no practical consequence but to tie the hands of Disciplinary Counsel in proving conflicts.

There is no case in the history of the D.C. disciplinary where a hearing committee, the board and the court so studiously ignored the proven facts to achieve the desired result

The lone voice of concern can be found in the dissent of Senior Judge John Steadman

> I disagree that the structure of criminal law presents a fair analogy. Bar discipline proceedings are designed to ensure that attorneys abide by the rules of professional conduct that their license demands and to protect the public accordingly.

Not today.

From my earlier post on this case

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

The injustice perpetrated in these disgraceful proceedings was a direct result of the court and board's unwarranted deference to the agenda of the hearing committee chair as I blogged

> When I read the report, I wondered about the background of the committee chair and surprise, surprise: He's an elder care lawyer. He signed (and presumably authored) an opinion that makes it nearly impossible to prosecute lawyer elder abuse. A classic "fox guards henhouse" approach to bar discipline.

And then, this from the committee chair's law partner hits my in box:

> My partner, John Quinn, chaired a Board on Professional Responsibility panel which decided the attached case against Bar Counsel and in favor of the lawyers involved.The case spanned several years and the opinion is 219 pages. It is the only case known to the Hearing Committee that squarely deals with the difference between legal compentency and legal capacity.  I recommend reading it in that it involved charges of Bar Counsel of conflicts of interest, dishonesty, fraud and other ethical

RX0843

violations against several attorneys alleging that they represented a client who Bar Counsel alleged was "incompetent...suffered from cognitive impairment..and memory problems." The report cites the relevant cases and other authorities that are pertinent and useful to practitioners.

https://www.dropbox.com/s/iyu7z002yfm1q5r/Ackerman__Hearing_Committee's_Final_Decision_Order_dated_September_28_2012.pdf

I find this shocking, but at least it makes the agenda of this report crystal clear: protect the profession, trash the victim of misconduct (and discourage other victims from coming forward), make future Bar Counsel prosecutions virtually impossible and use the whole thing as a marketing tool.

 It also is noteworthy that it took the hearing committee over 2 1/2 years to produce this whitewash, notwithstanding a rule that requires that the report be filed within 120 days of the close of the hearing.

In its wisdom, the board refused to consider the above email. Ignoring it was more convenient.

During the pendency of these proceedings, I reached out to respected members of the probate bar who uniformly expressed horror at what these lawyers did but were reluctant to speak out in public.

This is - simply put - Exhibit One in anyone's indictment of the "self-regulating" District of Columbia legal profession.

A very disappointing day. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2018/11/district-of-columbia-court-absolves-elder-abuse-conflict.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

RX0844



# BOARD ON PROFESSIONAL RESPONSIBILITY

May 28, 2019

Robert C. Bernius
*Chair*

Matthew G. Kaiser
*Vice Chair*

Mary Lou Soller
Billie LaVerne Smith
David Bernstein
Lucy Pittman
Elissa J. Preheim
Sundeep Hora
Bernadette C. Sargeant
*Board Members*

James T. Phalen
*Executive Attorney*

J.P. Szymkowicz, Esquire
Szymkowicz & Szymkowicz, LLP
P.O. Box 57333
Washington, D.C. 20037-0333

Re:     Porter Complaint

Dear Mr. Szymkowicz:

I have reviewed your May 9, 2019 complaint against Deputy Disciplinary Counsel Julia L. Porter, in which you (i) allege that she made false statements in Disciplinary Counsel's Opposition to your request for expungement of your disciplinary records, and (ii) request that these additional allegations be considered as part of the Board's administrative review of your March 29, 2019 complaint.

It is not appropriate for the Board to conduct an administrative review of statements made in briefs filed in a currently-pending matter. To conclude otherwise would invite any respondent who disagrees with Disciplinary Counsel's argument in any brief filed in any pending matter to ask the Board separately to investigate Disciplinary Counsel's arguments. This does not mean that Disciplinary Counsel is permitted to make false statements in any matter, only that the Board will not review such allegations while the underlying matter is still pending.

RX0845

If, following the resolution of your request to expunge your disciplinary records, you continue to believe that Ms. Porter made false statements, you may seek an administrative review at that time.

Sincerely,

Robert C. Bernius,
Chair

cc:   Hon. Anna Blackburne-Rigsby, Chief Judge
      Hamilton P. Fox, III, Esquire
      James T. Phalen, Esquire

2

RX0846



# BOARD ON PROFESSIONAL RESPONSIBILITY

April 15, 2019

J.P. Szymkowicz, Esquire
Szymkowicz & Szymkowicz, LLP
P.O. Box 57333
Washington, D.C. 20037-0333

Robert C. Bernius
*Chair*

Matthew G. Kaiser
*Vice Chair*

Mary Lou Soller
Billie LaVerne Smith
David Bernstein
Lucy Pittman
Elissa J. Preheim
Sundeep Hora
Bernadette C. Sargeant
*Board Members*

