# EXHIBIT 1

Case 1:20-cv-03109-RBW   Document 101-1   Filed 12/13/22   Page 2 of 30
eFiled
11/04/2022 4:38:16 PM
Superior Court
of the District of Columbia

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

LARRY KLAYMAN, an individual
7050 W. Palmetto Park Road
Boca Raton, FL, 33433

       Plaintiff,

v.

ELHAM SATAKI
4141 Crisp Canyon Road #317
Sherman Oaks, CA, 91403

  And

HAMILTON FOX III
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

  And

ELIZABETH HERMAN
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

  And

H. CLAY SMITH, III
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

  And

JULIA PORTER
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

  And

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street NW
Building A, Suite 117
Washington, DC, 20001

  And

MATTHEW KAISER
1099 14th St NW

Case No.:    2022-CAB-005235

**COMPLAINT**

Washington DC 20005

   And

MICHAEL E. TIGAR
601 W Rosemary St #317
Chapel Hill, NC, 27516

   And

WARREN ANTHONY FITCH
3930 Georgetown Court NW #602
Washington DC 20007

         Defendants.

## I.   INTRODUCTION

1.     Plaintiff Larry Klayman ("Mr. Klayman") brings this action against individual Defendants Hamilton Fox ("Defendant Fox"), Elizabeth Herman ("Defendant Herman"), H. Clay Smith III ("Defendant Smith"), Julia Porter ("Defendant Porter"), Office of Disciplinary Counsel ("ODC"), Matthew Kaiser ("Defendant Kaiser), Michael Tigar ("Tigar"), and Warren Anthony Fitch ("Fitch") pursuant to D.C. Superior Court Civil Rule 60(d) which states that "[t]his rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding; or (2) set aside a judgment for fraud on the court." (hereinafter "Rule 60").

## II.   PARTIES

2.     Plaintiff Larry Klayman is an individual, a natural person. Mr. Klayman is at all relevant times a citizen and resident of the state of Florida.

3.     Defendant Sataki is an individual, a natural person.  Defendants Sataki is a citizen and resident of California.

4.      Defendant Hamilton Fox is an individual, a natural person. At all material times, Defendant Fox was employed by ODC as Bar Disciplinary Counsel. Defendant Fox is a citizen and resident of the District of Columbia.

5.      Defendant Elizabeth Herman is an individual, a natural person. At all material times, Defendant Herman was employed by ODC. Defendant Herman as a Deputy Bar Disciplinary Counsel and  is a citizen and resident of the District of Columbia

6.      Defendant H. Clay Smith III is an individual, a natural person. At all material times, Defendant Smith was employed by ODC as Assistant Bar Disciplinary Counsel Defendant Smith is a citizen and resident of the District of Columbia

7.      Defendant Julia Porter is an individual, a natural person. At all material times, Defendant Porter was employed by ODC as Deputy Bar Disciplinary Counsel. Defendant Porter is a citizen and resident of the District of Columbia

8.      Defendant Office of Bar Disciplinary Counsel serves as the chief prosecutor for attorney disciplinary matters, and purports to have a dual function: "to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints."

9.      Defendant Tigar is an individual, natural person. Defendant Tigar was at all material times a member of the Ad Hoc Hearing Committee ("AHHC") in the disciplinary proceeding styled *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"). Defendant Tigar is a citizen and resident of North Carolina.

10.      Defendant Fitch is an individual, natural person. Defendant Fitch was at all material times a member and chairperson of the AHHC in the Sataki Matter. Defendant Fitch is a citizen and resident of Washington D.C.

11.     Defendant Kaiser is an individual, natural person. Defendant Kaiser was at all material times the chairperson of the District of Columbia Board on Professional Responsibility ("Board."), which oversees ODC and the AHHC. Defendant Kaiser is a citizen and resident of the District of Columbia

## III.   STANDING

12.     Mr. Klayman has standing to bring this action because he has been directly affected by the unlawful conduct complained herein.  His injuries are proximately related to the conduct of Defendants. Mr. Klayman has standing under Rule 60 to challenge the Suspension Order and Judgment of September 15, 2022 issued by the District of Columbia Court of Appeals.

## IV.   FACTS

13.     On September 15, 2022, the District of Columbia Court of Appeals ("DCCA") suspended Mr. Klayman for a period of eighteen (18) months with a reinstatement provision (the "Suspension Order" or "Judgment") - notwithstanding the fact that Mr. Klayman had already been serving an unwarranted and unconstitutional "temporary suspension" for the twenty (20) prior months – stemming from his representation of Defendant Sataki back in 2010. This Suspension Order and Judgment was the direct and proximate result of fraud by Defendant Sataki and the ODC Defendants – Defendants ODC, Fox, Porter, Herman, and Smith – at every single level of this disciplinary proceeding that mandate action under Rule 60. This fraud was furthered by Defendants Tigar, Fitch, and Kaiser. Defendants were driven by an extrajudicial bias and animus based on both ideology, politics and gender and their singular and admitted goal to remove Mr. Klayman from the practice of law.

14.     This instant action is therefore a continuation of *In re Klayman*, 20-BG-583 (D.C.C.A), as Mr. Klayman is simply seeking relief from judgment under Rule 60, and is therefore not a new action.

