# EXHIBIT 2

*Notice:  This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-BG-583

IN RE LARRY E. KLAYMAN, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 334581)

On Report and Recommendation
of the Board on Professional Responsibility

(17-BD-063; DDN-028-11)

(Argued June 16, 2022                    Decided September 15, 2022)

*Melissa Isaak* for respondent.

*Myles V. Lynk*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, was on the brief, for petitioner.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and MCLEESE, *Associate Judges*.

PER CURIAM:  The Board on Professional Responsibility concluded that respondent Larry E. Klayman violated numerous District of Columbia Rules of Professional Conduct during his representation of former client E.S.  The Board recommended that Mr. Klayman be suspended for eighteen months, with a requirement that he show fitness before being permitted to return to the practice of

law.  We accept the Board's conclusion that Mr. Klayman violated the Rules of Professional Conduct, and we adopt the Board's recommended sanction.

## I.  Factual Background

In sum, the evidence presented by Disciplinary Counsel to the Hearing Committee was as follows.  The evidence largely consisted of E.S.'s testimony but also included numerous documents, including written correspondence between E.S. and Mr. Klayman.

E.S. met Mr. Klayman in 2009, while she was covering a story for Voice of America (VOA).  E.S. told Mr. Klayman that she was being sexually harassed by her cohost and that after she reported the harassment to her supervisor, she was transferred to a different position.  Early in 2010, Mr. Klayman and E.S. agreed that he would represent her in a case against VOA.  E.S. did not believe that Mr. Klayman provided her with a written document setting out the scope and nature of the representation.  Mr. Klayman and E.S. agreed that Mr. Klayman would work on a contingent basis, receiving forty percent of any award E.S. won.  Mr. Klayman later unilaterally increased his fee to fifty percent.

Mr. Klayman initially attempted to negotiate a settlement with VOA.  After the negotiations were unsuccessful, Mr. Klayman encouraged E.S. to move from the District of Columbia to Los Angeles, assuring her that he could get her transferred to the VOA office in Los Angeles.  Mr. Klayman paid for the move and for E.S.'s living expenses in Los Angeles.  E.S. and Mr. Klayman agreed that the money Mr. Klayman was providing would be paid out of any award E.S. won, in addition to the contingency fee.  VOA denied E.S.'s request for a transfer, at which point Mr. Klayman filed a civil suit against E.S.'s alleged harasser and supervisors.

E.S. had wanted her case to be "very quietly handled," with as few people as possible finding out about the harassment.  She explained her concerns about publicity to Mr. Klayman, and he initially respected her wishes.  Mr. Klayman later began to pursue a strategy designed to draw attention to E.S.'s case.  For example, shortly after filing suit against E.S.'s harasser and supervisors, Mr. Klayman filed suit against the members of VOA's governing board, the Broadcasting Board of Governors (BBG).  The BBG included prominent public figures, particularly then-Secretary of State Hillary Rodham Clinton.  E.S. did not agree to the BBG suit, worrying that the case "was getting too big" and preferring to focus on her harasser and supervisors.  Mr. Klayman subsequently filed motions to disqualify the district-court judge who had been assigned to both of E.S.'s cases, arguing that the judge

4

was politically biased against him. Mr. Klayman also wrote numerous articles mentioning E.S.'s case and providing confidential information about E.S. Although E.S. was initially "completely against" the articles, she ultimately agreed to the publicity after Mr. Klayman explained that it would help her case.

In April 2010, Mr. Klayman began to repeatedly express romantic feelings towards E.S. Mr. Klayman told E.S. that he loved her, and E.S. replied that he was her attorney and they could only be friends. For months thereafter, Mr. Klayman kept saying that "he wanted to have a relationship with [E.S.] and [E.S. kept] saying no, and it was ongoing and ongoing and it wouldn't stop . . . it was very, very, very uncomfortable" for E.S. For example, Mr. Klayman sent an email to E.S. saying "You are . . . the only woman I've ever really loved. . . . [W]hen I walk down the street . . . and see an attractive woman, my thoughts immediately flip to you. I see no one else. . . . My loving you has given me true meaning in my life."