James T. Phalen
*Executive Attorney*

      Re:      Porter Complaint

Dear Mr. Szymkowicz:

      I have reviewed your complaint against Deputy Disciplinary Counsel Julia L. Porter, including your request that the Board's Executive Attorney be appointed as Special Disciplinary Counsel to investigate Ms. Porter's conduct during the investigation and prosecution of Bar Docket Nos. 2005-D179 (John T. Szymkowicz) & 2007-D050 (John P. Szymkowicz). Please note that D.C. Bar R. XI, § 19(a) provides that Disciplinary Counsel and all assistants and employees are immune from disciplinary complaint. The rule states, in pertinent part:

> Members of the Board, its employees, members of Hearing Committees, Disciplinary Counsel, and all assistants and employees of Disciplinary Counsel, all persons engaged in counseling, evaluating or monitoring other attorneys pursuant to a Board or Court order or a diversion agreement, and all assistants or employees of persons engaged in such counseling, evaluating or monitoring shall be immune from disciplinary complaint under this rule and from civil suit for any conduct in the course of their official duties.

*See In re Nace*, 490 A.2d 1120, 1124 (D.C. 1985) (recognizing that Disciplinary Counsel has immunity from disciplinary complaints arising from activities within the scope of his or her duties).

      Because your complaint involves alleged misconduct occurring in the course of Deputy Disciplinary Counsel Porter's official duties, she is immune from disciplinary complaint. I am therefore precluded under

D.C. Bar Rule XI, § 19(a) from referring your allegations for investigation.

The Board, however, may conduct an administrative review of allegations of misconduct against members of the Office of Disciplinary Counsel.   We will undertake such a review in this case.


Sincerely,

Robert C. Bernius,
Chair

cc:   Hon. Anna Blackburne-Rigsby, Chief Judge
Hamilton P. Fox, III, Esquire
James T. Phalen, Esquire

2

EXHIBIT 6



ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dee Henley Chair and*
*Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/

2 June 2014

Board on Professional Responsibility
430 E Street, NW
Suite 138
Washington, DC 20001

RE: *In the matter of* Larry Klayman, Esq. (Bar Docket No. 2008-D048)

My name is Ronald D. Rotunda. I am the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University, The Dale E. Fowler School of Law, located in Orange, California, where I teach Professional Responsibility and Constitutional Law. I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review. I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.

During the course of my legal career, I have practiced law in Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee. I am the co-author of Problems and Materials on Professional Responsibility (Foundation Press, Westbury, N.Y., 12th ed. 2014), the most widely used legal ethics course book in the United States. It has been the most widely used since I coauthored the first edition in 1976. In addition, I have authored or coauthored several other books on legal ethics, including Rotunda & Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility (ABA/Thompson, 11th ed. 2013).

In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume. State and federal courts at every level have cited my treatises and articles over 1000 times. From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

I have reviewed the facts of the above referenced bar complaint against Larry Klayman. It is my expert opinion that in the present situation Mr. Klayman has not committed any offense that merits discipline. In fact, he, to the best of his ability, simply pursued an obligation that he knew that he owed to Sandra Cobas, Peter Paul, and Louise Benson.

Mr. Klayman, whose organization, Judicial Watch, was once engaged as attorneys for Paul (it never was engaged for Benson or Cobas), reasonably believed he had an ethical obligation to represent them, and chose to uphold his duty to these clients.  District of Columbia Rule of Professional Conduct 1.3 states that, "(a) A lawyer shall represent a client zealously and diligently within the bounds of the law."  Further, Rule 1.3(a) (comment 1) provides guidance on this issue and the duties of an attorney. "This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."

Recall *Maples v. Thomas*, 132 S.Ct. 912 (2012).  In that case, two lawyers working in the firm of Sullivan & Cromwell entered an appearance for a client. These two associates worked pro bono and sought state habeas corpus for a defendant sentenced to death. A local Alabama lawyer moved their admission pro hac vice. Later, the two associates left the firm and their "new employment disabled them from representing" the defendant (one became a prosecutor and one moved abroad). Neither associate sought the trial court's leave to withdraw (which Alabama law required), nor found anyone else to assume the representation. Moreover, no other Sullivan & Cromwell lawyer entered an appearance, moved to substitute counsel, or otherwise notified the court of a need to change the defendant's representation.  When Mr. Klayman left Judicial Watch, no other lawyer for Judicial Watch stepped up to the plate, because in fact Judicial Watch had taken actions adverse and harmful to Paul, Benson and Cobas.  No lawyer stepped up to the plate in *Maples v. Thomas*.

The issue before the U.S. Supreme Court was whether the defendant showed sufficient "cause" to excuse his procedural default. Justice Ginsburg, for the Court, acknowledged that the usual rule is that even a negligent lawyer-agent binds the defendant. Here, however, the lawyers "abandoned" the client without notice and took actions which in fact harmed them thus severing the lawyer-client relationship and ending the agency relationship. This made the failure to appeal an "extraordinary circumstance" beyond the client's control and excused the procedural default. In the view of Mr. Klayman, he could not abandon the clients.