15.     Notwithstanding the egregious fraud that has infected this proceeding that mandate vacatur under Rule 60, it is also important for the Court to understand that the completely frivolous and meritless nature of Defendant Sataki's Complaint.

16.     *First,* Defendant Sataki had filed identical bar complaints in Florida and Pennsylvania in or around October of 2011, and both of these jurisdictions summarily dismissed the complaints as entirely frivolous and meritless.

17.     *Second*, Mr. Klayman provided ODC with an opinion from one of the preeminent legal scholars and experts on the subject of legal ethics, the late Ronald Rotunda, that clearly showed (1) that Defendant Sataki's allegations were frivolous and meritless, and (2) that in any event, the extreme delay from ODC in instituting this matter – the Specification of Charges was filed on July 20, 2017, approximately seven years after the events in question – ODC was time barred from pursuing Defendant Sataki's Complaint against Mr. Klayman. Exhibit 1; *Opinion of Ronald Rotunda*.

### Facts Pertaining to Mr. Klayman's Representation of Defendant Sataki

18.     On November 2, 2010, exactly 12 years ago, a Complaint was filed against Mr. Klayman with the ODC, styled *In re: Klayman*, Bar Docket No. 2011-D028. (the "Sataki Complaint").

19.     The Sataki Complaint was implemented as the result of a complaint  prepared and filed by non-lawyers on by or on behalf, one of which was a convicted felon by the name of Sam Razavi.

20.     Defendant Sataki did not identify who prepared and filed her operative complaint, but later it was disclosed that it was filed by Sam Razavi, her cousin, who uses many aliases and is a convicted felon over gambling fraud in Las Vegas, Nevada.

21.     The Sataki Complaint was based on Mr. Klayman's representation of Defendant Sataki's interests in an alleged sexual harassment and workplace retaliation action against her former employer, Voice of America ("VOA Lawsuit") in case styled *Sataki v. Broadcasting Board of Governors, et al*, 1:10-cv-00534 (D.D.C). This was a lawsuit brought pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), against the governors of the Broadcasting Board of Governors ("BBG").

22.     The scope of Mr. Klayman's services, performed along with Defendant Sataki's union representative and president, Mr. Tim Shamble ("Mr. Shamble") included, *inter alia*, attempted settlement discussions,  the filing of an administrative EEO/VOA Office of Civil Rights ("OCR") complaint, lobbying congressmen and senators to intervene on Defendant Sataki's behalf, engaging in approved publicity by Defendant Sataki to try to coax a settlement, and filing the VOA Lawsuit in the U.S. District Court for the District of Columbia ("District Court") to preserve the "status-quo" while the EEO/OCR complaint proceeded administratively.

23.     The VOA Lawsuit, which was also filed with Defendant Sataki's knowledge and consent, and which sought to ask the District Court to put Defendant Sataki to work at another VOA office in Los Angeles - away from her alleged harasser – was eventually improperly dismissed by the District Court, without even providing an evidentiary hearing.

24.     Furthermore, the EEO/OCR administrative complaint was ultimately not successful, as after a thorough investigation, the OCR found that Defendant Sataki's allegations of sexual harassment and workplace retaliation never actually occurred. Of course, Mr. Klayman did not know this at the time, and therefore believed her and agreed to represent her.

25.     Prior to and during the course of Mr. Klayman's representation of Defendant Sataki, he developed a close friendship with her, within the bounds of the relevant rules of professional responsibility and ethics.

26.     At the time, Mr. Klayman sympathized with Defendant Sataki's apparent plight, as she had claimed to be destitute and stuck in an untenable work situation. Mr. Klayman was himself going through a difficult time in his life, and therefore identified with Defendant Sataki's alleged problems. This motivated Mr. Klayman to work extremely diligently on Defendant Sataki's behalf, pro bono.

27.     As a close friendship developed further during the course of the legal representation, Mr. Klayman took it upon himself to help Defendant Sataki, including moving her out to Los Angeles to escape her alleged harasser, paying for her apartment, and other expenses, at a personal cost of about $ 30,000, and even finding psychologists for her and paying for some of her psychological counseling, for which she was otherwise insured.

28.     Defendant Sataki, however, began to exploit and take advantage of her close friendship with Mr. Klayman, at one point asking Mr. Klayman to purchase a car for her. Mr. Klayman declined to do so.

29.     Specifically, as a "final straw," Defendant Sataki's requested that Mr. Klayman purchase a car for her and her other actions led Mr. Klayman to realize that he could not continue legal representation of Defendant Sataki. Mr. Klayman thus suggested that it would be best if Defendant Sataki found new counsel to represent her in her claims against VOA.

30.     Mr. Klayman even referred Defendant Sataki to his personal friend, Gloria Allred, Esq., a famous, accomplished and highly successful women's rights legal advocate, as well as

Tim Shea, Esq., legal specialist in VOA matters, who had come suggested by Mr. Shamble. Defendant Sataki however insisted that Mr. Klayman continue to represent her.

31.     When Defendant Sataki's complaints against VOA did not yield immediate results, Defendant Sataki became more difficult, demanding, belligerent, frequently disrespectful, and hard to reach.