E.S. believed that Mr. Klayman's feelings for her were causing him to act unprofessionally in his representation, which Mr. Klayman himself acknowledged in writing several times. For example, in one letter, Mr. Klayman said that "I do truly love [E.S.]. . . . [A]nd my own emotions have rendered me non-functional even as a lawyer." In an email, Mr. Klayman said "It[']s very hard to be a lawyer and feel

so much for your client."  In a second email, Mr. Klayman said that he had "not been able to function lately, because [he was] out there so far emotionally and got nothing back," and that E.S. would "get better legal representation with someone else . . . who does not have an emotional conflict and can keep his mind clear."

In July 2010, E.S. wrote to Mr. Klayman and directed him to withdraw the case against the BBG, which was by then the only active case.  Several days later, E.S. wrote to an executive at VOA stating that she had "instructed Larry Klayman to withdraw any and all civil actions that he may have filed in my name and that he is no longer representing me."  This letter was not sent directly to Mr. Klayman, but by the next day he had received a copy.  Mr. Klayman, however, did not dismiss the entirety of the case against the BBG.  He also continued to act on E.S.'s behalf.  For example, after the trial court granted defendants' motion to dismiss the BBG case, Mr. Klayman filed a motion to reconsider.

In November 2010, because Mr. Klayman continued to contact her about her case, E.S wrote another letter to him reiterating his termination.  That letter was incorrectly addressed, and Mr. Klayman testified that he did not receive it.  E.S. wrote to Mr. Klayman a third time in January 2011, stating that he was "not representing [her] in any way or shape."  Mr. Klayman replied to E.S., implying that

she had not written the email and explaining that he "[could not] allow her legal rights and obligations to be compromised or lost altogether." Several days later, Mr. Klayman filed a notice of appeal in the BBG case, despite not having had any communication with E.S. about filing the appeal. E.S. later personally filed a notice of appeal in that case.

Mr. Klayman's testimony was contrary to E.S.'s in many respects. Generally, Mr. Klayman testified that E.S. was seeking revenge against him because she was angry that her case had not gone well. Mr. Klayman denied having any romantic intentions toward E.S. To the extent he did have feelings for E.S., they "actually made [him] work harder" on her behalf. Mr. Klayman also contested the existence of a contingent fee agreement. Mr. Klayman testified that he consulted with E.S. about his actions in the case, such as filing the disqualification motion. Finally, he acknowledged E.S.'s initial reluctance to pursue publicity but testified that she later agreed to do so. He denied pressuring E.S. on the issue.

Mr. Klayman offered testimony from several other witnesses. Gloria Allred, a women's rights attorney, testified that she and Mr. Klayman had discussed E.S.'s case and that she had twice declined to take E.S.'s case. Former Judge Stanley Sporkin testified that he had found Mr. Klayman to be an honest and ethical lawyer

and had no reason to doubt Mr. Klayman's character.  Former Judge Sporkin also testified that he and Mr. Klayman had discussed E.S.'s case and that he had agreed with aspects of Mr. Klayman's litigation strategy.  Timothy Shamble, who was E.S.'s union representative at VOA, testified, among other things, that E.S. had agreed to publicize her case and had herself distributed one of the articles Mr. Klayman wrote about her case at a VOA event.  Keya Dash, a family friend, testified that Mr. Klayman did not seek a romantic relationship with E.S., although Mr. Dash was unaware of the emails that Mr. Klayman had sent E.S. stating that he loved her. Finally, Joshua Ashley Klayman, Mr. Klayman's sister, testified that E.S. agreed with Mr. Klayman's publicity strategy and that Mr. Klayman was not in love with E.S.

## II.  Procedural Background

In 2010, E.S. filed a complaint with Disciplinary Counsel, alleging that Mr. Klayman was harassing her even though she had terminated his representation of her.  Disciplinary counsel notified Mr. Klayman of the complaint and began to investigate, but apparently lost contact with E.S. for several years.  Counsel brought charges in 2017.