In applying these principles, it is reasonable and understandable that Mr. Klayman believed that had an ethical obligation, in accordance with perhaps the most important principle of this profession, to zealously and diligently represent his clients. More importantly, comment 7 observes that **"[n]eglect of client matters is a serious violation of the obligation of diligence."** Note that there is no credible claim that he used any confidence of Judicial Watch against Judicial Watch.

One should also consider Mr. Klayman's actions in light of the doctrine of necessity. We know that judges can decide cases even if they are otherwise disqualified if there is no other judge available to decide the case. For example, the Court of Claims applied the "rule of necessity" and held that, under that rule, its judges could hear the case involving their own salaries. Otherwise, no judge would be available to decide some important legal questions. The court then turned to the judges' substantive claim and denied it. *Atkins v. United States*, 556 F.2d 1028 (Ct.Cl.1977) (per curiam), cert. denied, 434 U.S. 1009 (1978).  See also, *United States v. Will*, 449 U.S. 200 (1980). The *Will* Court explained: "The Rule of Necessity had its genesis at

2

least five-and-a-half centuries ago. Its earliest recorded invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge."

Faced with the dilemma of either representing Cobra, Paul, and Benson, or allowing them to lose their legal rights, Mr. Klayman sided with the rights of the clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them. Judicial Watch attempted, and succeeded, at disqualifying Mr. Klayman from the lawsuits because it knew no one else would be able to represent Cobas, Paul, and Benson, and that Judicial Watch would escape liability for the wrongs that they had caused. The trial judge did disqualify Mr. Klayman in representing Paul in a new case after Paul's previous lawyers withdrew representation because he could not pay them, but note that the trial judge did *not* refer this case to the disciplinary authorities for further discipline. It appears reasonable to believe that the trial judge imposed all the discipline (in the form of a disqualification) that he believed should be imposed. The situation involving these particular clients provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Mr. Klayman, out of necessity, attempted to correct the wrongs caused by Judicial Watch, so that he would not violate D.C. RPC Rule 1.3. Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson.

There has been an unusual delay in instituting these proceedings against Mr. Klayman. If this were civil litigation, Bar Counsel's Petition would obviously not pass muster under the District of Columbia statute of limitations. The general statute of limitations for most civil causes of actions in the District of Columbia is three (3) years. D.C. Code § 12-301 *et seq.* "The purpose of statutes of limitation is 'to bring repose and to bar efforts to enforce stale claims as to which evidence might be lost or destroyed.'" *Medhin v. Hailu*, 26 A.3d 307, 313 n.7 (D.C. 2011) citing *Hobson v. District of Columbia*, 686 A.2d 194, 198 (D.C. 1996). "By precluding stale claims, statutes of limitations not only protect against 'major evidentiary problems which can seriously undermine the courts' ability to determine the facts,' but also protect[] a potential defendant's 'interest in security . . . and in planning for the future without the uncertainty inherent in potential liability,' and 'increase the likelihood that courts will resolve factual issues fairly and accurately.'" *Id.* Granted, the D.C. Rules of Professional Conduct do not expressly create a statute of limitations, the indisputable fact remains however that these proceedings — if they should have been brought at all — should have been brought years ago.

That brings up the problem of laches. The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations. As held by the District of Columbia Court of Appeals, laches is the principle that "equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant. It was developed to promote diligence and accordingly to prevent the enforcement of stale claims." *Beins v. District of Columbia Bd. of Zoning Adjustment*, 572 A.2d 122, 126 (D.C. 1990). Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.,* 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id.*

3

Note that Mr. Klayman left Judicial Watch on September 19, 2003. He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas. This Bar Complaint was filed on May 1, 2014. The delay in filing the complaint was nearly 8 years.

The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr. Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and witnesses and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman. The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches. Such discipline, if the courts uphold it, can ruin his career.

This Petition also raises issues regarding the application of Mr. Klayman's Fifth Amendment due process rights. Lawyers in attorney discipline cases are entitled to procedural due process. In *Ruffalo*, the respondent appealed his disbarment after records of his employments were brought up into his disciplinary proceedings at a late stage in the proceedings without giving him the opportunity to respond. In reversing, the U.S. Supreme Court held that the attorney's lack of notice that his full employment record would be used in the proceedings caused a violation of procedural due process that "would never pass muster in any normal civil or criminal litigation." *In the Matter of John Ruffalo, Jr.,* 390 U.S. 544, 550 (1968).