32.     Due to this, Mr. Klayman suggested that they memorialize their attorney-client relationship with a contingent fee agreement, but no agreement was ever reached in this regard, meaning that at all times, Mr. Klayman represented Defendant Sataki *pro bono*.

33.     Mr. Klayman and Mr. Shamble were unable to reach Defendant Sataki after this point, and in an abundance of caution, Mr. Klayman filed at his further expense on Defendant Sataki's behalf, an appeal to the U.S. Court of Appeals to the District of Columbia Circuit, regarding the District Court's dismissal of the VOA Lawsuit in order to ensure that Defendant Sataki's right of appeal was protected and not lost.

34.     At the end of the day, Defendant Sataki was not able to obtain relief through either the EEO/OCR process or the District Court, but not due to lack of effort from Mr. Klayman, who worked extremely diligently on her behalf, even on a *pro bono* basis.

35.     Ultimately, OCR, which did a thorough investigation of Defendant Sataki's sexual harassment and workplace retaliation claims, made the finding that this alleged sexual harassment and workplace retaliation never occurred, and therefore was simply made up by Defendant Sataki – the first in a series of proven false statements by Defendant Sataki.

***Facts Pertaining to Defendant Sataki's Complaint Against Mr. Klayman***

36.     On November 2, 2010,  exactly twelve years ago, Defendant Sataki  filed and later supplemented with ODC a complaint against Mr. Klayman  – as set forth previously - regarding the VOA lawsuit ("Sataki Complaint") pertaining to his other pro bono representation.

37.     Again, of great import, Defendant Sataki filed her bar complaint in November 2010 which was later supplemented by non-lawyers, with identical corresponding  complaints sent to The Florida Bar and the Pennsylvania Bar at that time, both of which were summarily dismissed about eleven years ago because they were not based upon fact or law, much less the clear and convincing evidence required to substantiate these types of claims.

38.     Nevertheless, ODC sent Defendant Sataki a letter dated July 7, 2011 containing Mr. Klayman's response, with explicit instructions that "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations."

39.     Afterwards, Defendant Sataki abandoned the Sataki Complaint, as evidenced by ODC's own internal correspondence, admissions and policy.

40.     On January 15, 2014, Defendant Smith sent an email to ODC investigators Chuck Anderson and Kevin O'Connell, stating, "I am trying to locate a complainant [Defendant Sataki] that has dropped off the map…She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed."

41.     Then, Defendants, for their own unethical, unconstitutional, illegal, and tactical reasons, outrageously and incredibly resurrected Defendant Sataki's complaint seven (7) years later, waiting until July 20, 2017 to file the Specification of Charges in this case. During this time period, believing that the Complaints before ODC had also been dismissed, as they had been in Florida and Pennsylvania, Mr. Klayman understandably did not retain the files necessary to

defend himself. In addition, during this interim time period, relevant documents were discarded, witnesses moved, and memories faded.

42.     A draft of the Specification of Charges was prepared even before Mr. Klayman was given an opportunity to file a supplemental response, which evidence ODC's punitive and biased mindset and improper, unethical, unconstitutional and illegal motivations, all in violation of accepted norms concerning statutes of limitations, laches, and other laws.

43.     Before the Specification of Charges was filed on July 20, 2017, Mr. Klayman received a phone call from Defendant Smith where Defendant Smith informed him that ODC was likely be going to institute  the Sataki Complaint. Mr. Klayman was shocked, as he believed that ODC had dismissed the Sataki Complaint, much like what The Florida Bar and Pennsylvania Bar had done since he had not heard from them in the intervening seven year period. Mr. Klayman had already discarded crucial documents pertaining to his representation of Defendant Sataki, as he believed the matter was behind him.

44.     Defendant Smith was sympathetic to Mr. Klayman and said that pursuing the Sataki Complaint was "out of his hands," and therefore appeared to be doing the bidding of his superiors at ODC, which Mr. Klayman at the time believed to be Deputy Disciplinary Counsel, Defendant Herman. Mr. Klayman therefore set a meeting with Defendant Herman and Mr. Smith in order to discuss the Sataki Complaint.

45.     On July 28, 2017, Mr. Klayman met with Defendant Herman and Defendant Smith in order to try to explain his position in a polite and civil manner. However, he was met with an extremely hostile and disrespectful demeanor by Defendant Herman, who clearly had no interest in resolving the issues. Defendant Herman abruptly and in a hostile voice refused to say

whether she had had contact and/or met with Ms. Sataki. In fact, she told Mr. Klayman that this was "none of his business."

46.     Furthermore, Defendant Herman's brazenly and openly admitted her bias and animus against Mr. Klayman due to his political beliefs, activism, free speech, and gender, which explains her participation in her baseless prosecution against him, when she curtly and in a hostile manner, on more than one occasion, stated to Mr. Klayman, "I [we] don't like the way you practice law."

47.     Furthermore, when Mr. Klayman advised Defendant Herman at the same meeting that The Florida Bar and the Pennsylvania Bar had summarily dismissed Ms. Sataki's claims, she on behalf of Defendants stated that "we could care less."