After the evidentiary hearing, the Hearing Committee issued a lengthy report and recommendation. The Hearing Committee largely credited E.S.'s testimony over that of Mr. Klayman. The Hearing Committee concluded that Mr. Klayman had committed numerous disciplinary violations. Specifically, the Hearing Committee concluded that Mr. Klayman violated: (1) D.C. R. Prof. Cond. 1.2(a) (lawyer shall abide by client's decisions as to objectives of representation and shall consult with client as to means used) and 1.4(b) (lawyer shall appropriately explain matter to client), by, among other things, failing to inform E.S. before taking important steps in the litigation, including the filing of the motion to disqualify, and refusing to dismiss the BBG suit as E.S. had directed; (2) D.C. R. Prof. Cond. 1.5(b) (requiring written agreement regarding representation) and (c) (contingent fee agreement shall be in writing), by not entering into a written fee agreement with E.S.; (3) D.C. R. Prof. Cond. 1.6(a)(1) and (a)(3) (lawyer shall not reveal client confidence or secret for lawyer's advantage), by disclosing E.S.'s secrets, without her informed consent, in the articles he wrote, and making these disclosures for personal gain; (4) D.C. R. Prof. Cond. 1.7(b)(4) (lawyer shall not represent client if lawyer's professional judgment will be or reasonably may be adversely affected by personal interest), by, among other things, representing E.S. without informing her about the conflicts of interest created by his feelings for her, his animus towards the Clinton family and the district-court judge, and his desire for publicity; and (5) D.C.

R. Prof. Cond. 1.16(a)(3) (discharged lawyer shall withdraw from representation), by continuing to act on E.S.'s behalf after she terminated the representation. The Hearing Committee recommended that Mr. Klayman be suspended for thirty-three months and that he be required to demonstrate fitness to practice law before being reinstated.

The Board largely adopted the findings and recommendations of the Hearing Committee, with several exceptions. First, the Board's analysis of the Rule 1.4(b) violation differed from the Hearing Committee's. The Board concluded that Mr. Klayman had violated that rule because his communications with E.S. about his feelings for her were not "the kind of communication . . . that a client ought to receive from her lawyer" and had "drowned out" any legitimate communications about E.S.'s case. Second, the Board noted that Mr. Klayman appeared to concede a violation of Rule 1.5(b), but the Board did not explicitly find a violation of that Rule. Third, the Board concluded that Mr. Klayman's personal interest in E.S., not his animosity towards the Clintons and the trial judge or his interest in publicity, provided the sole basis for the conflict-of-interest violation. Fourth, the Board recommended an eighteen-month suspension with a fitness requirement.

After the Board issued its Report and Recommendation, this court issued an order to show cause why Mr. Klayman should not be temporarily suspended pending final action by this court.  *See* D.C. Bar R. XI, § 9(g)(1) (if Board recommends suspension of one year or more, court will issue order to show cause why attorney should not be temporarily suspended pending final action by court); *id.* (to avoid temporary suspension, attorney bears burden of showing substantial likelihood of success on merits).  Mr. Klayman opposed the temporary suspension, but this court ordered a temporary suspension in January 2021.  The court also denied Mr. Klayman's motion to reconsider.  Mr. Klayman subsequently filed additional challenges in this court to his temporary suspension.  By separate order, we deny those challenges as moot in light of this decision adopting the sanction of suspension recommended by the Board.

Mr. Klayman also filed a federal lawsuit challenging his temporary suspension.  *Klayman v. Blackburne-Rigsby*, No. 21-0409, 2021 WL 2652335, at *1 (D.D.C. June 28, 2021).  The federal district court denied relief, and the United States Court of Appeals for the District of Columbia Circuit summarily affirmed.  *Id.* at *3; *Klayman v. Blackburne-Rigsby*, No. 21-7069, 2022 WL 298933, at *1 (D.C. Cir. Jan. 20, 2022) (per curiam).

Under D.C. Bar R. XI, § 9(g)(4), an attorney who is temporarily suspended pending final action by this court is required to comply with the requirements of D.C. Bar R. XI, § 14.  Among other things, § 14 requires suspended attorneys (1) to notify clients and adverse parties of the suspension; and (2) to file an affidavit with the court, the Board, and Disciplinary Counsel stating that the attorney has complied with the order of suspension and the requirements of § 14.  D.C. Bar R. XI, § 14(a)-(c), (g).  The order temporarily suspending Mr. Klayman directed Mr. Klayman's attention to those requirements.  The temporary suspension order also advised Mr. Klayman that his eligibility for reinstatement after suspension was tied to compliance with the requirements of § 14.  *See* D.C. Bar R. XI, § 16(c) ("[A] suspended attorney shall not be eligible for reinstatement until a period of time equal to the period of suspension shall have elapsed following the attorney's compliance with section 14 . . . .").  In February 2021, Disciplinary Counsel advised the court that Mr. Klayman had failed to file the required affidavit.  As of the date of this opinion, Mr. Klayman apparently still has not submitted the required affidavit.