In *Kelson*, the Supreme Court of California similarly held that it was a violation of procedural due process for the State Bar of California to amend its charges on the basis of Mr. Kelson's testimony without having given Mr. Kelson notice of the charge and an opportunity to respond. *Kelson v. State Bar,* 17 Cal. 3d. 1, 6 (Cal. 1976). *Kelson* is directly on point. Judicial Watch submitted boxes full of voluminous documents to the Bar Counsel's office in secret, none of which were ever served to Mr. Klayman until the Petition was filed and then served. It appears that Judicial Watch and Mr. Klayman have had a parting of the ways that has not been amicable. One can understand why, even after all these years, a former employer who is very upset might wish to use the discipline process to punish a former employee, but that does not mean that the discipline authorities should aid and abet (even unintentionally) what appears to be a vendetta by one private group against its former lawyer. Discipline, after all, exists to protect future clients and the public; it does not exist for one party to wreak punishment against another.

Further, these alleged ethical violations have already been dealt with by the Honorable Royce C. Lamberth in his Memorandum Opinion and Order in *Paul v. Judicial Watch, et al.*, No. 1:07-CV-00279 (D.D.C. filed Feb. 5, 2007). In his Memorandum Opinion, Judge Lamberth specifically addressed the issue of D.C. Bar Rule 1.9 in regard to disqualifying Mr. Klayman from continuing to represent Paul in the lawsuit. Judge Lamberth, in his ruling, found that "A survey of relevant case law in this and other circuits reveals some ambiguity with respect to the standard for disqualification in the face of a violation of Rule 1.9 (or its equivalent)." *Id.* at 6. Indeed, given the circumstances, and the harm that would be caused to Paul, it was ambiguous whether Rule 1.9 required Mr. Klayman's disqualification. Judge Lamberth took "note of Paul's

4

Case 1:20-cv-08100-DLF Document 46-25 Filed 05/10/21 Page 202 of 216
Case 1:20-cv-00046-CMH-PAL Document 122-5 Filed 04/07/18 Page 80 of 129

argument that he will suffer prejudice if Mr. Klayman is disqualified." *Id.* at 14. Judge Lamberth emphasized that "[t]he essence of the hardship that Paul asserts will result from disqualification of Mr. Klayman is an inability to obtain alternate counsel for lack of financial resources" and ultimately apologetically found that "[t]he Court is not unsympathetic to this concern." *Id* at 14.

Immediately following Judge Lamberth's order, Mr. Klayman ceased all legal representation of Mr. Paul. No harm was caused by the limited and short-term representation that Mr. Klayman had provided. In fact, the harm was only done when Judicial Watch ceased representation of Paul, who as a result has been convicted of the alleged crimes and has since been incarcerated. Judge Lamberth did not sanction Mr. Klayman, or even report his actions to the Bar Counsel or the Board. Judge Lamberth recognized that the D.C. RPC was not clear when disqualification was necessary under Rule 1.9 and thus took no further action.

Given the delay in instituting these proceedings, it appears that Judicial Watch has targeted Mr. Klayman for selective prosecution. Seldom in the history of the District of Columbia Bar has someone been the subject of such an investigation for such a technical violation. To prevail on a defense of selective prosecution, one must simply prove that he was singled out for prosecution among others similarly situated and that the decision to prosecute was improperly motivated. *See, e.g. United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982). Here, Mr. Klayman is being investigated, and even charged, with an alleged ethical violation that otherwise would have been resolved as a result of Judge's Lamberth's decision to disqualify Mr. Klayman from the case.

For the foregoing reasons, it is my expert opinion that this bar complaint should not be pursued. Mr. Klayman, faced with what Judge Lamberth concluded was an "ambiguous" rule, understood that Mr. Klayman did not take on a case for personal profit but simply to protect the rights of those who could otherwise not pursue justice in the court system. Further justifying dismissal of this bar complaint is the unreasonably delay by the Office of Bar Counsel in bringing these allegations against Mr. Klayman. Mr. Klayman's defense of these alleged ethical violations has been severely prejudiced by the length of time that has passed since the events leading up to the bar complaint took place.

In sum, Mr. Klayman should not be disciplined. He did what he believed he had an ethical obligation to do by protecting his clients, at his expense.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence

# CHAPMAN UNIVERSITY | FOWLER SCHOOL OF LAW

ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dee Henley Chair and*
*Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/
www.ronaldrotunda.com

19 December 2016

Larry Klayman, Esq.
Klayman Law Firm
c/o 2020 Pennsylvania Ave., N.W.
#800
Washington, D.C. 20006

     RE:    Bar Complaint of Oct. 20, 2011
     VIA:   Email, leklayman@gmail.com

Dear Mr. Klayman:

     You have asked me to evaluate the Office of Bar Counsel Complaint dated October 20, 2011. Despite the fact that it is dated about six years ago, you received it only recently. Perhaps that is because the Office of Bar Counsel (OBC) sent it to the wrong address. OBC may have sent it to 2000 Pennsylvania Ave. N.W., Suite 345, while your office is at 2020 Pennsylvania Ave, NW, Suite 345.