48.     Pursuant to the District of Columbia's one-party consent laws, Mr. Klayman recorded this meeting with Defendant Herman. Seeing that he was not going to be able to get anywhere by speaking with Defendant Herman, Mr. Klayman then sought a meeting with Disciplinary Counsel, Defendant Fox, who was Defendant Herman's superior. Mr. Klayman believed at the time that Defendant Herman was solely behind the baseless resurrection of Defendant Sataki's Complaint, and that by speaking with Defendant Fox he would be able to resolve the issues.

49.     On September 29, 2017, Mr. Klayman was finally able to meet with Defendant Fox, where Defendant Fox set the tone of the meeting by refusing to hear from Mr. Klayman why the Sataki complaint should not be instituted.

50.     Then, in a subsequent meeting on May 11, 2018 to discuss the Sataki Complaint, which Mr. Klayman had asked for to disclose evidence of bias and misconduct by Deputy Bar

Counsel Herman Defendant Fox acted with extremely hostility towards Mr. Klayman and shouted that he had no interest in discussing anything.

51.    Mr. Klayman was surprised to find that both Defendant Deputy Bar Counsel, Defendant Porter, and ODC's described investigator, Kevin O'Connell would be present in the meeting, which had not been disclosed previously.

52.    From the outset, Defendant Fox immediately and belligerently stated that he was not going to hear anything about or discuss dismissal of the Specification of Charges

53.    Mr. Klayman calmly responded that he would not be dictated to as to what he could discuss. This prompted Defendant Fox to stand up threateningly and scream "this meeting is over" and that Mr. Klayman "should leave [his] office."

54.    When Mr. Klayman got up from his chair, he indicated that this gross prosecutorial misconduct would leave him no recourse but to resort to legal action.

55.    Defendant Fox then charged at Mr. Klayman at the door of his office as Mr. Klayman was leaving, as if to physically assault him  and screamed, "I welcome your complaint," adding in a hostile voice, "do you seriously believe that I would not welcome the opportunity through discovery to show how you practice law."

56.    This more than confirmed to Mr. Klayman that each and every ODC Defendant, acting at the direction of Defendant Fox, harbored improper motivations towards Mr. Klayman and that they had decided that they were going to try to unlawfully attempt to remove Mr. Klayman from the practice of law, by whatever unprofessional, unethical, unconstitutional, and illegal means are used to "justify" these ends.

### *Facts Pertaining to Defendants' Highly Politicized Motivations*

57.     ODC had previously been run by Bar Disciplinary Counsel Wallace "Gene" Shipp prior to his retirement in 2017. During Mr. Shipp's tenure, ODC had been what it was supposed to be – a fair, unbiased, and neutral body. Once Defendant Fox took over, everything changed, and ODC became weaponized ad morphed into a highly politicized tool to remove conservative and Republican activist attorneys like Mr. Klayman from the practice of law.

58.     This explains why Defendant Sataki's Complaint sat dormant and thus abandoned for seven years until Defendant Fox took over. It is clear that Defendant Fox ordered ODC and his deputies Herman and Porter, as well as Assistant Bar Disciplinary Counsel Clay Smith, to revive the abandoned Sataki Complaint in order to try to remove Mr. Klayman from the practice of law.

59.     The ODC Defendants, since Defendant Fox arrived, have engaged in a pattern and practice of abusing and exceeding their position of authority, which is granted under state law, which authority is not to act outside the scope of their official duties and intentionally to violate the constitutional and other rights of bar members such as Mr. Klayman by selectively prosecuting them because of their political activism and free speech as well as other bases such as gender.

60.     Mr. Klayman is a prominent conservative and non-partisan attorney and public interest activist who has brought lawsuits against Hillary Clinton, Barack Obama, George W. Bush, and other politicians and government officials. He conceived of and founded the prominent public interest watchdogs, Judicial Watch, Inc. and Freedom Watch, Inc., and is a former U.S. Department of Justice federal prosecutor, having been on the trial team which broke up the AT&T monopoly during the Reagan administration. In 2003-2004, he ran for the U.S. Senate in the Florida Republican Primary. Mr. Klayman is also the only lawyer to ever have a

court rule that a president,  former President Bill Clinton, had committed a crime, when he illegally released the Privacy Act protected White House government file of a woman he had allegedly sexually abused and harassed in the Oval Office. Her name is Kathleen Willey. Mr. Klayman has also represented Juanita Broaddrick, Gennifer Flowers, Paula Jones, Dolly Kyle Browning, and other Bill Clinton female victims, who Hillary Clinton is alleged to have retaliated against and tried to destroy to advance her and her husband's political interests. Mr. Klayman is a supporter of and legal advocate for women's rights. At Freedom Watch, which he founded, he successfully enjoined the National Security Agency during the Obama administration over its unconstitutional mass surveillance and later played a prominent role in invalidating President Obama's illegal executive order granting amnesty to over 5 million illegal aliens. This latter case went all the way to the U.S. Supreme Court. In sum, Mr. Klayman has had a very successful career as a public interest legal advocate.