## III.  Delay

Mr. Klayman argues that the court should dismiss this matter because of the seven-year delay in bringing charges.  We agree that the delay in this case was very

unfortunate.  We have held, however, that "mere delay in the disciplinary process generally does not provide a legitimate ground for dismissal of the complaint," because "[t]he public interest in regulating members of the bar takes precedence over the attorney's interest in having claims speedily resolved."  *In re Morrell*, 684 A.2d 361, 368 (D.C. 1996); *see also, e.g.*, *In re Pearson*, 228 A.3d 417, 427 n.13 (D.C. 2020) (per curiam) ("It clearly is not an ideal practice to delay prosecutions for seven years, but even troubling and inexcusable delays, without more, will not rise to a due process violation that requires dismissal.") (brackets and internal quotation marks omitted).  Rather, undue delay "must be coupled with actual prejudice in order to justify dismissal."  *In re Pearson*, 228 A.3d at 427 n.13 (internal quotation marks omitted).  To warrant dismissal, the undue delay must have "substantially impaired" Mr. Klayman's ability to defend against the charges filed by Disciplinary Counsel.  *In re Fay*, 111 A.3d 1025, 1032 (D.C. 2015) (per curiam).

The Board denied Mr. Klayman's request for dismissal, concluding that Mr. Klayman had failed to show prejudice sufficient to warrant dismissal.  Our cases do not appear to make clear whether our review on this issue is deferential or de novo, and the parties have not addressed that issue.  We need not decide the issue, because we agree with the Board's conclusion.

Mr. Klayman alleges that he was prejudiced in four ways.  First, he points to an intended expert witness, Professor Ronald Rotunda, who passed away before the hearing.  As the Board explained, however, Professor Rotunda's expert report was admitted into evidence.  Moreover, as the Board further explained, Professor Rotunda's expected testimony was focused primarily on legal issues, such as when delay in disciplinary prosecution warrants dismissal.  The proper function of such testimony would have been limited at best.  *See Steele v. D.C. Tiger Mkt.*, 854 A.2d 175, 181 (D.C. 2004) ("[A]n expert may not state [an] opinion as to legal standards nor may [the expert] state legal conclusions drawn by applying the law to the facts.") (internal quotations marks omitted).  Finally, Mr. Klayman provided no information about any efforts he may have made to obtain a replacement expert.

Second, Mr. Klayman notes that E.S.'s psychologist, Dr. Arlene Aviera, became unavailable to testify due to illness.  The record contains written documentation from Dr. Aviera about E.S.'s condition and correspondence from Mr. Klayman to Dr. Aviera.  The availability of those materials mitigates the effect of Dr. Aviera's unavailability.  Mr. Klayman also testified about his communications with Dr. Aviera.  Mr. Klayman accurately points out that he attempted to take a deposition of Dr. Aviera in advance of the hearing, but the Hearing Committee denied that request.  The Hearing Committee reasonably denied the request,

however, because Mr. Klayman had failed to concretely describe what additional information Mr. Klayman would seek in a deposition. Moreover, the evidence that Mr. Klayman now claims he would have sought to elicit from Dr. Aviera – such as that E.S. was a difficult client and that E.S.'s psychological problems were not caused by Mr. Klayman – does not appear to be of substantial importance.

Third, Mr. Klayman asserts that his memory had faded over the years, as had E.S.'s. We agree with the Hearing Committee, however, that neither E.S. nor Mr. Klayman displayed significant gaps in their memory of material facts.