     I have evaluated the OBC Complaint of Oct. 20, 2011, and discussed the matter with you. You should feel free to show this letter to the OBC if you wish.

     A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, the OBC sat on this complaint for years and now is resurrecting it.

     Because of the passage of time — the reasons for this delay are unknown — relevant evidence cannot be found and memories fade.

     For example, you told me that you recall a phone voice mail from someone speaking in a belligerent tone who claimed to be speaking for Ms. Sataki. This person said that you should not contact her. You had been trying, unsuccessfully, to contact Ms. Sataki to see if she wanted to appeal, and you filed a notice of appeal

- 2 -

to protect her rights.  The union representative, who was representing Ms. Sataki in her employment dispute, also was unsuccessful in contacting her.  Shortly after that, Ms. Sataki did so and you and her Union Representative, Mr. Shamble, did not pursue the appeal.  You have moved since then and you are unable to find this voice mail.  The tone and substance of this voice mail is very relevant to the complaint, but it no longer exists (or, you cannot find it) because of the passage of time.

The caselaw shows that OBC is subject to laches.  In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 11978)(per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules.[1]  One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall discipline.   The Court said,

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the "agonizing ordeal" of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate.

*The Florida Bar v. Rubin*, 362 So. 2d 12, 15 (footnotes omitted)(emphasis added).  As *Rubin* concluded, "The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct." 362 So. 2d 12, 16.

*Rubin* is no judicial orphan. Later, *The Florida Bar v. Walter*, 784 So. 2d 1085, 1087 (Fla. Sup. Ct. 2001) ruled that a *seven-year interim* between the lawyer's alleged misconduct and the filing of the Bar's complaint, makes "it 'unjust or unfair' to require Walter [the lawyer] now to answer the Bar's charges in this matter. That the Bar may have diligently pursued Chesnoff's statement does not render this seven-year interim a "reasonable time," especially considering that

---

[1]     "On January 6, 1978 fourteen months after the Bar received referee White's report and eight months after it had received referee Carey's the Bar filed both referees' reports with the Court." "Referee White's report, which recommended a public reprimand, was not filed with us until fourteen months after its receipt by the Bar. Rubin contends that this filing clearly was not prompt, and that the Bar's violation of the rule denies him due process" *The Florida Bar v. Rubin*, 362 So. 2d 12, 14 (Fla. 1978)(footnote omitted).

- 3 -

the delay is not attributable to Walter." The court ruled that the lawyer does not have "to defend against the Bar's charges after so many years have passed."[2]

See also, *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012), concluding that a discipline prosecutor's failure to charge out a matter for an unreasonably long time violates the ethics rules. *Grigsby* involved a case where the lawyer did not even dispute the facts, and the lawyer's violations were "obvious," yet the court rejected the disciplinary hearing:

> Finally, it is also worth noting the procedural irregularities in this discipline matter. Grigsby was suspended for 60 days on April 16, 2009. Grigsby's single instance of misconduct resulting in this disciplinary proceeding took place sometime during April and May 2009, and the Assistant County Attorney informed the Director of it on June 3, 2009. T*he facts of this case are simple and undisputed, Grigsby's violations are obvious,* and Grigsby complied with the Director's investigation. The Director *did not file a petition for disciplinary action until May 31, 2011, 727 days after notice of the misconduct.* Because Grigsby, understandably, did not seek readmission while under investigation for practicing law while suspended, he has effectively been suspended from the practice of law since April 16, 2009, or for over 3 years. The purpose of any disciplinary proceeding, as noted earlier, is to protect the public; *the delay here tends to weaken the Director's argument that protection of the public requires a reinstatement hearing* and we decline to do so notwithstanding the legitimate concerns discussed earlier.

*In re Disciplinary Action against Grigsby*, 815 N.W.2d 836, 846–47, 2012 WL 2814088 (Minn.), *reinstatement granted sub nom. In re Disciplinary Action Against Grigsby*, 822 N.W.2d 291, 2012 WL 5355573 (Minn. 2012)(emphasis added).

In evaluating Minnesota cases, William J. Wernz, , Minnesota Legal Ethics: A Treatise (6th ed. 2016) reviews the cases concludes that the Office of Bar Counsel is subject to a "Special Promptness Requirement?" Rule 3.2 of the Rules of Professional Conduct applies to Bar Counsel and that "general delay in investigation" could violate Rule 3.2.[3]

---

[2]  Cited and quoted with approval in, *The Florida Bar v. Kane*, 202 So.3d 11, 19 (Fla. Sup. Ct. 2016):

> The Court has made clear that the Bar has an obligation to process disciplinary cases in a fair and just manner. *See Fla. Bar v. Rubin.* 362 So.2d 12, 16 (Fla.1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct.").

[3]  Wernz, Minnesota Legal Ethics; A Treatise 779-80, § II(D) (2016).