61.    On the other hand, even a quick search of FEC records shows that Defendant Fox, as well as Defendant Herman both donated significant sums of monies to Hillary Clinton and Barack Obama as well as other liberal Democrats, many of whom Mr. Klayman brought suit against as a public interest advocate.

62.    ODC, especially during the Trump years and thereafter in the wake of the 2020 presidential election in particular, filed, accepted and initiated ethics complaints against Trump White House Counsellor Kellyanne Conway[1] over remarks she made on cable news, against former Trump Attorney General William Barr[2] (this partisan complaint was incredibly filed by all four (4) prior presidents of the District of Columbia Bar as well as a former Senior Bar

[1] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[2] https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

Counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[3] and Josh Hawley[4] over their role in advocating for President Trump in the last election, and of course former U.S. Attorney Rudy Giuliani, who was temporarily suspended without even a hearing,[5] over his representation of President Trump, to name just a few. And, Defendant Fox himself personally charged former Justice Department attorney Jeffrey Clark with disciplinary action stemming from his relationship with Donald Trump. Exhibit 7. To the contrary, and as just one of many examples of selective prosecution, when an ethics complaint was filed against Defendants counsel, Mark MacDougall, for making false statements in court pleadings, and  fellow leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails illegally retained on a private server, which complicity is not even in dispute, the ODC, under the "leadership" of Defendant Fox,  turned a blind eye toward their ideological "soul brothers."   The MacDougall complaint and the Kendall complaints thus were characteristically dismissed. Most notably and telling,  the ODC summarily and quickly rejected the complaint filed by conservative lawyer and public interest advocate Ty Clevenger against Hillary Clinton.  The ODC then sought to disbar Mr. Clevenger – that is until they drove him into submission due to the cost of defending himself, and he simply resigned.[6]

---

[3] https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[4] https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[5] https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[6] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

63.     The highly politicized nature of ODC lends itself to only one possible conclusion; that Defendants  "packed" the Ad Hoc Hearing Committee with persons that were ideological foes to Mr. Klayman. This included Defendant Tigar – a proud and avowed communist, <u>Exhibit 2</u> – and Defendant Fitch, was openly deferential to Defendant Tigar and himself highly politicized and leftist.

64.     Bob Woodward wrote in his book about the Supreme Court, titled *The Brethren,* that Defendant Tigar in his early career had been fired, at the urging of J. Edgar Hoover, from his High Court clerkship by Justice William Brennan for his subversive communist ties. <u>Exhibit 2</u>.

65.      Defendant Tigar's book, *Mythologies of State and Monopoly Power*, a Marxist rant against capitalist law, relishes his time with Fidel and the Castro brothers. His proud thank you letters from Fidel and a photo with his revolutionary brother Ramon is even housed in the archives of the University of Texas School of Law. <u>Exhibit 2</u>.

66.     Then after ensuring that Mr. Klayman stood no chance at the AHHC level, the Sataki Complaint went to the Board, whose president, Defendant Kaiser, has openly publicized his political beliefs, having penned articles for the leftist legal publication "Above the Law," extolling the virtues of Hillary Clinton and trashing Donald Trump.[7]

67.     As conclusive evidence of the fact that the Defendants are driven by their political ideology and affiliations, the Report and Recommendation of the Board was hyper-fixated on and incredibly angered and offended by the fact that the lawsuit that Mr. Klayman filed on behalf of Defendant Sataki named Hillary Clinton as a Defendant, despite the fact that it was a *Bivens* Complaint against all of governors of the BBG, and also included a conservative and Mr. Klayman's personal friend, Blanquita Collum, as a Defendant. Thus, it was clear that

---

[7] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

Clinton was not included for political purposes, but out of necessity. This did not stop the Defendants from taking great umbrage, however.

68.     Furthermore, as the as the final "nail in the coffin," confirming the Defendants' politically motivated bias and prejudice, the Court need not look any further than the completely disparate "selective prosecutorial" treatment afforded by the Defendants to one Kevin Clinesmith in handling *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.).

69.     In that case, Kevin Clinesmith—the former senior FBI lawyer who dishonestly falsified a surveillance document which helped trigger the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC, and only temporarily suspended for <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Clinesmith also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track if not whitewash his case—clearly in order to minimize his temporary suspension period —the D.C. Court of Appeals let Clinesmith off with "time served" in just seven (7) months. And importantly, the Court imposed no reinstatement provision on Clinesmith, despite him literally being a convicted felon. Attached hereto as <u>Exhibit 3</u> is an article detailing this cover-up and the D.C. Court of Appeals' opinion in *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). Had Clinesmith been treated in an unbiased and non-preferential fashion by the D.C. Bar disciplinary apparatus, run by Defendant Fox at ODC, and Defendant Kaiser of the Board of Professional Responsibility, he would have surely been permanently disbarred as the convicted dishonest felon was convicted to be.

***Facts Pertaining to Fraudulent Misconduct***

70.     At the disciplinary hearing in the Sataki Matter, the ODC Defendants and Defendant Sataki conspired and worked together in concert to suppress material evidence and suborned and provided perjurious testimony to the AHHC.