Finally, Mr. Klayman claims that he lost or discarded documents that would have been helpful to his defense. We note that Mr. Klayman was on notice of the disciplinary complaint by 2011, and he therefore could have been expected to retain any relevant documents until that matter was explicitly resolved. *Cf. In re Ekekwe-Kauffman*, 210 A.3d 775, 786 (D.C. 2019) (per curiam) (attorney's claim of lost documents "is unpersuasive in light of the fact that [the attorney] was aware of the potential for misconduct charges"). In any event, Mr. Klayman has not in this court identified specific lost documents or their relevance.

In sum, we conclude that Mr. Klayman has failed to show that the delay in this case caused him substantial prejudice warranting dismissal. To the extent Mr. Klayman suggests that this court should not require such a showing, we are bound by the contrary holdings of our prior cases. *See, e.g.*, *In re Ekekwe-Kauffman*, 210 A.3d at 785 n.12 (declining to apply doctrine of laches in disciplinary proceedings, in light of prior precedent applying due-process framework to determine when dismissal is warranted on basis of delay).

## IV.  Alleged Bias

Mr. Klayman argues that the Office of Disciplinary Counsel, the Hearing Committee, the Board, this court, and others are all biased against him. For example, Mr. Klayman argues that (1) the district-court judge who handled the federal suits Mr. Klayman filed on E.S.'s behalf is "highly partisan and to the far left"; (2) the Office of Disciplinary Counsel and the Board are "managed by leftist pro-Clinton Democrats"; (3) one member of the Hearing Committee is a "communist" and another is a "deferential ultra-leftist"; (4) the entire disciplinary proceeding has been "highly partisan"; (5) the Office of Disciplinary Counsel is engaged in a "dogmatic and unrelenting . . . jihad" to remove Mr. Klayman from the practice of law; (6) members of the Hearing Committee "exhibited great vitriol toward Mr. Klayman";

(7) the Board "exhibited . . . open animus and bias against Mr. Klayman"; (8) "men are frequently disbelieved but women more often than not get off scot free when they lie to tribunals"; and (9) this court has prejudged this matter, suffers from a conflict of interest in the matter, and temporarily suspended Mr. Klayman "strategically to harm Mr. Klayman's reputation."  The record, however, does not support Mr. Klayman's repeated assertions of bias.

## V.  Other Disciplinary Proceedings

Mr. Klayman repeatedly argues that it was inappropriate for Disciplinary Counsel to move forward with charges in this case, because disciplinary authorities in Pennsylvania and Florida long ago dismissed the claims of misconduct in this case as baseless.  We are not persuaded by that argument.

First, the record provides no direct information about the resolution of any disciplinary proceedings in Pennsylvania and Florida regarding the allegations in this case.  There is some evidence that E.S. brought complaints to those authorities.  Mr. Klayman also presented evidence that he has not been disciplined in those jurisdictions.  It is unclear, however, whether complaints actually were brought in those jurisdictions, and if so, how those matters were resolved.  For example, it may

be that those jurisdictions choose to await resolution of the complaint in the District of Columbia, where the conduct at issue appears to have primarily occurred.  *Cf., e.g.*, *In re Krapacs*, 245 A.3d 959, 959 (D.C. 2021) (per curiam) (noting that District of Columbia disciplinary proceeding had been stayed pending final resolution of disciplinary proceeding in Florida).

Second, in any event, it is unclear whether the District of Columbia disciplinary authorities or this court would be required to give binding effect to any determination that might have been reached in another jurisdiction as to the propriety of Mr. Klayman's conduct.  *Cf., e.g.*, *In re Robbins*, 192 A.3d 558, 565-66 & n.7 (D.C. 2018) (per curiam) (declining to give preclusive effect in disciplinary proceedings to determination of Virginia court in Virginia disciplinary proceeding, because, among other things, disciplinary counsel did not participate in Virginia proceeding and Virginia court relied on inferior record).

## VI.  Disciplinary Violations

Mr. Klayman challenges the Board's conclusion that he committed numerous disciplinary violations.  We agree with the Board that each of the violations at issue was supported by the record.

We "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record." D.C. Bar R. XI, § 9(h)(1). We review legal conclusions de novo. *In re Cleaver-Bascombe*, 892 A.2d 396, 401-02 (D.C. 2006).