- 4 -

Rule 3.2 ("Expediting Litigation"), Model Rules of Professional Conduct, corresponds to Rule 3.2 of the D.C. Rules of Professional Conduct. As Comment 1 to the D.C. Rules asks, "The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay."[4]

In this case, OBC should explain why any competent Bar Counsel, acting in good faith, would regard the delay of 6 years since the complaint was filed and 7 years since the alleged violation occurred would this delay "as having some substantial purpose other than delay." Why has OBC waited so long?

In Indiana, when the Bar Counsel did not act with reasonable promptness, the Court imposed a new rule making clear what states like Minnesota and Florida thought were already clear. Rule 23, Disciplinary Commission and Proceedings now provides, Section 10(h):

> *Limitation on time to complete investigation.* Unless the Supreme Court permits additional time, any investigation into a grievance *shall be completed and action on the grievance shall be taken within twelve (12) months from the date the grievance is received* (or the date a response is demanded to a Disciplinary Commission grievance). The purpose of the deadline is to enable the Supreme Court to promote a fair and efficient process and not to create substantive or procedural rights. Requests for additional time shall be submitted to the Supreme Court and shall briefly describe the circumstances necessitating the request. No response or objection shall be allowed. Delays caused by a respondent's noncooperation or requests for extensions of time, and periods during which the respondent is suspended from practice, shall not be counted toward the 12-month period. *If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed.*[5]

The Virgin Islands also recognizes laches applied to Bar Counsel. No "legal authority precludes this Court or the EGC from applying the common law doctrine of laches to a grievance. 'Laches, an equitable defense, is distinct from the statute of limitations, a creature of law,' and precludes an action if 'an omission to assert a right for an unreasonable and unexplained length of 'time and under circumstances prejudicial to the adverse party.' Thus, "[l]aches ... may be found even if the applicable statute of limitations has not yet run." *In Matter of Joseph*, 60 V.I. 540, 558–59, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014)(internal citations omitted). Thus, the "laches defense may apply to attorney discipline proceedings in certain very narrowly defined circumstances, such as when the delay in instituting the disciplinary proceedings results in prejudice to the respondent." *Id.*

---

[4]     http://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-02.cfm

[5]     http://www.in.gov/judiciary/files/order-rules-2016-1103-adm-disc.pdf  (last two emphases added).

- 5 -

That is what is occurring hear because memories have faded and some evidence cannot be found.  The evidence collected by the Pennsylvania and Florida Bars — both of which dismissed the complaint — no longer exists. Perhaps the D.C. Bar has some evidence, but it has not given it to Mr. Klayman.  One of the papers in the files the D.C. Bar refers to a draft complaint and an opinion from a lawyer who practices in the employment area, but neither the Bar Counsel nor the expert have reviewed all of the relevant files and documents of Ms. Sataki's case. Mr. Klayman has sent you a copy.

The Virgin Islands Supreme Court sets out a test that *presumes* prejudice in a case like this: "we shall only presume prejudice with respect to the laches defense when there is a substantial delay in the initiation of disciplinary proceedings." *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014). Here there is a substantial delay.

See also, *id.*, *Joseph, id.*, citing, *In re Wade*, 814 P.2d 753, 764 (Ariz. 1991); *In re Siegel*, 708 N.E.2d 869, 871 (Ind. 1999) ("There may be factual situations in which the expiration of time destroys the fundamental fairness of the entire proceeding."); *Anne Arundel County Bar Ass'n, Inc. v. Collins*, 325 A.2d 724, 728 (Md. 1974) (laches applicable to attorney discipline proceedings if "prejudice or circumstances making it inequitable to grant the relief sought"). *Tennessee Bar Ass'n v. Berke*, 344 S.W.2d 567, 571–72 (Tenn. 1961) (dismissing disciplinary proceedings for laches when grievance filed nine years after alleged misconduct occurred with no explanation for the delay and respondent was not responsible for the delay). *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014).

Similarly., in *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791 (Ala. 1998), the State Bar suspended lawyers convicted of misdemeanors for "serious crimes" and charged them with additional rules infractions.  The Supreme Court held, inter alia, that the State Bar's delay in pursuing remaining formal charges following resolution of criminal proceedings warranted dismissal.[6]

---

[6]     *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791, 1998 WL 321956 (Ala. 1998)(footnote omitted)(emphasis added):

In *Noojin* [*Noojin v. Alabama State Bar*, 577 So.2d 420 (Ala.1990),] this Court examined an attorney's contentions that the Alabama State Bar had erred in delaying disciplinary proceedings against him. It held that the culmination of a federal criminal matter was not "good cause" for *delaying disciplinary proceedings for nearly a year*, and it barred the Alabama State Bar from proceeding on the charges pending against the attorney. As in *Noojin*, we consider in the present case whether the Bar had "good cause" to defer or delay the disciplinary proceedings against the attorneys. Rule 14, Ala.R.Disc.P. The Bar asserts that it "stayed" the proceedings on the formal charges based on the attorneys' alleged attempts to obtain discovery for their criminal cases. Aside from this assertion, the Bar has not attempted to provide a reason for its continued delay in regard to the formal charges against the attorneys.[5] Therefore, if we accept the Bar's only explanation of "good

- 6 -

Let me now leave the subject of laches and turn to the actual complaint, filed in 2011. Ms. Sataki makes several complaints.