71.     These fraudulent actions tainted and infected the entire disciplinary proceeding, as they were allowed to remain on the record due to the actions of Defendants Tigar, Fitch, and Kaiser.  These fraudulent actions therefore directly and proximately caused the entire Suspension Order and Judgment, and therefore the only possible remedy is to "throw the baby out with the bathwater," or in other words, to vacate the Suspension Order and Judgment in its entirety.

72.     This was furthered by Defendants Tigar and Fitch on the AHHC, as they repeatedly denied Mr. Klayman leave to conduct discovery, which allowed the ODC Defendants and Defendant Sataki to suppress material evidence and provide perjurious testimony, as Mr. Klayman did not have the benefit of discovery to uncover suppressed evidence and obtain the truth.

73.     Then, when exculpatory material evidence was independently discovered by Mr. Klayman's legal team after the disciplinary hearing, the head of the Board on Professional Responsibility, Defendant Kaiser played his part by refusing to reopen the record or to even consider the newly discovered exculpatory evidence in order to ensure that the ODC Defendants and Defendant Sataki would not be held accountable for their illegal and unethical conduct.

74.     The suppression of exculpatory material evidence and perjurious testimony is set forth herein.

75.     *First*, Ms. Sataki gave the fraudulent testimony that she had not approved of engaging in publicity. On May 31, 2018, Ms. Sataki gave the following fraudulent testimony to the AHHC (Exhibit 4) :

Mr. Klayman: And that we agreed we would get some positive publicity here to

try to coerce VOA into a favorable settlement so you could be in LA, correct?
Defendant Sataki: Correct.
Mr. Klayman: And –
Defendant Sataki: **But I didn't agree to do it. You explained all this to me.** Ex

Chairman Fitch: Did he send you copies of some articles that he had written?
Defendant Sataki: Yes, he did.
Mr. Klayman: At that time you did not tell me, "Don't write any more."
Defendant Sataki: **I did.**
Mr. Klayman: There's nothing in writing that you presented to that effect at that time, did you?
Defendant Sataki: **We talked to each other. I explained to you on the phone why I don't want articles out there.**

76.     Defendant Sataki further fraudulently testified that she did not approve of publicity because of how sexual harassment was perceived in the Persian community:

Defendant Sataki: So sexual harassment, in the Persian community, is rape. It's the actual act of intercourse and rape. So to this day I have to answer all those questions
….

That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that – I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life. Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life. Exhibit 4.

77.     However this conflicts with the testimony of numerous material witnesses who testified on Mr. Klayman's behalf, including Mr. Shamble, as set forth above, that Ms. Sataki personally participated in publicizing her case!

78.     The record clearly showed that Defendant Sataki agreed to this publicity, with Mr. Klayman writing positive and complimentary articles and arranging for interviews with major publications, such as the Los Angeles Times. Indeed, a crucial piece of evidence is an email which Mr. Klayman sent to the LA Times, copying both Defendant Sataki and Mr. Shamble, attempting to arrange such an interview. Exhibit 5.

79.     This was consistent with Defendant Sataki being provided contemporaneously with all the articles and publicity that Mr. Klayman, who along with Mr. Shamble, he had generated for her. At no time did Defendant Sataki object and instead approved, and there is no contemporaneous written record of any objection.

80.     In fact, Defendant Sataki personally engaged in the publicizing of her case by personally handing out copies of one the articles written by Mr. Klayman on Capitol Hill. Extensive efforts to lobby politicians were made, often with Defendant Sataki present, but always with her informed consent.

81.     And, as the final "nail in the coffin," Mr. Klayman uncovered evidence that was fraudulently hidden by Ms. Sataki and ODC in September of 2019—after the AHHC hearing had concluded—that Ms. Sataki had even participated in making a widely aired and publicized public video broadcast on Persian television about her case, with intimate personal details about her personal life, discussing her sexual harassment and workplace retaliation complaint against VOA and others, which further undercuts and totally refutes any possible false claim that Ms. Sataki did not agree to publicize her case.[8]   The video, which is in Ms. Sataki's native language Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. Exhibit 6. To be certain of and confirm the content, Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. Exhibit 6. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.
> (displaying Elham [Sataki]'s photo) former broadcaster of VOA.

---

[8] https://www.youtube.com/watch?v=e3g5f61muZ4

Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty. This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner·. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and [Sataki] with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this

network.

Display of Mehdi Falahati laughing loud.

82.     Unsurprisingly, Ms. Sataki and ODC Defendants – which on information and belief knew about this video - did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves. This clearly fraudulent conduct was obviously done in concert with the ODC Defendants, who must have known about this crucial evidence and chose not to disclose it in order to further their goal to attempt to remove Mr. Klayman from the practice of law. This clear fraud grossly prejudiced Mr. Klayman because it was not part of the record at the Hearing Committee or the Board level. That the D.C. Court of Appeals denied a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues – a clear violation of Mr. Klayman's due process and other rights. Thus, Mr. Klayman was never even given a chance to use this clearly relevant evidence that completely undercut any possible assertion that Defendant Sataki did not agree to use publicity and herself publicize detailed personal details about her case—one of the key "violations" found by the D.C. Court of Appeals in suspending him for eighteen months.