## A. Credibility

Most broadly, Mr. Klayman takes issue with the decision of the Hearing Committee and the Board to largely credit E.S.'s testimony rather than that of Mr. Klayman. We are required, however, to "place great weight on credibility determinations made by the Board and the Hearing Committee because of the Hearing Committee's unique opportunity to observe the witnesses and assess their demeanor." *In re Pearson*, 228 A.3d at 423 (internal quotation marks omitted). We see no adequate basis upon which to overturn the credibility determinations made by the Hearing Committee and the Board.

It is true that E.S.'s testimony on various issues was impeached or contradicted by other evidence. For example, although E.S. testified that she wanted to limit the publicity surrounding her case, there was evidence that she ultimately

agreed to publicity and even in one instance publicly distributed information about the case. E.S. also testified that she was opposed to the suit against the BBG, which is arguably inconsistent with her later decision to personally file a notice of appeal after the case was dismissed. It is also true, however, that Mr. Klayman's testimony was impeached and contradicted on critical points. For example, Mr. Klayman testified that he had no romantic intentions toward E.S., but the record contains numerous emails from him where he declared that he was in love with E.S., going so far as to state that she was "the only woman [he had] ever really loved." Similarly, Mr. Klayman testified that he was representing E.S. pro bono and did not have a fee arrangement with her. In an email to E.S., however, Mr. Klayman said that "50 percent of any recovery is fair and that is what I require."

We conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman.

## B. Specific Rule Violations

Many of Mr. Klayman's challenges to the findings of specific rule violations rest on Mr. Klayman's version of the facts. As we have explained, however, we must accept the factual findings of the Hearing Committee and the Board if those

findings are "supported by substantial evidence in the record as a whole."  *In re Godette*, 919 A.2d 1157, 1163 (D.C. 2007).  That is true even if "there might also be substantial evidence to support a contrary finding."  *Id.* (internal quotation marks omitted).   Having reviewed the record, we conclude that substantial evidence supports the Board's conclusion that Mr. Klayman violated the rules at issue.

## 1.  Conflict of Interest

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.7(b)(4) by representing E.S. when his professional judgment was adversely affected by his personal interest in E.S.  The record amply supports that conclusion.

Whether or not his feelings for E.S. were sexual or romantic in nature, Mr. Klayman indisputably had strong feelings for E.S.  For example, he wrote that he had "fall[en] in love with [E.S.]," would always love her, and was "feeling real pain" because she did not share his feelings.  Additionally, Mr. Klayman sent emails acknowledging that his feelings for E.S. interfered with his ability to represent her. For example, he wrote that his own "emotions [had] rendered [him] non-functional even as a lawyer."  The record thus supports the Hearing Committee's conclusion,

echoed by the Board, that Mr. Klayman had strong feelings for E.S. and that those feelings created a conflict of interest in violation of Rule 1.7(b)(4).

As Mr. Klayman suggests, some potential conflicts of interest can be waived if the client provides informed consent.  D.C. R. Prof. Cond. 1.7(c)(1).  Even if the client consents, however, the lawyer must "reasonably believe[] that the lawyer will be able to provide competent and diligent representation" to the client.  D.C. R. Prof. Cond. 1.7(c)(2).  In light of his own statements, Mr. Klayman could not have reasonably believed that his professional judgment was unimpaired and that he could provide competent and diligent representation.  Moreover, the record supports the conclusion that Mr. Klayman's feelings for E.S. did adversely affect his representation of E.S.  For example, E.S. testified that she terminated Mr. Klayman's representation in part because he was not able to act professionally towards her and his contacts with her had become abusive.  We therefore agree with the Board that Mr. Klayman's representation of E.S. while he had strong personal feelings towards her violated the rule.

## 2.  Failure to Abide by Client's Wishes

D.C. R. Prof. Cond. Rule 1.2(a) requires a lawyer to "abide by a client's decisions concerning the objectives of representation" and to "consult with the client as to the means by which they are to be pursued."  The Board concluded that Mr. Klayman violated this rule in two ways: by seeking publicity contrary to E.S.'s wishes and by refusing to dismiss the BBG lawsuit as E.S. directed.  We agree with the Board's conclusion on the latter point and therefore see no need to address the first.