FIRST, she claims that Mr. Klayman was not competent to handle her case and thus violated RULE 1.1. Pennsylvania and Florida have already rejected that claim. In addition, Ms. Sataki has never filed any lawsuit claiming that there was malpractice or sexual harassment by Mr. Klayman. She also claims that he used incorrect procedures and failed to make deadlines. She does not indicate what deadlines he missed. He did tell me that he filed a notice of appeal to protect her rights when she did not bother to respond to his requests asking her if she wanted to appeal. Her union representative also could not get in contact with her. Eventually, she bothered to respond and ordered him and Mr. Shamble (her Union Representative) not to pursue appeals, so they complied. If an error was made below, the normal way we correct it is by appeal.

The OBC says that it has an opinion by a lawyer as to the alleged malpractice, but OBC has not disclosed it to Mr. Klayman so neither he nor anyone else could answer it. OBC also says that it has a complaint, which suggests OBC has prejudged the matter, by showing its complaint to someone who is not part of the Office of Bar Counsel.

SECOND, she claims Mr. Klayman violated RULE 1.3 by revealing information to the public that was not secret client information and not confidential client information. Mr. Klayman told me that when he wrote to talked about the case it was only after his client's prior permission. She and Mr. Shamble thought that publicity would help her case by encouraging the Voice of America to settle rather than suffer bad publicity.

THIRD, she claims that Mr. Klayman did not disclose the fee until several months after the case began, and thus violated RULE 1.5. Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero — he did it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee.

FOURTH, she claims a violation of RULE 1.6, by disclosing client confidences. Mr. Klayman has told me that he had her permission before he disclosed anything. She and her Union

---

cause" for delay, there remains a period of over a year, from February 14, 1997, to now, during which the Bar has taken no action to proceed on the merits of the formal charges. Under our *Noojin* analysis, we find that this delay in proceeding on the remaining formal charges is excessive. Therefore, because of the inordinate delay on the part of the Bar in pursuing the remaining formal charges against the attorneys, those charges are dismissed.

- 7 -

Representative, Mr. Shamble, thought that publicity would help her case, and she was probably right — although not pursuing an appeal undercut her case.

FIFTH, she claims that Mr. Klayman violated RULE 1.7 because he used her case for his purposes. Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only motivation was to help her as a friend because she was in trouble and had other problems. He would be willing to disclose these other problems to you if Ms. Sataki waives her attorney-client privilege. After all, we do not want a situation where the OBC seeks to discipline Mr. Klayman in this case because he used what the OBC later claims is information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver.

Sixth, Ms. Sataki says Mr. Klayman violated RULE 3.3 because he was dishonest in telling people he was her lawyer when he was not her lawyer. Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if he wanted to appeal. Her complaint[7] says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority.[8]

I am troubled that the OBC has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances. The OBC has not even asserted that it learned something in the intervening years to justify reopening this old complaint.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Law

---

[7]     I refer to the complaint as "her complaint" but I do not mean to imply that she wrote it. Mr. Klayman tells me that when he knew her, her English was not good enough to draft a complaint like this one.

[8]     Mr. Klayman has met her brother once, but does not know him well enough to recognize her voice, and he has met her mother once. Both times, he met them at the residence of Ms. Sataki, because the mother and the brother invited him — they wanted to meet the lawyer who was representing their sister/daughter. Ms. Sataki claims that he showed up "unannounced." If she is telling the truth it is only because she did not talk to her brother or mother on this matter.

EXHIBIT 7

In Re: Larry E. Klayman
July 18, 2019

Page 770

1  ask the court to sanction him, and it's very rare for
2  a court to do it sua sponte, but that does not mean
3  that the statements that he made to the court were
4  not false as the court found, including the 9th
5  Circuit, or that these claims that he made against
6  Judge Navarro, Judge Bybee and others had any merit
7  -- they didn't.
8       No reasonable lawyer could think that the
9  claims that he made against Judge Navarro and later
10  Judge Bybee had any merit or any chance of success.
11  You know, and again legally they were without basis
12  -- judges are absolutely immune, so are Presidents.
13       The allegations of this vast conspiracy
14  between Judge Navarro and others -- as Judge Navarro
15  found, displayed a lack of respect for the judiciary
16  and a complete lack of ignorance of the independent
17  jury.  And as the 9th Circuit found, they were for
18  intimidation and retaliation because she had denied
19  his pro hac vice.
20       And I'll get finally to the last issue and
21  that is kind of the repetitive nature of the claims.
22  Yes, in some of the petitions Mr. Klayman said they