83.     Because Mr. Klayman knew that Defendant Sataki had a propensity for untruthfulness, he prior to the disciplinary hearing moved to take discovery and depositions of Defendant Sataki as well as her psychiatrist, Arlene Aviera ("Dr. Aviera") on February 15, 2018.

84.     Even this simple request was tellingly vehemently opposed by the ODC Defendants, and then denied by the AHHC (Defendants Tigar and Fitch), despite discovery clearly being allowed and an integral part of the attorney discipline process, particularly in a case such as this one where ODC delayed seven years to even file a Specification of Charges, resulting in passage of time causing memories to fade, documents to be discarded and lost, and witnesses to become unavailable. *See* Board on Professional Responsibility Rules, Chapter 3.

85.     Then, the ODC Defendants – on the first day of the hearing (!) – sought to and was allowed to introduce into evidence a slew of "new" emails into evidence that they clearly coached Defendant Sataki into perjuriously stating that she had just "discovered."

86.     Even then, when Mr. Klayman renewed his request to take discovery, he was still denied by Defendants Tigar and Fitch. This allowed the ODC Defendants and Defendant Sataki to put perjurious testimony onto the record and suppress the exculpatory evidence of Defendant Sataki's video interview publicizing her case without being caught.

87.     This is especially important as the AHHC had said prior to the hearing that Mr. Klayman would be able to renew his request for discovery at the hearing if necessary. Discovery was clearly necessary, as Mr. Klayman would have been able to (1) discover the fraudulently withheld exculpatory video evidence had he been able to depose Defendant Sataki, and (2) would have been able to elicit testimony from Dr. Aviera that Mr. Klayman had competently and diligently represented Defendant Sataki to the best of his abilities, as she had contemporaneous personal knowledge and records of the details of Mr. Klayman's representation of Defendant Sataki.

88.     As set forth above, only after the disciplinary hearing, once the matter was before the Board, did Mr. Klayman's legal team independently discover and unearth Defendant Sataki's video interview publicizing her case – clearly exculpatory material evidence. However, despite being faced with this clear illegal, unethical and fraudulent conduct by the ODC Defendants and Defendant Sataki, Defendant Kaiser still without any bases, refused to open the record or even consider this new exculpatory evidence, thereby ensuring that the ODC Defendants and Defendant Sataki were allowed to suppress exculpatory material evidence and give perjurious testimony without repercussions.

89.     *Second*, on May 31, 2018, Ms. Sataki gave further perjurious and fraudulent testimony, at the instruction of the ODC Defendants, that she never wanted to move to Los Angeles, and that somehow Mr. Klayman had made the decision for her and forced her to move out to Los Angeles – in order fraudulently and falsely create the impression that Mr. Klayman was controlling her:

> Ms. Sataki: Well, in the beginning when he – when  I moved -- **he moved me to Los Angeles** and he paid for everything. Exhibit 4 at 83:17-19

90.     However, this false and fraudulent testimony was also exposed by numerous other witnesses, including Mr. Shamble, as well as Ms. Sataki herself being forced to admit that it was false.

91.     On May 31, 2018, Mr. Klayman was able to show that the decision to move to Los Angeles was collective, and part of a legal strategy to have her assigned there due to having a medical exemption:

> Mr. Klayman: And we decided that, if we could show that you had a medical reason why you had to be in  Los Angeles, that we could qualify for a reasonable medical accommodation move to Los Angeles.

> Defendant Sataki: Yes.

> Mr. Klayman: And therefore we submitted documentation from Dr. Aviera, from the prior psychologist that you saw, and also from a doctor  named Long, an internist, to Voice of America with various documentation arguing that you needed to be in Los Angeles because those were where your  physicians were, that's where your family was,  that's where your friends were, and besides, you could do your work out of the Persia News Network on Wilshire Boulevard at the federal building, which was run by Voice of America. Do you remember that?

> Defendant Sataki: Yes. Exhibit 4 at 351.

92.     *Third*, Defendant Sataki, at the direction of the ODC Defendants, perpetuated the fraudulent notion that she had wanted Mr. Klayman to dismiss her cases, which was completely contradicted by her own actions where she (1) filed *pro se* a notice of appeal after the fact and (2) when ODC hunted her down years after the fact, she even asked them if they could still

prosecute her sexual harassment and workplace retaliation claims for her, despite the fact that the

Office of Civil Rights had thoroughly investigated her claims and found them to be meritless:

> Mr: Klayman: That you wanted Bar Counsel to file a sexual harassment case for
> you. You asked them that within the last year, against VOA.
> Defendant Sataki: I asked if it's doable.
> Mr. Klayman: And you asked Bar Counsel to do it for you, correct?
> Defendant Sataki: I asked if it's doable…. Exhibit 4 at 489:3-10 (May 31, 2018).

93.    The actions of Defendants Tigar, Fitch, and Kaiser, the ODC Defendants and

Defendant Sataki, resulted in fraud on the court, with imperviousness and without and

repercussions. This fraud on the court directly and proximately led to the Suspension Order and

Judgment at the DCCA.

## FIRST CAUSE OF ACTION
### Relief from Judgment Pursuant D.C. Superior Court Rule 60(d)

94.    Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety

of this Complaint, including, but not limited to, the Introduction and the exhibits to this

Complaint, with the same force and effect, as if fully set forth herein again at length.