Mr. Klayman argues that by not dismissing the entirety of the suit against BBG he was abiding by E.S.'s stated wishes.  That argument is contradicted, however, by the plain language of E.S.'s July 2010 email, which directed Mr. Klayman to "withdraw all the pending lawsuits that are on my behalf and/or in my name."  Mr. Klayman also argues that he did not believe the letters instructing him to dismiss the BBG case and cease representation of E.S. reflected E.S.'s true wishes, pointing to the fact that E.S. ultimately appealed the trial court's decision in the BBG case.  E.S.'s later appeal is not necessarily inconsistent with her desiring to dismiss the case at the time she instructed Mr. Klayman to do so.  Moreover, the Hearing

Committee reasonably did not credit Mr. Klayman's claim that he did not believe that the direction to dismiss the case was from E.S.

### 3.  Revealing and Using Client Secrets

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.6(a)(1) (revealing client confidence or secret) and (a)(3) (using client confidence or secret for advantage of lawyer).  Specifically, the Board concluded that Mr. Klayman's publicity campaign resulted in the public disclosure of confidential information about E.S. and that Mr. Klayman had not obtained informed consent from E.S.  The Hearing Committee concluded that those disclosures were for Mr. Klayman's own advantage because the publicity lauded Mr. Klayman's own actions in handling E.S.'s cases, raising Mr. Klayman's professional profile.

Mr. Klayman argues that E.S. eventually consented to the publicity about her cases and her personal life.  *See* D.C. R. Prof. Cond. 1.6(e)(1) (permitting disclosure of client confidence or secret with client's informed consent).  Even assuming that is true, the Hearing Committee and the Board both concluded that E.S. did not give informed consent, but rather acquiesced in Mr. Klayman's views on the topic

without having the benefit of adequate advice from Mr. Klayman.  We conclude that the record supports those conclusions.  *See generally* D.C. R. Prof. Cond. R. 1.0(e) ("'Informed Consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.").  We also note that several of the articles that Mr. Klayman wrote were published after July 2010, when E.S. terminated Mr. Klayman's representation.  We agree with the Hearing Committee that Mr. Klayman did not have E.S.'s informed consent to such publication, because E.S. had by that point terminated Mr. Klayman's representation of her.

Mr. Klayman notes that he attempted to provide the Board with a video that he contends showed that E.S. was trying to publicize her claims.  The Board refused to consider that video, because the motion bringing the video to the Board's attention was received after the Board's recommendation was pending in this court.  Although Mr. Klayman argues in passing that the Board's ruling on this issue was incorrect, he does not address the Board's reasoning or provide a specific argument as to why the Board's ruling was incorrect under applicable principles of law.  Because this issue has not been adequately presented for our review, we decline to address it.  *See PHCDC1, LLC v. Evans & Joyce Willoughby Trust*, 257 A.3d 1039, 1043 (D.C.

2021) ("[Appellant], however, has not briefed that issue with adequate specificity, having failed to identify specific disputes of fact or issues of law that support reversal of the trial court's ruling.").

### 4.  Explaining Matters to Client

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.4(b), which requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  As previously noted, the Board reasoned that Mr. Klayman's barrage of communications with E.S. about his feelings for her were not "the kind of communication . . . that a client ought to receive from her lawyer" and "drowned out" any legitimate communications about E.S.'s case.

Mr. Klayman challenges the Board's reasoning, but we need not resolve that issue.  The Hearing Committee based its conclusion of a Rule 1.4(b) violation on specific instances in which the Hearing Committee found that Mr. Klayman did not consult with E.S. before taking important steps in the litigation, including filing the motion to disqualify the district-court judge.  The record supports that conclusion.

### 5.  Absence of Written Fee Agreement

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.5(c) (requiring written fee agreement in contingent-fee case).  Specifically, the Board credited E.S.'s testimony that there was a contingent fee agreement between Mr. Klayman and E.S.

Mr. Klayman disputes the existence of a contingent fee agreement, relying on his own testimony.  The Board, however, reasonably credited E.S.'s testimony over Mr. Klayman's on this point, particularly given the email that Mr. Klayman sent demanding a contingent fee.