Page 771

1  were changed circumstances, but if you go back and
2  look at the second 9th Circuit decision denying his
3  second petition, which I believe is 79, you'll see
4  that those changed circumstances -- the IG's report,
5  or alleged governmental misconduct.
6       They had nothing to do with whether or not
7  the pro hac vice application should have been granted
8  or that Judge Navarro had a basis to deny it.  And
9  indeed, these claims have changed circumstances for
10  procedural, completely inappropriate because they
11  were being raised for the first time on appeal.  But
12  it was the -- it wasn't just these changed
13  circumstances, but a lot of the allegations that
14  I've already gone over -- that Mr. Whipple was
15  threatened with contempt, that Mr. Bundy was ordered
16  in solitary confinement.
17       That Mr. Klayman had been completely
18  honest on his pro hac vice, that Judge Bybee lacked
19  appreciation and sensitivity because his prior
20  rulings or involvement in the drafting of a memo.
21  These were repeated, sometimes verbatim, over and
22  over and over again.

Page 772

1       And even his claim, which disciplinary
2  counsel doesn't claim was illegitimate or wasn't made
3  in good faith, that Mr. Bundy should have been given,
4  you know, his right to counsel of choice
5  notwithstanding the disciplinary matters.  That's a
6  legitimate argument, but it's not okay to raise it
7  in at least 15 -- at least 15 separate pleadings,
8  over and over and over again, which he did, and I can
9  cite to all of them in our post-hearing motions.
10       So, I think the evidence shows both
11  clearly and convincingly that Mr. Klayman engaged in
12  misconduct.  And I confirmed that the record of the
13  pre-hearing motions and -- which include the
14  disciplinary complaints that Mr. Klayman filed
15  against disciplinary counsel, are already part of the
16  record.
17       And I'd say his conduct in this proceeding
18  confirms that he should not continue to have the
19  privilege of being a lawyer because he cannot conform
20  himself to the ethical rules.
21       CHAIRPERSON MIMS:  Before you step down, I
22  don't know if anyone else has any questions.  I do

Page 773

1  have one question and maybe you've answered it, but I
2  want to be sure I'm clear.  Under Rule 8.1, which is
3  one, it's in the specification of charges and you've
4  discussed a little bit.  Rule 8.1 is you say, "In
5  his application and supplemental application for
6  admission to the District Court, Respondent
7  knowingly made false statements of fact or material
8  fact, and he failed to disclose a fact necessary to
9  correct a misapprehension known by the applicant."
10       I just want to be clear on what that
11  misapprehension is that you're referring to?
12    A   Well, and I think I've kind of gone over
13  it with Judge Navarro understanding what was going on
14  with respect to the disciplinary proceedings and also
15  with respect to the two judges who had banned him and
16  kind of the basis for that decision, and everything
17  else.
18       CHAIRPERSON MIMS:  Alright, alright, thank
19  you.
20       MR. KLAYMAN:  May I take two minutes and
21  go to the restroom?
22       CHAIRPERSON MIMS:  Yes, sure.  Let's go

33 (Pages 770 to 773)

EXHIBIT 8

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at www.FreedomWatchUSA.org**

EXHIBIT 9

 Gmail

**Oliver Peer <oliver.peerfw@gmail.com>**

---

## Klayman v Porter (Sup. Ct.)

**Larry Klayman** <klaymanlaw@gmail.com>                Mon, May 10, 2021 at 9:35 AM
To: Oliver Peer <oliverpeerfw@gmail.com>

---------- Forwarded message ---------
From: **MacDougall, Mark** <mmacdougall@akingump.com>
Date: Wed, Apr 8, 2020 at 1:43 PM
Subject: RE: Klayman v Porter (Sup. Ct.)
To: Larry Klayman <klaymanlaw@gmail.com>
Cc: Oliver Peer <oliver.peerfw@gmail.com>, McNaughton, Abbey <amcnaughton@akingump.com>

Dear Mr. Klayman,

I am not entirely sure what you are trying to communicate or accomplish but, from what I can discern we – of course – do not consent to any of it.

**Mark J. MacDougall**

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Direct: +1 202.887.4510 | Internal: 24510

**From:** Larry Klayman <klaymanlaw@gmail.com>
**Sent:** Wednesday, April 8, 2020 4:05 PM
**To:** MacDougall, Mark <mmacdougall@AKINGUMP.COM>
**Cc:** Oliver Peer <oliver.peerfw@gmail.com>
**Subject:** Klayman v Porter (Sup. Ct.)

**EXTERNAL Email**

We will be moving for cross sanctions and criminal referral to the U.S. Attorney for the District of Columbia for participating, furthering and instigating the fraud of Montgomery, including the myriad of false statements to government authorities. Notwithstanding the lack of absolute immunity with regard to abuse of process, there is no immunity at all for participating in criminal conduct, which is what Ms. Porter has been engaged in.

Please provide your consent by cob today.

Larry Klayman, Esq.

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.