95.    D.C. Superior Court Civil Rule 60(d) states that "[t]his rule does not limit a

court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or

proceeding; or (2) set aside a judgment for fraud on the court."

96.    The ODC Defendants and Defendant Sataki have committed a fraud on the court

by willfully suppressing exculpatory evidence and suborning and committing perjury at the

disciplinary hearing.

97.    These fraudulent statements include:

> Mr. Klayman: And that we agreed we would get some positive publicity here to
> try to coerce VOA into a favorable settlement so you could be in LA, correct?
> Defendant Sataki: Correct.
> Mr. Klayman: And –
> Defendant Sataki: **But I didn't agree to do it. You explained all this to me.** Ex

> Chairman Fitch: Did he send you copies of some articles that he had written?

<u>Defendant Sataki</u>: Yes, he did.

<u>Mr. Klayman</u>: At that time you did not tell me, "Don't write any more."

<u>Defendant Sataki</u>:  **I did.**

<u>Mr. Klayman</u>: There's nothing in writing that you presented to that effect at that time, did you?

<u>Defendant Sataki</u>:. **We talked to each other. I explained to you on the phone why I don't want articles out there.**

<u>Defendant Sataki</u>: So sexual harassment, in the Persian community, is rape. It's the actual act of  intercourse and rape. So to this day I have to answer all those questions

….

That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that – I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life. Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life. <u>Exhibit 4</u>.

<u>Ms. Sataki</u>: Well, in the beginning when he – when  I moved -- **he moved me to Los Angeles** and he paid for everything. <u>Exhibit 3</u> at 83:17-19

98.     Also included are fraudulent statements that Defendant Sataki wanted Mr. Klayman to drop and dismiss her cases.

99.     Defendants Tigar and Fitch furthered this fraud on the court by refusing to allow Mr. Klayman leave to conduct discovery which clearly would have unearthed this exculpatory material evidence and prevented perjurious statements from being put on the record, which directly and proximately resulted in the September 15, 2022 Suspension Order and Judgment in its entirety.

100.     Defendant Kaiser and the Board then furthered this fraud on the court by refusing to open the record and refusing to even consider the buried exculpatory evidence when it was independently discovered by Mr. Klayman's legal team, which directly and proximately resulted in the September 15, 2022 Suspension Order and Judgment  in its entirety.

101.    As a direct and proximate result of Defendants' fraud, misrepresentations and misconduct, including but not limited to perjury and subornation of perjury, Rule 60's requirement for relief from a judgment or order come into play.

102.    Plaintiff prays that this Court set aside and vacate the DCCA's Suspension Order and Judgment as it was a direct and proximate result of fraud on the court.

## SECOND CAUSE OF ACTION
### *Civil Conspiracy*

103.    Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

104.    Each and every one of the Defendants conspired to enter into an agreement to participate in committing fraud on the court in the Sataki Matter.

105.    The Defendants did, in fact, commit a fraud on the court. The ODC Defendants and Defendant Sataki buried and suppressed exculpatory evidence and suborned and committed perjury. Defendants Tigar, Fitch, and Kaiser then furthered this fraud by refusing to hold the ODC Defendants and Defendant Sataki accountable for their fraud, allowing for routine discovery under the circumstances of extreme delay in the prosecution which would have disclosed the fraud in full detail, and ensuring that the fraud remained  on the record when presented to the DCCA, which then directly and proximately caused the issuance of the September 15, 2022 Suspension Order and Judgment.

106.    As a direct and proximate result of this, Mr. Klayman has suffered an injury in the form of being suspended from the practice of law in the District of Columbia for eighteen (18) months with a reinstatement provision as well as the possibility of reciprocal discipline, however unwarranted,  in other jurisdictions.

## THIRD CAUSE OF ACTION
### *Laches*

107.    Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

108.    There was an undue, egregious and highly prejudicial delay of seven years by the ODC Defendants in instituting the Specification of Charges on July 20, 2017, approximately seven (7) years after the underlying events in question – Mr. Klayman's representation of Defendant Sataki – had occurred.

109.    Mr. Klayman was grossly and severely prejudiced by this undue, egregious delay because (1) he believed that this matter had been dismissed and therefore destroyed records pertaining to his representation of Defendant Sataki, (2) memories had faded, and (3) witnesses were unavailable to testify, as material witnesses Professor Rotunda passed away in the interim period and Dr. Aviera was diagnosed with cancer, among other areas of fatal prejudice resulting from this delay.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Klayman prays that the DCCA's September 15, 2022 Suspension Order and Judgment be vacated pursuant to Rule 60 for the Defendants' fraud and related egregious misconduct, including but not limited to perjury and the suborning of perjury, before and on the court.  Mr. Klayman also seeks attorney fees and costs for having to defend the meritless Sataki Complaint and for having to bring this instant action.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts, as to all issues so triable.

DATED: November 4, 2022                    Respectfully submitted,

/s/ Larry Klayman

Larry Klayman
7050     W.Palmetto     Park     Road
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5336
*Plaintiff Pro Se*