The Board noted that Mr. Klayman did not appear to contest the Hearing Committee's determination that Mr. Klayman violated D.C. R. Prof. Cond. 1.5(b), by failing to obtain a written agreement memorializing the terms of the representation.  The Board, however, did not explicitly state its own conclusion on that issue.  Although Mr. Klayman does not appear to specifically dispute in this court that he violated R. 1.5(b), we see no need to address that issue given the other violations that we uphold.

### 6. Failure to Cease Representation

Finally, the Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.16(a)(3) (lawyer shall withdraw when discharged).   Mr. Klayman himself acknowledges that he continued to take action in E.S.'s case even after she discharged him as her lawyer.   Mr. Klayman argues that he did not receive some of the communications in which E.S. terminated his representation, but he concededly received at least one.   Mr. Klayman also argues that he did not believe that E.S. actually wanted him to stop representing her, and instead believed that the communication at issue was actually sent by someone else.   The Hearing Committee reasonably declined to credit this argument, finding that Mr. Klayman was aware of his termination by August 5, 2010, at the latest.

In sum, we accept the Board's conclusions that Mr. Klayman violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3).

### VII. Sanction

Mr. Klayman challenges the Board's recommended sanction of an eighteen-month suspension with a fitness requirement.   When determining the appropriate

sanction, we "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted."   D.C. Bar R. XI, § 9(h)(1) (internal quotation marks omitted).    "The Board's recommended sanction comes to us with a strong presumption in favor of its imposition."  *In re McClure*, 144 A.3d 570, 572 (D.C. 2016) (per curiam) (internal quotation marks omitted).  "To require proof of fitness as a condition of reinstatement after suspension, the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law."  *In re Peters*, 149 A.3 253, 260 (D.C. 2016) (per curiam) (internal quotation marks omitted).

Mr. Klayman challenges the proposed sanction in two ways.  First, he argues that the record does not support the proposed sanction because the record does not support the findings of misconduct.  For the reasons we have already given, we conclude to the contrary.

Second, Mr. Klayman argues that the imposition of a fitness requirement would be at odds with our decision in *In re Klayman*, 228 A.3d 713 (D.C. 2020) (per curiam).  In that case, this court concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.9, which generally prohibits conflicts of interest involving former clients.

29

*In re Klayman*, 228 A.3d at 715-19.   Specifically, the court concluded that Mr. Klayman acted impermissibly, and vindictively, by representing parties in suits brought against an organization where Mr. Klayman had previously served as general counsel.  *Id.*  The court imposed a ninety-day suspension but accepted the Board's recommendation against imposition of a fitness requirement.  *Id.* at 719. The court explained that the disciplinary violations in that case, though serious, did not leave the court "with serious doubt or real skepticism that Mr. Klayman can practice ethically."  *Id.* (brackets and internal quotation marks omitted).  The court's holding in that case rested on the record and disciplinary violations in that case.  That conclusion sheds no significant light on the question of whether the record and disciplinary violations in this case warrant a fitness requirement.  We agree with the Board that Mr. Klayman's many serious disciplinary violations in this case warrant the imposition of a fitness requirement.

## VIII.  Failure to File § 14(g) Affidavit

Finally, Mr. Klayman argues that he had no duty to file an affidavit attesting to his compliance with the rules governing suspended attorneys.  D.C. Bar R. XI, § 14(g).  Specifically, Mr. Klayman contends that a § 14(g) affidavit is only required after a final disciplinary order.  We disagree.  As previously noted, D.C. Bar R. XI,

§ 9(g)(4) explicitly states that an attorney temporarily suspended pending final action by the court must comply with the requirements of § 14.


For the foregoing reasons, respondent Larry E. Klayman is hereby suspended from the practice of law in the District of Columbia for eighteen months, with reinstatement conditioned on demonstrating fitness to practice law.  We note that Mr. Klayman could not be reinstated until eighteen months after he "files an affidavit that fully complies with the requirements of D.C. Bar R. XI, § 14(g)."  *In re Moats*, 275 A.3d 890, 891 (D.C. 2022) (per curiam); D.C. Bar R. XI, § 16(c) ("[A] suspended attorney shall not be eligible for reinstatement until a period of time equal to the period of suspension shall have elapsed following the attorney's compliance with section 14 . . . .").


*So ordered.*